1

2            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF WISCONSIN

3           COURT FILE NO.: 19-cv-1555-JPS

4 _____

5 Kimya D. Green,

6              Plaintiff,

7    -vs-

8 Cenlar FSB,

9              Defendant.

10 _____

11       VIDEOCONFERENCE 30(B)(6) DEPOSITION OF

12              RAYMOND CRAWFORD

13              July 14, 2020

14              10:15 a.m.

15

16

17

18

19

20

21

22

23           CIVIL ACTION GROUP
           Ryan Ziegler, RPR
24            PO Box 1598
         Maple Grove, MN  55311
25          (763) 576-8832

EXHIBIT

1    The 30(b)(6) deposition of Raymond Crawford was taken

2    on July 14, 2020; via videoconference; commencing at

3    10:15 a.m. pursuant to Notice.

4

5                        - - - - -

6                        APPEARANCES

7    CONSUMER JUSTICE CENTER, PA
     Attorneys at Law
8    367 Commerce Court
     Vadnais Heights, MN  55127
9    (651) 770-9707
     Tommy@ConsumerJusticeCenter.com
10   By Thomas J. Lyons, Jr. (via videoconference)
     appearing on behalf of the Plaintiff.

11
     JOHNSON, BLUMBERG & ASSOCIATES, LLC
12   Attorneys at Law
     633 West Wisconsin Avenue
13   Suite 408
     Milwaukee, WI  53203
14   (312) 541-9710
     SCummings@JohnsonBlumberg.com
15   By Shannon K. Cummings (via videoconference)
     appearing on behalf of the Defendant.

16

17                      - - - - -

18

19                     I N D E X                            Page

20   RAYMOND CRAWFORD, DULY SWORN  . . . . . . . . . . . .    6

21   EXAMINATION BY MR. LYONS  . . . . . . . . . . . . . .    6

22   CORRECTION PAGE   . . . . . . . . . . . . . . . . . .  186

23   REPORTER'S CERTIFICATE  . . . . . . . . . . . . . . .  187

24                      - - - - -

25

E X H I B I T S

Page

Exhibit No. 1   . . . . . . . . . . . . . . . . . . .   20
6/24/2020 Plaintiff's Amended Notice of
Oral/Video/Webcast Deposition of Defendant's
Rule 30(b)(6) Representative(s)

Exhibit No. 2   . . . . . . . . . . . . . . . . . . .   22
1/9/2020 Answer and Affirmative Defenses of Defendant
Cenlar FSB

Exhibit No. 3   . . . . . . . . . . . . . . . . . . .   23
2/2020 Cenlar FSB's Response to Plaintiff's First Set of
Interrogatories and Request for Production of Documents

Exhibit No. 4   . . . . . . . . . . . . . . . . . . .   31
Consolidated Notes

Exhibit No. 5   . . . . . . . . . . . . . . . . . . .   128
Procedure: Third Party Operational Reporting Credit
Bureau Oversight, DEFENDANT 00064 - DEFENDANT 00077

Exhibit No. 6   . . . . . . . . . . . . . . . . . . .   123
Cenlar Third Party Reporting Departmental Procedure,
DEFENDANT 00051 - DEFENDANT 00063

Exhibit No. 7   . . . . . . . . . . . . . . . . . . .   138
11/7/2018 Letter from K. Green to Equifax, with
attachments, including DEFENDANT 00010 - DEFENDANT 00020

Exhibit No. 8   . . . . . . . . . . . . . . . . . . .   149
11/7/2018 Letter from K. Green to Experian, with
attachments, including DEFENDANT 00001 -
DEFENDANT 00009 and EXP-GREEN 000074 - EXP-GREEN 000092

Exhibit No. 9   . . . . . . . . . . . . . . . . . . .   153
11/7/2018 Letter from K. Green to TransUnion, with
attachments, including DEFENDANT 00021 -
DEFENDANT 00034 and TU-000049

Exhibit No. 10   . . . . . . . . . . . . . . . . . . .   158
1/21/2019 Letter from K. Green to Equifax, with
attachments

Exhibit No. 11   . . . . . . . . . . . . . . . . . . .   160
1/21/2019 Letter from K. Green to Experian, with
attachments, including EXP-GREEN 000093 -
EXP-GREEN 000135

```
 1   Exhibit No. 12  . . . . . . . . . . . . . . . . . .   168
     1/21/2019 Letter from K. Green to TransUnion, with
 2   attachments, including TU-000068 - TU-000105

 3   Exhibit No. 13  . . . . . . . . . . . . . . . . . .     6
     8/2/2016 Affidavit of Non-Identity, PLAINTIFF
 4   GREEN 00106 - PLAINTIFF GREEN 00107

 5   Exhibit No. 14  . . . . . . . . . . . . . . . . . .    33
     3/15/2017 Letter from Bayview to K. Green
 6
     Exhibit No. 15  . . . . . . . . . . . . . . . . . .    52
 7   6/23/2017 Letter from Bayview to K. Green

 8   Exhibit No. 16  . . . . . . . . . . . . . . . . . .    69
     11/9/2017 Letter from Bayview to K. Green
 9
     Exhibit No. 17  . . . . . . . . . . . . . . . . . .    76
10   12/5/2017 Letter from Bayview to K. Green

11   Exhibit No. 18  . . . . . . . . . . . . . . . . . .    86
     12/14/2017 Letter from Bayview to K. Green
12
     Exhibit No. 19  . . . . . . . . . . . . . . . . . .    93
13   4/15/2018 Letter from Cenlar to K. Green

14   Exhibit No. 20  . . . . . . . . . . . . . . . . . .    93
     4/23/2018 Letter from Cenlar to K. Green
15
     Exhibit No. 21  . . . . . . . . . . . . . . . . . .   103
16   7/16/2018 Letter from Cenlar to K. Green

17   Exhibit No. 22  . . . . . . . . . . . . . . . . . .    98
     1/16/2018 Letter from K. Green to Cenlar, with
18   attachments

19   Exhibit No. 23  . . . . . . . . . . . . . . . . . .    63
     ServiceLink Documentation
20
     Exhibit No. 24  . . . . . . . . . . . . . . . . . .   162
21   Credit Reporting History, DEFENDANT 00036 -
     DEFENDANT 00041
22
     Exhibit No. 25  . . . . . . . . . . . . . . . . . .    78
23   4/3/2020 Declaration of Doug Mandeville, with
     attachment, PLAINTIFF GREEN 00104 - PLAINTIFF
24   GREEN 00106

25                        - - - - -
```

1          M A R K E D   T E S T I M O N Y

                                                    Page

2     BY MR. LYONS  . . . . . . . . . . . . . . . .  71

3     BY MR. LYONS  . . . . . . . . . . . . . . . .  95

4     BY MR. LYONS  . . . . . . . . . . . . . . . .  124

5

6                          - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Exhibits 1-25 were marked for

2    identification.)

3                    - - - - -

4              Raymond Crawford,

5         having been duly sworn, was examined

6              and testified as follows:

7                    - - - - -

8                    EXAMINATION

9  BY MR. LYONS:

10  Q.   Good morning, Mr. Crawford.  My name is Tommy Lyons.

11       I am Kimya Green's -- one of Kimya Green's attorneys

12       in this matter, and I'm going to ask you a series of

13       questions this morning, and you understand that you're

14       under oath.  Correct?

15  A.   Yes.

16  Q.   Please state your full name for the record, spelling

17       your last.

18  A.   Raymond Crawford, C-R-A-W-F-O-R-D.

19  Q.   And what is your home address, sir?

20  A.   6317 Sunsail, S-U-N-S-A-I-L, Place, Apollo Beach,

21       Florida 33572.

22  Q.   And what is the year of your birth, sir?  The year of

23       your birth.

24  A.   1978.

25  Q.   Have you ever had your deposition taken before,

1      Mr. Crawford?

2   A.    Yes.

3   Q.    On how many previous occasions?

4   A.    50, 60 times.

5   Q.    And when was the last time?

6   A.    What is it?  July?  Last month.

7   Q.    Okay.  So you've had your deposition taken since COVID

8         has kind of disrupted all of our worlds.  Correct?

9   A.    Yes.

10  Q.    Okay.  And tell me the -- in the last deposition you

11        gave, was that concerning a Fair Debt Collection or

12        Fair Credit Reporting Act case?

13  A.    No.

14              MS. CUMMINGS:  Objection.  Relevance.

15  BY MR. LYONS, CONTINUING:

16  Q.    Tell me -- typically when you provide a deposition,

17        tell me the types of cases you're typically providing

18        deposition testimony in.

19  A.    I have provided cases in foreclosure, QWR, credit

20        reporting.  Different cases depending on the subject.

21  Q.    Have you ever been designated as an expert witness

22        before?

23  A.    No, sir.

24  Q.    Have you yourself ever been a plaintiff in a lawsuit

25        before?  Meaning have you personally ever sued anyone

1        else before?

2   A.   No, sir.

3   Q.   Has anyone ever sued you personally before?

4   A.   No, sir.

5   Q.   Have you ever filed bankruptcy?

6   A.   No, sir.

7   Q.   Have you ever been arrested?

8   A.   No, sir.

9   Q.   Did you serve in the military?

10  A.   No, sir.

11  Q.   Tell me where you went to high school.

12  A.   The name of my high school or where I went to high

13       school?

14  Q.   Tell me the name of where you went to high school.

15  A.   John Bartram High School.

16  Q.   And where is that located?

17  A.   Philadelphia.

18  Q.   In what year did you graduate from high school?

19  A.   Late '90s.

20  Q.   And did you go on to college after that?

21  A.   Yes, sir.

22  Q.   Where did you go to college?

23  A.   Penn State.

24  Q.   And what year did you graduate from Penn State?

25  A.   Sometime in the 2000s.  Early 2000s.

1  Q.  And what was your degree in from Penn State?

2  A.  Political science.

3  Q.  And did you go on to any postsecondary education after

4      Penn State?

5  A.  No, sir.

6  Q.  Have you ever been fired from a job?

7  A.  Yes, sir.

8  Q.  What job were you fired from?

9  A.  Red Lobster.

10  Q.  In what year was that?

11  A.  Sometime in college, but I was rehired.

12  Q.  Any other job that you were let go from?

13  A.  No, sir.

14  Q.  Okay.  Who is your current employer?

15  A.  Cenlar FSB.

16  Q.  And how long have you worked for Cenlar?

17  A.  Since September 1st, 2009.

18  Q.  And what was the first position you had with Cenlar?

19  A.  Foreclosure analyst.

20  Q.  Prior to working for Cenlar, where did you work

21      immediately before becoming a foreclosure analyst?

22  A.  I was with Popular Mortgage Servicing, Inc.

23  Q.  What was your job there?

24  A.  Loss mitigation specialist.

25  Q.  And how long were you with Popular?

1   A.   I was there from late 2006 until July 2009 when they

2        went out of business.

3   Q.   And prior to Popular, where were you employed?

4   A.   With -- I started with Homecomings Financial.

5   Q.   And what did you do for Homecomings?

6   A.   What was the title?  Customer service, collection, a

7        loan analyst.

8   Q.   And was Homecomings the first job you had after

9        graduating from Penn State?

10  A.   Yes, sir.

11  Q.   Now, let's talk for a minute about the Homecomings

12       job.  Did you have any interaction with credit

13       reporting when you were at Homecomings?

14  A.   I'm not sure what you mean, "any interaction."

15  Q.   Did you process or review any ACDV communications or

16       have -- work with the e-OSCAR platform?

17  A.   No, sir.

18  Q.   When you worked at Popular, same question.  Did you

19       have any interaction with ACDVs, AUDs, UDFs, or the

20       e-OSCAR platform?

21  A.   No, sir.

22  Q.   In either of those jobs, Homecomings or Popular

23       Mortgage, did you have any training in the Fair Credit

24       Reporting Act?

25  A.   At which job?

Raymond Crawford                                    11

1   Q.   Either one, I'm asking.  Homecomings or Popular.

2   A.   Oh, I don't recall.

3   Q.   As a foreclosure analyst when you started with Cenlar

4        in September of 2009, tell me about your job

5        responsibilities.

6   A.   I managed a foreclosure report -- a foreclosure

7        portfolio from the time it was referred to foreclosure

8        up till it went to sale.  I worked with the law firm,

9        clients, and investors.

10  Q.   And how long were you a foreclosure analyst?  From

11       September of '09 until when, roughly?

12  A.   Roughly about late 2012 or early 2013.

13  Q.   And then what was the next job you had at Cenlar?

14  A.   Corporate representative.

15  Q.   And tell me the job responsibilities for a corporate

16       representative.

17  A.   I review loan documents and business records for

18       trials, depositions, mediations, and settlement

19       conferences.

20  Q.   And so when you testified earlier that you've given

21       between 50 and 60 depositions during your tenure at

22       Cenlar, when you switched to being a corporate

23       representative, is that when those depositions and

24       trial appearances and trial preparations started?

25  A.   Yes, sir.  I started traveling in March of 2010.

1   Q.   And are you still a corporate representative?  Is that

2       your current title, or have you changed titles since

3       2012 or 2013?

4   A.   Current title.

5   Q.   Have your job responsibilities changed from 2012 or

6       '13 to today?

7   A.   No.

8   Q.   Now, in your capacity as a corporate representative,

9       have you received training in the Fair Credit

10      Reporting Act?

11   A.   Yes.

12   Q.   Tell me about your training with regard to the FCRA.

13   A.   We have banking compliance codes, and we have credit

14      reporting training that is completed to follow the

15      policy and procedures of the credit reporting and how

16      it is done.

17   Q.   So the first thing you mentioned is something about

18      compliance codes.  Tell me about that.

19   A.   It's the F- -- it's the FCRA compliance codes.

20   Q.   And is it knowing what those codes are, or is there,

21      like, a code of conduct?  That's what I don't -- I

22      guess I'm not understanding.

23   A.   It is knowing the information; when it came about, if

24      there's information; and completing the test at the

25      end.

1   Q.   And was that done through the e-OSCAR platform, or is

2        that something that Cenlar -- is that a Cenlar test?

3   A.   That's a banking test.  I guess a Cenlar test.

4   Q.   And then you said something about training with

5        regards to policies and procedures, and, again, is

6        that a Cenlar test?  Or is that Cenlar training

7        materials?

8   A.   Yes.  That was training with the credit reporting

9        department.

10  Q.   And is that a one-time training module, or is that

11       something you do annually or every so often, or tell

12       me about that.

13  A.   Which one?

14  Q.   The training with regard to the policies and

15       procedures.

16  A.   That's once in a while, whenever there's time in the

17       schedule or so.

18  Q.   If I use the term "ACDV," do you know what that is?

19  A.   Yes, sir.

20  Q.   Okay.  Tell me what your understanding of an ACDV is.

21  A.   It's a report of a dispute being sent to the credit --

22       to the credit bureaus, and the credit bureaus send the

23       dispute to Cenlar or the bank or mortgage servicer to

24       review to check on the dispute and respond back.

25  Q.   And have you ever worked in the department that does

1        the investigation with regard to the ACDVs?

2   A.   No, sir.

3   Q.   Okay.  But you have given testimony in previous cases

4        and in depositions regarding ACDVs.   Correct?

5   A.   Yes, sir.

6   Q.   Do you know what Metro 2 codes are?

7   A.   I've seen them before.  It's not something I do every

8        day, but I've seen them before.

9   Q.   And do you know where you've seen them?  Has that been

10       in training or in the compliance information that

11       you've received?

12  A.   Training and the ACDV.

13  Q.   Who is your direct supervisor?

14  A.   My manager is Mat Davila.

15  Q.   And do you know what his -- Mr. Davila's title is?

16  A.   He's a litigation manager.

17  Q.   And, Mr. Crawford, what is your current compensation

18       package for Cenlar?  Is that -- are you hourly or

19       salary, or how does that work?

20  A.   Salary.

21  Q.   And what's your salary per year?

22  A.   Not disclosing that.

23              MS. CUMMINGS:   Objection.   Relevance.

24  BY MR. LYONS, CONTINUING:

25  Q.   You can answer.

1   A.   I'm not disclosing my salary, sir.

2   Q.   You're refusing to answer the question?

3   A.   Yeah.  I'm not giving my salary.

4   Q.   Are there bonuses related to your terms of employment?

5            MS. CUMMINGS:  Objection.  Relevance.

6   BY MR. LYONS, CONTINUING:

7   Q.   You can answer.

8   A.   I do not receive a personal bonus.  There's bonuses

9        based on if -- based on -- there's company bonuses.

10  Q.   Okay.  And you can receive those company bonuses?

11  A.   If the company does well during the year, they give

12       out bonuses.

13  Q.   But the bonuses aren't attached to your work

14       performance.  Is that correct?

15  A.   I mean, it's partially attached to my work

16       performance.  If I don't do my job properly, then

17       there could be a reason why I may not receive a bonus,

18       but it's not based on my testimony of what information

19       I provide.

20  Q.   Have you read the complaint that my client, Kimya

21       Green, filed in this action?

22  A.   Yes.  I've read it.  Yes, sir.

23  Q.   Okay.  When's the last time you looked at it?

24  A.   This morning.

25  Q.   And I understand you're not an attorney, but in your

1      own words, can you tell me what you believe that

2      Ms. Green is complaining about?

3   A.  Company-level credit reporting.

4   Q.  Okay.  Cenlar's credit reporting?

5   A.  Her credit reporting.

6   Q.  Cenlar's credit reporting of her loan.

7   A.  Yes.

8   Q.  Okay.  In preparation for your deposition today, other

9      than reading the complaint this morning, have you

10     reviewed any other document?

11  A.  Yes.

12  Q.  What did you review?

13  A.  The doc- -- different documents that was produced for

14     production.

15  Q.  Produced by Cenlar in this litigation?

16  A.  Yes, sir.

17  Q.  Any other documents than the ones that have been

18     produced in the litigation?

19  A.  Reviewed those documents and the servicing records of

20     the loan.

21  Q.  Did you look into any audio recordings?

22  A.  No, sir.

23  Q.  In preparation for your deposition, did you speak with

24     anyone other than or outside of your lawyers'

25     presence?

1   A.   No, sir.

2   Q.   Okay.  So did you speak with anyone in preparation for

3        the deposition?

4   A.   Outside of my lawyers?

5   Q.   Outside of your lawyers.

6   A.   No, sir.

7   Q.   Okay.  You didn't speak to the ACDV operators,

8        Ms. Barker or Ms. Cooper.  Is that correct?

9   A.   That is correct.

10  Q.   Have you ever spoken with them before on any case?

11  A.   No, sir.

12  Q.   Are you aware of any quotas that exist at Cenlar that

13       the ACDV operators need to meet in completing or

14       investigating ACDVs per day?

15  A.   Quota?

16  Q.   A quota.  When I use that word, do you know what that

17       means?

18  A.   Yeah, but I'm not sure what you mean by a quota or --

19  Q.   Is there a certain number of ACDVs that need to be

20       processed either a day, a week, a month by those ACDV

21       operators like Barker and Cooper?

22  A.   I believe so.  Yes, sir.

23  Q.   Okay.  Tell me what you know about those quotas.

24  A.   I believe not just ACDV, but they need to review about

25       30 loans a day.

1    Q.   And when you say review loans, are you talking about

2         the credit disputes that come in through the e-OSCAR

3         platform?

4    A.   Different loans, different status, different dispute.

5         Whatever comes in, whatever 30 loans is assigned to

6         them.  It could be for different scenarios.

7    Q.   Okay.  So let's stay on that for a second.  Is the --

8         so it's my understanding that Barker and Cooper work

9         in the credit department.  Is that correct?

10   A.   Credit reporting.  Yes.

11   Q.   And so that's what I want you to -- that's what I want

12        you to focus on in terms of my question in terms of

13        quotas.  Is there a requirement that the credit

14        reporting department representatives work on 30 loans

15        per day?

16   A.   Make a review of about 30 loans, yes.  Yes.  Based on

17        the type of loan, yes.

18   Q.   And does the credit reporting department handle both

19        disputes received from the credit reporting agencies

20        as well as direct disputes that come directly from the

21        customers?

22   A.   Yes.  Direct and indirect dispute.  Yes.

23   Q.   If the credit reporting department needs to make a

24        change regarding a direct dispute from a customer,

25        they use what's called an AUD.  Is that correct?

1   A.   Yes, sir.

2   Q.   Okay.  And an indirect dispute, they would be

3        responding to what's called an ACDV.  Correct?

4   A.   Yes, sir.

5   Q.   Okay.  When the credit reporting agents like Barker

6        and Cooper respond to ACDVs, what systems do they have

7        available to them to review to perform their

8        investigations?

9   A.   Black Knight Servicing Platform.

10  Q.   Anything else?

11  A.   No, sir.

12  Q.   Okay.  So within the Black Knight Servicing Platform,

13       tell me what information they have available to them.

14  A.   You have every loan information available.

15  Q.   And does Black Knight also serve as a warehouse for

16       the account notes?

17  A.   I'm not sure what you mean, "a warehouse."

18  Q.   Through Black Knight, you can access the Cenlar

19       account notes for the loans.  Correct?

20  A.   Yes.

21  Q.   Okay.  And you can also access e-OSCAR to communicate

22       with the credit reporting agencies through the ACDVs.

23       Correct?

24  A.   Right.

25  Q.   And is that all done through Black Knight, or are

1      those separate systems?

2   A.    I mean, the report is sent from Black Knight to

3         e-OSCAR.

4   Q.    Okay.  But Cooper and Barker don't work for Black

5         Knight.  They work for Cenlar.  Correct?

6   A.    That is correct.

7   Q.    Who is the department head of credit reporting?

8   A.    I don't understand the question.

9   Q.    Who's the head of the credit reporting department?

10  A.    Oh, I don't know the manager's name offhand.

11  Q.    And do you know how many operators or agents like

12        Barker and Cooper there are in the credit reporting

13        department?

14  A.    No, sir.

15  Q.    Okay.  Let's show the witness Deposition Exhibit

16        Number 1.

17              (Exhibit 1 was introduced at this time.)

18  BY MR. LYONS, CONTINUING:

19  Q.    Mr. Crawford, I'm showing you what's been marked as

20        Deposition Exhibit Number 1.  Have you seen this

21        document before?  And the court reporter will scroll

22        slowly through the pages.

23  A.    Yes, sir.

24  Q.    Okay.  And when did you first see this document?

25  A.    Is this the first -- is this the amended one or the

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 20 of 187   Document 30-2

```
 1        first time the deposition was set up?

 2   Q.   Okay.  And this is -- this is the amended, so this is

 3        the second notice.  Right?

 4   A.   I don't remember seeing a date on there, but, I guess,

 5        depending on what date is on this determines which one

 6        is the first or the second.

 7   Q.   Okay.  Well, I'm going to represent to you this is the

 8        second notice.  If we could -- if you could look at

 9        Number 4 on Exhibit 1, on the first page, it says --

10        one of the topics I want to talk with you about today

11        is, "The critique, if any, of each ACDV operator's

12        'investigation' into the plaintiff's" -- and that's my

13        client's, Kimya Green's -- "disputes."  Do you see

14        that.

15   A.   Yes, sir.

16   Q.   Do you know if there were any critiques by Cenlar or

17        Cenlar management or Cenlar litigation management team

18        into the investigations that were performed related to

19        the plaintiff's disputes?

20   A.   I'm not sure what you mean by any crit- -- Cenlar's

21        critique.

22   Q.   Was there any review or auditing of those

23        investigations performed by Cooper and Barker?

24   A.   Not an investigation.  Not that I know of, sir.

25   Q.   Okay.  Thank you.
```

1       And we talked -- if you look at Number 5, it

2   says, "Criteria or quotas."  That's -- we talked about

3   that a minute ago.  You thought that those processors

4   needed to look into approximately 30 loans per day.

5   Is that what you said?

6   A.    Yes, sir.

7   Q.    If I could show you what has been marked as Deposition

8   Exhibit Number 2, let's put that up on the screen for

9   you.

10              COURT REPORTER:  And first I will upload it

11   for Ms. Cummings.

12              MR. LYONS:  Thank you.

13              (Exhibit 2 was introduced at this time.)

14   BY MR. LYONS, CONTINUING:

15   Q.    Mr. Crawford, this is Cenlar's answer and affirmative

16   defenses.  It's an eight-page document.  Have you seen

17   this document before?

18   A.    Yes, sir.

19   Q.    Okay.  If we could turn to page 7 of 8, at the bottom

20   of the page, in the wherefore clause, at paragraph 2,

21   it says, "That defendant be awarded its costs,

22   disbursements, and attorney's fees and expenses

23   incurred herein."  Do you see that?

24   A.    Yes, sir.

25   Q.    What is the amount of the attorney's fees and costs

1    that Cenlar has incurred to date in defending this

2    case that Ms. Green has brought?

3              MS. CUMMINGS:  Objection.  Relevance.

4  BY MR. LYONS, CONTINUING:

5  Q.   You can answer.

6  A.   I do not know the amount offhand, sir.

7  Q.   Okay.  And is that information that you would be privy

8    to as part of your job as the corporate

9    representative?

10 A.   That's information, if I need, I can request the

11   invoices that has been paid on the account.

12 Q.   And have there been occasions when you've had to do

13   that?

14 A.   For invoices?

15 Q.   Yeah.  Are there -- are there occasions in your job

16   when you have requested the invoices for the

17   attorney's fees and costs that Cenlar's been paying?

18 A.   Not that -- if the invoices is part of the exhibits,

19   then yes.

20 Q.   Did you review this answer before it was filed on

21   January 9th, 2020?

22 A.   No, sir.

23 Q.   All right.  Now I'd like to show you Deposition

24   Exhibit Number 3.

25              (Exhibit 3 was introduced at this time.)

1   BY MR. LYONS, CONTINUING:

2   Q.   Mr. Crawford, I'm showing you Exhibit 3, which are

3        Cenlar's responses to the first set of interrogatories

4        and requests for production of documents.  Have you

5        seen this document before?

6   A.   Yes, sir.

7   Q.   Okay.  And if we scroll to the second-to-the-last

8        page, they were certified and verified by Erin

9        Sullivan.  Do you see that?

10  A.   Yes.

11  Q.   Now, it looks like she only verified certain

12       interrogatories.  Do you know who Erin Sullivan is?

13  A.   I do not know her personally, but I've seen her name

14       before.

15  Q.   Okay.  And it says the position -- her position is

16       manager.  Do you know what she's manager of?

17  A.   Not off the top of my head.

18  Q.   Okay.  And then if we go one more page before that,

19       you will see that other interrogatories were verified

20       by someone named Diane Constantine.  Do you see that?

21  A.   Yes, sir.

22  Q.   And do you know Diane Constantine?

23  A.   Yes, I do.

24  Q.   And who is -- who is she?

25  A.   I do not -- I do not know off the top of my head her

1    current position, but she was my former manager.

2  Q.  And you don't know what her current position is now?

3  A.  No, sir.  I don't know her current position now.

4  Q.  But she's still with the company.  Right?

5  A.  Yes, sir.

6  Q.  Okay.  All right.  Then if we could scroll up to

7      Interrogatory Number 4, okay.  Yep.  Interrogatory

8      Number 4.

9          And if you look at the answer or the response to

10     Interrogatory Number 4, after the objections, it says,

11     "Plaintiff made trial payments from March 31st, 2017,

12     till May 12th, 2018."  Do you see that?

13 A.  Yes, sir.

14 Q.  Is that unusual?  That a customer of Cenlar would make

15     trial payments for -- well, it almost amounts to 15

16     months?

17 A.  I'm not understanding the question, "Is that unusual?"

18 Q.  Is that -- is that how trial payments in those

19     programs work?  That you would make a trial payment

20     for 15 months?

21 A.  Each loan and each trial payment is different, but a

22     trial payment is usually three months.

23 Q.  Okay.  And that was kind of my question.  Right?

24     Typically you make a trial payment for three months.

25     Correct?

1    A.    Yes, sir.

2    Q.    Okay.  And what circumstances allow for trial payments

3          beyond three months?

4    A.    If there is something that is preventing a loan from

5          becoming -- the loan modification from becoming

6          permanent.

7    Q.    And is there a term that is used regarding the loan

8          modification called "conversion"?

9    A.    I'm not sure -- con- -- what about conversion?

10   Q.    Let me explain it, and then I'll show you an example

11         in a minute, but at some point in time, it goes from

12         the trial payments to a modification.  Right?  There's

13         a conversion from the trial payments to the conversion

14         to the new loan modification amount.  Is that correct?

15   A.    Well, it goes from a trial payment to a permanent loan

16         modification.

17   Q.    Thank you.

18               And does the -- does Cenlar have the ability to

19         extend the trial payment period from 3 to 15 months?

20   A.    The trial payment period is not being extended.

21         Payments are being received while there's different

22         stuff being worked on to make the loan permanent.

23   Q.    Okay.  But is there -- does the customer have to

24         continue to sign a new trial payment plan if it's

25         going to go beyond the three months?

1   A.   It is not a new trial plan.  It is the same plan, and

2        the homeowner is continuing to make that payment,

3        again, until the loan becomes permanent.

4   Q.   Okay.  And so am I correct in reading Interrogatory

5        Response Number 4 that the trial payments for Ms. --

6        for Ms. Green were from March 31st, 2017, until

7        May 12th, 2018?

8   A.   That's not what the document says, sir.  The trial

9        plan that was sent to her was for three months.

10  Q.   Okay.  So at the end of three months, was she supposed

11       to continue making the trial payments?

12  A.   At the end of three months, the loan needs to be

13       reviewed to turn it into a permanent modification.

14  Q.   And if there are things that are still holding up that

15       modification, is the customer to continue to pay the

16       trial payments?

17  A.   That is the customer's position.  A payment is still

18       due, so if they continue to make the payment, it

19       benefits them, but if there's something being worked

20       on in the back, it will prevent that permanent mod

21       from taking place.

22  Q.   Right.  Okay.  I think I understand.  So -- but the

23       way I read this answer is that the plaintiff continued

24       to make the trial payments from March 31st, 2017,

25       until May 12th, 2018.  That's -- is that what she was

1    supposed to do?

2  A.   That's -- that -- the statement there, that's what she

3       did.

4  Q.   Okay.  So the Cenlar records show that, from

5       March 31st, 2017, until May 12th, 2018, she made the

6       trial payments.  Right?

7  A.   Right.  There were payments of that amount.  Yes.

8  Q.   Okay.  And are -- as you sit here today, do you know

9       whether or not that was compliant with the trial

10      payment letter that she signed?

11 A.   Again, the trial payment letter was for three months,

12      the first three months.

13 Q.   So how does -- so what is she supposed to do on Month

14      Number 4?

15 A.   On Month Number 4, that's when it's supposed to be

16      reviewed for a loan modification.  If the loan

17      modification is not in place, the loan has not been

18      brought current, and she should continue making her

19      trial plan while they work on the problem, on the

20      judgment problem, to have that resolved.

21 Q.   Okay.

22 A.   And after a certain time, if there's no resolution,

23      then they will stop accepting payments and deny the

24      trial plan.

25 Q.   Okay.  But while she is in the trial plan, she should

1   continue to make the trial payments.

2  A.   I'm sorry.  The last question kind of broke in and

3       out.

4  Q.   My apologies.

5           During the trial plan, Cenlar is expecting the

6       plaintiff in this case, Ms. Green, to make the trial

7       payments.  Correct?

8  A.   Right.  For the first three months, right.

9  Q.   Okay.  Okay.  And then now let's go back to what

10      happens on Month Number 4?  If the loan is being

11      reviewed and they're still trying to work it out,

12      should she make the trial payments, or should she go

13      back to the old payments?  The regular payment?

14 A.   She, in that scenario, continues to make a payment,

15      because the payment is still due, whether on a trial

16      plan or not.  So you continue to make your payment

17      while the work is being done in the back.

18 Q.   And --

19 A.   So rather than -- rather than canceling the loan

20      modification, Cenlar, as the creditor, was continuing

21      accepting the payments while we worked to resolve the

22      issue.

23 Q.   Okay.  And so -- but then I guess that's what I'm

24      trying to find out.  In Month Number 4, while Cenlar's

25      trying to work out the loan modification, should

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 29 of 187   Document 30-2

1      the -- should the plaintiff make the trial payment or

2      the old, regular payment?

3  A.  I mean, at that point, there's no -- there's no plan

4      in place.  The trial plan was for three months.  Now

5      you've gone beyond the three months, so --

6  Q.  And are you aware of any communication after the

7      three-month trial period that instructed the plaintiff

8      in this case to go back to making her regular payment?

9  A.  I'm not aware of any communication with that, sir.

10 Q.  Okay.  So you can't point to a document or a

11     communication, whether written or verbal, where

12     someone from Cenlar told Ms. Green to make her regular

13     monthly payment starting in Month Number 4 after the

14     three trial payments.

15 A.  I will need to look at a document, if you have a copy

16     of the collection notes, to go and see during that

17     time what was discussed.  I don't remember everything

18     offhand at that time.

19 Q.  But is it within the discretion of the Cenlar agents

20     to instruct the plaintiff to continue to make the

21     trial payments during the loan modification review?

22 A.  Their instructions would instruct the homeowner to

23     continue making their payment, because, again, the

24     payment is still due while you work on the permanent

25     loan modification.

1   Q.   Right.  And do they have the authority or discretion

2        to tell the customer like Ms. Green to continue making

3        the trial payment past the three months?

4   A.   We cannot stop anyone from making a payment.  So if

5        the homeowner continues to make their payment, it only

6        benefits them in the long run, because, again, the

7        payment is still due.

8             If it comes to the point where Cenlar receives a

9        payment, reviews their account, and based on a

10       delinquent status they can no longer accept the

11       payment, then the payment is sent back.  But we at no

12       point tell a homeowner not to make their monthly

13       payment.

14  Q.   Let me show you what has been marked as Deposition

15       Exhibit Number 4.

16                 (Exhibit 4 was introduced at this time.)

17            MR. LYONS:  Okay.  Up on the screen is

18       Exhibit 4, and unfortunately, these are not

19       Bates-labeled, so let's do this.  On the left-hand

20       side, Madam Court Reporter, you will see dates in the

21       second row past the three-alpha code.  So, for

22       example, on this first page that we're looking at, you

23       see COL at the top of the page, and then next to that

24       is an 11/09/18 date.

25                 And so what I'm going to ask you to do is

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 31 of 187   Document 30-2

1      scroll to the back of the exhibit, starting on a page

2      that has at the top of it the letter code LMT and then

3      3/15/17.  I'll try to tell you when you get there.

4      Yep.  You're getting pretty close.  Yep.  That's it

5      right there.

6   BY MR. LYONS, CONTINUING:

7   Q.   So, Mr. Crawford, Exhibit Number 4, how do you refer

8        to these screenshots?  Is this -- are these the

9        collection notes, or what are these?

10  A.   Yes, sir.  Collection notes.

11  Q.   Okay.  Thank you.

12  A.   Consolidated notes.

13  Q.   Consolidated notes.  And is that -- when you mean

14       "consolidated," is that pulling from collection, loss

15       mitigation, customer service?  Those are all

16       consolidated.  Correct?

17  A.   It's pulling from different doc- -- different

18       departments.  If you go on the top of the document, it

19       has a list of the departments, and if there's a Y next

20       to it, the notes are included.  If there's an N, the

21       notes are not included.

22  Q.   Thank you.

23            Okay.  So let's start on this page with these

24       notes, and I'm going to ask you for your

25       interpretation of some of these notes and try to

1    figure out what they say.  So in the middle of the

2    page, there's a note that says, "LMT, 3/15/17," with a

3    hashtag and then a BV, and it says, "Package complete.

4    Sent to underwriting or negotiator."  Do you see that

5    note?

6  A.    Yes, sir.

7  Q.    All right.  And tell me what you understand that note

8        to mean.

9  A.    Meaning you had a full financial package and you sent

10       it to the underwriter or the negotiator, depending on

11       what is being reviewed.

12 Q.    And is this related to the HAMP modification program

13       that the plaintiff entered into in March of 2017?

14 A.    Not the review process.

15 Q.    Okay.  So let's take a look at -- let's set this

16       document aside.  We'll come back to it, but now I want

17       Exhibit 14 to be put up on the screen.

18               (Exhibit 14 was introduced at this time.)

19 BY MR. LYONS, CONTINUING:

20 Q.    Okay.  So, Mr. Crawford, I'm showing you what's been

21       marked as Deposition Exhibit Number 14.  It's a

22       March 15th, 2017, letter from Bayview to the plaintiff

23       related to a HAMP modification program.  Do you see

24       that?

25 A.    Yes, sir.

1   Q.   Okay.  And then kind of like we talked about before,

2        if you go down the page, it says, "To accept this

3        offer, you must execute and return a signed agreement

4        before the first payment due date and make new monthly

5        payment of 1,157.31 for the next three months of the

6        trial period."  Do you see that?

7   A.   Yes, sir.

8   Q.   And it says the first payment is due on March -- or on

9        April 1st, May 1, and June 1 of 2017.  Do you see

10       that?

11  A.   Yes, sir.

12  Q.   Okay.  And then it's followed by, "Send these payments

13       instead of your normal monthly mortgage payment."  Do

14       you see that?

15  A.   Yes, sir.

16  Q.   Okay.  Now, who is Bayview Loan Servicing, LLC, that

17       we see referenced at the top?

18  A.   It's an entirely different entity, different business.

19  Q.   Right.  And what is their -- what is their connection

20       to the plaintiff's loan with Cenlar?

21  A.   During that time frame, they handled some loss

22       mitigation work for us.

23  Q.   Okay.  So Cenlar was the servicer of the loan.  Is

24       that correct?

25  A.   Cenlar's the subservicer.

1  Q.  Cenlar's the subservicer?

2  A.  Yes.  The subservicer of the loan.

3  Q.  Okay.  Who is the servicer of the loan?

4  A.  It'd be -- at that time, I believe it was Lakeview.

5  Q.  Okay.  So Lakeview's the servicer, Cenlar is the

6     subservicer, and then Bayview is -- what do we --

7     what's their title?  What do we call them?

8  A.  Bayview is handling some loss mitigation work.

9  Q.  For Cenlar?

10  A.  Yes.

11  Q.  Okay.  So they -- they're kind of the loss mit folks.

12     Right?

13  A.  They were handling some loss mitigation work for

14     Cenlar.  Again, Bayview is a separate company.

15  Q.  Right.  No.  I get that they're a separate company,

16     but they're working on behalf of Cenlar in

17     communicating with Ms. Green.  Correct?

18  A.  They're working on behalf of Cenlar of handling loss

19     mitigation work.

20  Q.  Okay.  And would this qualify -- this HAMP

21     modification program, does that qualify as loss

22     mitigation work?

23  A.  It's an FHA Home Affordable Mortgage Program.  Yes.

24  Q.  All right.  And on the fourth page of the exhibit,

25     Ms. Green executed it, it looks like, on March 20th,

1          2017.  Right?

2    A.    That's what's stated on the document.

3    Q.    Okay.  And you don't have any reason to dispute that?

4    A.    That's what's stated on the document, sir.

5    Q.    Okay.  And that's -- I'm just saying do you have any

6          information to dispute that Ms. Green didn't sign the

7          document on May 30th, 2017 [sic]?

8    A.    I don't know Ms. Green.  I don't know when she signed

9          or did not sign this document.  I can only go off

10         what's stated in the document.

11   Q.    Right.  But you don't have any other information in

12         your possession that would contradict or call into

13         question that that's not accurate.  Correct?

14   A.    I'm only going off what's on the document, sir.

15   Q.    Okay.  So --

16   A.    And that's the date on the document.

17   Q.    Yep.  Okay.  And if you go back to the front page of

18         Exhibit 14, there's a mark at the top of the page that

19         says, "Fulfillment, March 21st, 2017."  Do you know

20         what that means?

21   A.    That's when the document was received.

22   Q.    By whom?

23   A.    By Cenlar or Bayview.

24   Q.    Which one?

25   A.    It depends on where the document was sent, what

1       address in this document it was advised to send it to.

2   Q.  Okay.  So you're -- as you sit here, you're not sure

3       who received -- who stamped that document.

4   A.  No.  Not going off that.  I'm not sure who stamped it,

5       but, again, the address would be in the document

6       advising them where to send it to.

7   Q.  Okay.  All right.  So now let's go back to Exhibit 4,

8       and it looks like on that same page that we were just

9       on, on March 15th, 2017 -- yeah.  About maybe the

10      second note down -- or let's start with the first note

11      that is complete at the top.

12          So the hashtag "BV" is Bayview.  Is that correct?

13  A.  Yes, sir.

14  Q.  That's who entered this note.

15  A.  Yes, sir.

16  Q.  Okay.  And it says -- in that note, it says, "Spoke

17      with Kimya Green, verified e-mail and phone.  She

18      states that she spoke with the city, and there is no

19      lien, so I advise I will submit file and move forward

20      with the modification.  I will re-pull the title."  Do

21      you see that?

22  A.  Yes, sir.

23  Q.  What does that mean?

24  A.  Spoke with the homeowner, and the homeowner advised

25      there was no lien.

1   Q.   Okay.  So no -- there's no liens on the property.

2        Right?  Is that what that -- is that what that's

3        indicating?

4   A.   That's what is stated in the notes.  That's what the

5        homeowner advised.

6   Q.   Okay.  And then re-pulling the title, what does that

7        mean?

8   A.   Request a title report.

9   Q.   And who does Bayview request the title report from?

10  A.   I don't know the title company at that time, sir.

11  Q.   Do you remember whether or not it's ServiceLink?  Does

12       that sound familiar?

13  A.   ServiceLink sounds familiar, but I don't know where

14       they pulled the title from at that -- in 2017.

15  Q.   Okay.  Now if we scroll up to the -- yeah, to that

16       page, there's a note at the bottom.

17            Second note from the bottom says, "Fixed to

18       fixed."  What does that mean?

19  A.   A fixed mortgage going to another fixed mortgage.

20  Q.   Okay.  And then the next note up from that, again on

21       3/15/17, says, "Approved FHA HAMP."  Right?

22  A.   Right.

23  Q.   And does that mean that it was approved?

24  A.   Yes.

25  Q.   Okay.  And who approved it at that time?

1  A.   FHA.

2  Q.   Okay.  And so is that the end of the process, or does

3       somebody else have to approve it?

4  A.   That's the end of what process?

5  Q.   Well, that's -- so, remember, we're trying to seek a

6       loan modification.  Right?  And so we need to get

7       it --

8  A.   Right.

9  Q.   We need to get it approved.  Right?

10 A.   Correct.

11 Q.   Okay.  So tell me who has to approve it.

12 A.   FHA.

13 Q.   Okay.  And so that's what I'm trying to figure out.

14      So when I look at the note, it looks like it's

15      approved.  Right?  By FHA?

16 A.   Yes.

17 Q.   So what else -- so the only thing that needs to happen

18      now is what?  That she needs to make the three trial

19      period payments?

20 A.   They need to send out a trial payment letter.

21 Q.   Okay.  So is the -- the loan modification hasn't been

22      approved.  The only thing that's been approved is the

23      trial payment period?

24 A.   That is correct.

25 Q.   Okay.  So the modification hasn't been approved yet.

1  A.  You have a trial plan before it becomes a permanent
2      modification.
3  Q.  Right.  But what I'm trying to figure out is the
4      process by which the loan modification is going to be
5      approved.  Right?  So do we have to go through the
6      three payments first and then it gets approved?  Or do
7      we get it approved first and then, if it -- if she
8      makes the three payments on time, it should be
9      converted?
10 A.  It gets approved.  You advise of the trial plan.  If
11     you keep the terms of the trial plan, it is then
12     reviewed for a permanent modification.
13 Q.  Who reviews for permanent modification?
14 A.  The same process.  It's the same underwriter, and run
15     it through the same FHA system.
16 Q.  Okay.  So those are the three -- really, the three
17     steps.  Right?  We've got to get -- first, we've got
18     to get approval right off the bat by FHA.  Right?
19 A.  Right.
20 Q.  Then we've got to -- then we've got to get the trial
21     payments taken care of.  Right?
22 A.  Right.
23 Q.  And then the third step is to go back to FHA and say,
24     "She made the three payments.  What do you say now?"
25 A.  Right.  You run it through the -- you run it through

1    the permanent mod underwriting step.  Yes.

2  Q.  Okay.  And does FHA review the title report as well,

3      or is that only Bayview and Cenlar that's doing that?

4  A.  That would be the underwriter reviewing the credit --

5      the title report.

6  Q.  Yep.  And who does that person work -- and that's what

7      I'm asking you.  Is that an agent of Cenlar or an

8      agent of Bayview or an agent of FHA?

9  A.  This one is an agent of Bayview.

10 Q.  Okay.  So Bayview's going to make that call.  And is

11     there --

12 A.  Yes.

13 Q.  Is there a review process that would take it from --

14     out of Bayview's hands and up to Cenlar's hands to

15     make sure that Bayview knows what they're doing?

16 A.  If there's an issue, Bayview would bring the issue up

17     to Cenlar.

18 Q.  Okay.  So we'll get to that in a minute.

19     Mr. Crawford, we've been going at it for about an

20     hour.  I want to be respectful of your -- of your

21     comfort, and so do you want to take a break for five

22     minutes?

23 A.  It's totally up to you.  I have other stuff on my

24     schedule, so I'm good and fine.  I have a bottle of

25     water here.

1   Q.   Okay.

2   A.   So up to you and the court reporter.

3            MR. LYONS:  Okay.  Madam Court Reporter, how

4        are you doing?

5            COURT REPORTER:  Sorry.  I had to figure out

6        how to stop share.  I'm doing fine to continue.

7            MR. LYONS:  Okay.  And, Ms. Cummings, how

8        are you?

9            MS. CUMMINGS:  I'm doing fine.

10           MR. LYONS:  Okay.  All right.  Then let's

11       press forward.

12  BY MR. LYONS, CONTINUING:

13  Q.   Okay.  So we're going to go back to that exhibit.  The

14       same page that we were just on and, again, same

15       contact -- or same note, further up, kind of in the

16       middle of the page, where the redaction is, the

17       Bayview agent says, "Contact made with customer.  I

18       advised she was approved and the MLO will be calling

19       today."  What's the MLO?

20  A.   That is the loss mitigation letter.

21  Q.   The letter's going to be calling her today?

22  A.   I'm sorry.  Where are you reading from?

23  Q.   So the -- see the -- see the note in the middle of the

24       page that has the redaction?

25  A.   Right.

 1   Q.   Okay.  So right below and to the right of the

 2        redaction, it says, "I advised she was approved and

 3        the MLO will be calling today."  What is -- who is the

 4        MLO, and why are they calling her?

 5   A.   I'm -- I mean, MLO normally stands for mortgage loan

 6        officer, so it's just a loss mitigation person that

 7        will be calling to advise the trial plan was received.

 8   Q.   Okay.  And the note goes on to say, "We spoke about

 9        her last plan, and I advised how the payments got

10        assigned as well as the reinstatement numbers.  She

11        had no further questions, so I thanked her, and the

12        call was ended."  Do you see that?

13   A.   Yes.

14   Q.   Okay.  So now we're going to go up the page to the

15        next -- the next note.  There's an entry that says,

16        "And next payment date is 4/1/2017.  Advised we offer

17        a pay-by-phone service.  Advised that after the last

18        payment of the trial they will receive the details of

19        the loan."  Do you see that?

20   A.   Yes.

21   Q.   So it sounds like everyone is believing that she is

22        going to receive that modification.  Is that a fair

23        takeaway from that note?

24   A.   She was advised of the process.

25   Q.   Yeah.  And she'll receive the details of the loan.

1    That's the new loan. Right? Not the old loan. She

2    already knows what the details of the old loan are.

3    Right?

4  A.  Advised of the last payment and will receive details

5    of the loan. They didn't say, "Details of the loan

6    modification." It said, "Details of the loan."

7  Q.  Okay. And so you think that means -- you think that

8    means that the Bayview person was saying, "We're going

9    to tell you about your old loan, the details, after

10   you make the trial payments."

11 A.  No. I mean, the note says she will receive the

12   details of the loan, so details of what is going on

13   with the loan.

14 Q.  Got it.

15     In your deposition preparation, you didn't talk

16   to anybody from Bayview. Right?

17 A.  No, sir.

18 Q.  Okay. All right. The first note at the top of the

19   page, "Advised mini-Miranda and gave call-monitoring

20   disclosure." Now, is this a different part of Bayview

21   that is speaking to Ms. Green at this time? Is this

22   collections, or who is this?

23 A.  It just said, "Bayview."

24 Q.  Okay. So if, in this case --

25 A.  So --

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 44 of 187   Document 30-2

1   Q.   Go ahead.

2   A.   So Bayview is calling out.  Bayview called her.  The

3        associate said they advised her of the mini-Miranda.

4   Q.   Okay.  And do you believe that these notes from the

5        3/15/17 call are all the same?  Is this all one person

6        talking to her and just multiple notes?

7   A.   Some are continuation from the previous person.  And

8        the last one you just read, that was someone calling

9        out, so that was someone calling her.

10  Q.   Okay.  Now, the next payment looks like it's on

11       5/4/17.  If you go to that note further, scroll up.

12       Yeah.  Keep going.  5/4/17.  No, no, no.  Too far.

13       Yep.  Right there.  Okay.

14            So on 5/4/17, Mr. Crawford, there's a note that

15       says, "Processed payment in the amount of 1,157.31."

16       Do you see that?

17  A.   Yes.

18  Q.   So that's Payment Number 2 in the trial payment plan.

19       Right?

20  A.   That's in May.  I'm not sure which payment that is

21       for, because you kind of skipped some dates, so...

22  Q.   Okay.  Do you think there's another payment that we

23       missed?  I'm sorry.

24  A.   Oh, I don't -- I don't remember offhand.  You just --

25       I don't -- I can't confirm or deny whether that was

1    Payment Number 1 or 2 by just looking at that.

2  Q.   Okay.  Then let's go back -- let's go down the --

3       let's scroll down, then, to the March 27th -- or

4       March 21st, 2017.  Yep.  Right there.

5            In the middle of the page, it says, "Processed

6       her first payment for 3/31/17."  Right?  Do you see

7       that?

8  A.   Yes.

9  Q.   So that's Payment Number 1.  Right?

10 A.   Right.

11 Q.   Okay.  Then we just looked at 5/4/17, and that looks

12      like Payment Number 2.  Right?

13 A.   Right.

14 Q.   Okay.  And then on that same page, at the top, where

15      it says on June 7th, 2017, it looks like Payment

16      Number 3 then was made.  Correct?

17 A.   Right.

18 Q.   Okay.  So all the payments are done now.  Those were

19      the three payments.  So what happens next?  It should

20      go to underwriting now.  Correct?

21 A.   Right.

22 Q.   All right.  And let's scroll up to the next page,

23      and -- let's start from the bottom, though.  So let's

24      make sure we can see all the bottom notes.  Yeah.

25      There we go.

1          Okay.  So on 6/9/17, at the bottom, Bayview is

2     contacting her, and the agent "explained the process

3     of the conversion" -- that's where I got that word

4     from, Mr. Crawford -- "and advised her to continue to

5     make her mortgage payments."  Do you see that?

6  A.  Right.

7  Q.  "I let her know conversion could to" -- I don't know

8     what "T-O" means, but maybe that's an acronym -- "to

9     from 30 days to six months."  Right?

10  A.  Right.

11  Q.  Okay.  So then if we scroll -- or if we go up the

12     page, on 6/20/17, there's another note from Bayview.

13     "Spoke with Kimya.  She is getting letters from Cenlar

14     stating she is behind.  I explained they will continue

15     to send them while we are converting the loan."  So

16     tell me, in that context, what does "converting the

17     loan" mean?

18  A.  That means working on the loan to convert it from a

19     trial to a permanent mod.

20  Q.  Okay.  But you haven't seen any notes yet that would

21     say that underwriting has reviewed it yet.  Correct?

22  A.  Which date and time frame you're referring to now?

23  Q.  Well, I guess, as you look at this -- I mean, you

24     can't really flip back and forth, because you can only

25     see it on the screen, but at least so far on this

1    page, do you see anything about loss miti- -- or about

2    underwriting reviewing it?

3  A.  Not -- that was -- I mean, loss mitigation was

4    speaking to her regarding the status of her loan.

5  Q.  Yeah.  But where -- what's underwriting doing, if

6    anything, at this time?

7  A.  They were reviewing the title report and reviewing the

8    loan information to see if it's clear to go from a

9    permanent -- from a temp to a permanent modification.

10 Q.  Okay.  So we just haven't seen anything yet where

11   underwriting is entering a note yet.  Correct?

12 A.  Right.  If there is information, the underwriter will

13   provide it to the processor, and the processor will

14   call her and make notes on the account.

15 Q.  Okay.  And so that's -- then to continue on with the

16   note I was reading, it says, "I advised it could take

17   another 30 to 45 days, if not longer."  And is that

18   pretty typical, Mr. Crawford?  That somebody would

19   wait beyond the trial period plan to find out if their

20   loan is going to receive permanent modification

21   status?

22 A.  Yes, sir.  Each and every loan is different, and it's

23   based on each individual information and each

24   individual status.  So, like previously advised, it

25   could take three to six months, based on the situation

1     that is involved with the homeowner and making sure

2     title is clear to proceed to the next stage.

3  Q.  Okay.  And so then the note goes on to say, "I advised

4     it could take another 30 to 45 days, if not longer.  I

5     processed her July paying for $1,157.31."  Do you see

6     that?

7  A.  Yes.

8  Q.  Okay.  So it doesn't look like the Bayview agent

9     demanded that she make any greater payment than the

10    trial payment again here in Month Number 4.  Correct?

11 A.  That is correct.  At that time, no one knew what --

12    the permanent number has not been finalized, so

13    there's no way to determine what the new payment

14    amount would be.

15 Q.  Right.  So she should just keep making the trial

16    payment amount.  Correct?

17 A.  The trial payment amount was made.  Yes, sir.

18 Q.  Okay.  And that's what she should be doing.  Correct?

19 A.  I mean, again, before the final mod is done, what she

20    should -- she should be making her payments, but at

21    that time, she made the trial payment amount.

22 Q.  But is there anything that you've seen in these notes

23    right here in -- on June 20th that says to her, "Hey,

24    Ms. Green.  You need to make payment in an amount

25    other than the 1,157.31"?

1    A.    And, again, no one knew what was -- what her payment

2          would have been, because the calculation had not been

3          done for the permanent mod.  So she continued to

4          follow the terms of the trial mod until it is either

5          denied or finalized.

6    Q.    Okay.  But all I'm trying to make sure is that she

7          wasn't doing anything that Cenlar was telling her not

8          to do.  Right?  If they -- they didn't say to her,

9          "Hey, you need to make, you know, your old payment of,

10         you know, $1,300 or $2,600," or something like that.

11         Nobody was telling her to do that.  Right?

12   A.    I don't see any notes.  I see that she continued to

13         make the trial plan.  I'm relying on the notes, sir.

14   Q.    Perfect.  Okay.

15              Then if you go a little further up the page, same

16         page, on 6/23, there's a note that said, "Clouded

17         title uploaded on January 10th, 2017."  Do you see

18         that?

19   A.    I'm sorry.  Which date are you reading from?

20   Q.    June 23rd, 2017.

21   A.    Okay.

22   Q.    Okay.  So it says, "Clouded title uploaded on June" --

23         or, "On January 10th, 2017."  Do you see that?

24   A.    Yes.

25   Q.    Okay.  So is -- I thought there was a new title report

1    ordered back in March, but maybe I didn't read that

2    right.  Would you get a new title, or would you rely

3    on an old title report from July of -- or June of --

4    or January of 2017?

5  A.  It depends on how old is the title report?  But the

6    person's just stating that there was an old title

7    report load -- uploaded on January 10th of 2017.

8  Q.  Okay.  And then there's a note on the same day that

9    says, "Lien letter sent via FedEx."  Do you see that?

10 A.  Yes, sir.

11 Q.  Okay.  So do you know what -- do you know what a lien

12   letter is?

13 A.  It was -- yes, sir.

14 Q.  What is a lien letter?

15 A.  Advising that there's a lien on the property.

16 Q.  Okay.  So let's -- and that's what a lien letter

17   means.  Right?  There's an actual lien on the

18   property.  Correct?

19 A.  That's -- that's just my understanding of it, sir.

20 Q.  That's your understanding.  Correct?

21 A.  Correct.

22 Q.  Okay.  And this is what you do.

23 A.  I mean, I'm -- I'm sorry.  It could be a lien on the

24   property or a lien on the person, but it's just saying

25   a lien letter.

1  Q.    Okay.  So it may not just be on the property.

2  A.    Yeah.  It may not just be on the property.  I'm --

3        again, I don't -- that's a title issue.  From my

4        understanding, it could be on the person or on the

5        property, based -- just based on my understanding of

6        it.

7  Q.    Okay.  And is that something you've been trained on,

8        or where do you glean your knowledge from what -- from

9        what a lien letter means, whether it's on the property

10       or on the person or what?

11 A.    That's just based on my understanding of liens.

12 Q.    Okay.  So you haven't been trained on that at Cenlar.

13       Right?

14 A.    No, sir.  I don't work in the -- in the title

15       department, sir.

16 Q.    Okay.  That would be -- title would have to talk about

17       liens and what that all means.  Right?

18 A.    Right.

19 Q.    Okay.  So now I'd like to show you what's been marked

20       as Deposition Exhibit Number 15.

21             (Exhibit 15 was introduced at this time.)

22 BY MR. LYONS, CONTINUING:

23 Q.    Mr. Crawford, I'm going to show you what has been

24       marked as Deposition Exhibit Number 15.  This is a

25       two-page document.  Have you seen it before?

1   A.   Yes, sir.

2   Q.   Okay.  And is this the lien letter?

3   A.   Yes, sir.

4   Q.   Okay.  So the letter that we're looking at in

5        Exhibit 15 was sent from Bayview to Ms. Green on

6        June 23rd, 2017.  Correct?

7   A.   That's the date on the letter.

8   Q.   All right.  And that corresponds to the note that we

9        were looking at in Exhibit 4.  Correct?

10  A.   It was a June 23rd note.  Right.

11  Q.   Yeah.  Okay.  So it says, "In connection with your

12       loss mitigation application, we received a title

13       report for the associated property."  So what

14       property?  Is that the property that's listed above?

15       The 37- --

16  A.   I'm confused.  The property what?

17  Q.   Yeah.  Is the property that they're describing there

18       the property address that's listed on the letter of

19       3781 North 60th Street?

20  A.   That's -- if that's the property of the loan, that's

21       the property they're referring to.

22  Q.   Okay.  Now, does Cenlar instruct Bayview to send the

23       title reports along with the letter?

24  A.   It would make sense, to show the homeowner what it

25       is -- what they are referring to.

1   Q.   So do you think they -- I agree with that, but do they

2        actually send the title report with the letter?

3        That's my question.

4   A.   Right.  So the homeowner does not have to pay money to

5        request another title report, so you send a copy of

6        the title report.

7   Q.   Okay.  So do you believe that, in June of 2017, along

8        with Exhibit 15 was a copy of the title report?

9   A.   I don't know, sir.  I don't know what was included in

10       that package.

11  Q.   Okay.  But you think -- you think it would be a good

12       idea to send that information to the client or the

13       customer.

14  A.   It could be, but most things that are on people's

15       title report, they are aware of it, so...

16  Q.   Okay.  So I don't think that the title report was sent

17       to Ms. Green, but we can -- we'll figure that out at

18       another time.  You don't see anything in the notes

19       that said that the title report was sent.  Did you?

20  A.   Again, I don't know what was included in that package

21       from 2017.

22  Q.   Right.  Who would you have to talk to to find that

23       out?  Bayview?

24  A.   Yes.  You can -- you can ask your client if she did or

25       did not receive the title report in the package.

1   Q.   Well, yep.  I could ask her, but to find out if it

2        actually was in the package, we -- you would talk to

3        Bayview.  Right?  To find out if they sent it?

4   A.   I guess you could talk to the person and see if that

5        was included in the package.  Yes.

6   Q.   Okay.  But to the best of your knowledge, you don't

7        know what the policy and procedure is whether or not

8        Cenlar instructs Bayview to send title reports with

9        the lien letters.  Correct?

10  A.   No, sir.  I don't -- I don't know the policy offhand

11       regarding that matter.

12  Q.   Okay.  So the two -- there's two items listed in the

13       lien letter.  Correct?

14  A.   Yes, sir.

15  Q.   One is a judgment in the name of Kimberly Green in the

16       amount of $550.  Do you see that?

17  A.   That's what's listed on the document.

18  Q.   Okay.  And then the second one is some kind of UCC

19       financing statement.  Do you see that?

20  A.   Yes, sir.

21  Q.   But there's no amount listed there.  Correct?

22  A.   There's no amount.

23  Q.   Okay.  Do you understand how -- what that means if

24       there's no amount listed?

25  A.   No, sir.  I don't understand what that means.

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 55 of 187   Document 30-2

1    Q.    Okay.  And is there anything that -- in the letter

2          that you can see that would explain what it means that

3          there's no amount listed?

4    A.    No, sir.  It just lists the lien -- the judgment and

5          the lien that needs to be taken care of.

6    Q.    Okay.  Let's go back to Exhibit Number 4.  Yep.

7          That's perfect.  So in the -- if you scroll up to the

8          very bottom of the next -- of the page above, just

9          a -- yep.  Just like that.  Now come down a little,

10         and let's have the middle of -- yeah.  Keep going.  A

11         little more.  Yeah.  Right there.  Perfect.

12                Okay.  So, Mr. Crawford, you see a contact on

13         July 5th, 2017, at the bottom of the top page.  Right?

14   A.    Yes, sir.

15   Q.    And then at the -- at the top of the bottom page, it

16         says, "Spoke with Kimya Green.  Verified account

17         e-mail and phone."  And then it goes on to say, "She

18         received a lien letter and advised it is not her name.

19         I let her know I would reach out to the supervisor of

20         that department to advise and have someone get in

21         touch with her."

22                What department would that have been that Bayview

23         would have communicated with?

24   A.    I don't want to guess.  It could be the supervisor of

25         the underwriter.

1   Q.   Okay.  And the underwriter works for whom?  Bayview or

2        Cenlar?

3   A.   Bayview.

4   Q.   Okay.  Right.  We went over that.  Right?  And

5        Bayview's going to make a decision, and then if

6        there's a problem with it, Cenlar will take a look at

7        it.  Right?

8   A.   No.  Bayview is going to run the numbers within the

9        FHA's underwriting system, and FHA will either answer

10       yes or no.  So Bayview and Cenlar is not making a

11       final decision on any loan modification.  It is run

12       through the underwriting system based on the

13       information provided, and then FHA makes a final

14       decision.

15  Q.   How do the -- how do the liens we saw on Exhibit 15

16       impact those numbers that are going to get run?

17  A.   The liens impact the position.  The title is not

18       clear.  As the notes say, "Clouded -- clouded title."

19       The title is not clear.  That's nothing to do with the

20       numbers here.  They did not get to the numbers part.

21  Q.   Okay.  And so does the -- and that's all about the

22       position, right, of the -- of the first position or

23       second position related to the liens?

24  A.   It's all about title being clear.

25  Q.   Okay.  So --

1    A.    You cannot sell something or give something that is --

2          does not have a clear title.

3    Q.    Okay.  And when you talk about that title, you're

4          talking about the property title.  Right?

5    A.    Yes, sir.  The title report that was brought up for

6          the property.  Right.

7    Q.    You're talking -- when you're talking about clouded

8          title, you're talking about judgments and liens that

9          are on -- that are against the title of the property.

10         Right?

11   A.    I'm talking about what is on the title report.

12   Q.    Okay.  And does the title report reflect judgments and

13         liens that are against the property itself?

14   A.    I don't have -- I don't know what was on the title

15         report, but it's saying title was not clear based on

16         the information on the title report.

17   Q.    Okay.  All right.  So we'll look at that in a minute.

18         All right.  So let's scroll -- let's continue to now

19         look at that full page 14.  If you look at the top,

20         you'll see there's 14 of 31.  Yeah.  That's the

21         easiest way to do it.  Okay.  Great.

22              Now, do you see anybody from Bayview or Cenlar or

23         anywhere else following up with this issue yet about

24         the supervisor that we looked at on 7/5 of '17?

25         Remember, they said, "I let her know I would reach out

```
 1        to a supervisor in that department to advise and have

 2        someone get in touch with her."  Do you see anybody

 3        from anywhere trying to or making contact with her?

 4   A.   It showed in July calls were made with no answer.

 5        "Unsuccessful outbound calls."

 6   Q.   And who -- is there a supervisor calling?  Do you see

 7        that?

 8   A.   It just said, "Unsuccessful outbound calls."

 9   Q.   Okay.  So it's -- we don't know if the supervisor was

10        calling or not.  Right?

11   A.   I don't know who's calling, sir.  It just says,

12        "Unsuccessful outbound calls."

13   Q.   Okay.  So at the top of the page, it looks like there

14        was contact made on August 2nd, 2017.  Do you see

15        that?

16   A.   Yes, sir.

17   Q.   All right.  And that was an outbound call to her, and

18        she picked it up.  Right?

19   A.   Right.

20   Q.   And it says, "We're returning her call.  She had left

21        a voice mail message to Mr. Wazbinsky."  Do you see

22        that?

23   A.   Right.

24   Q.   Okay.  And do we know who Wazbinsky is?  We've seen

25        his name before.  Right?
```

```
 1   A.   I don't know who he is, sir.

 2   Q.   You do not?

 3   A.   He must be -- I do not know who he is.  I'm sorry.

 4   Q.   Okay.  Well, just for your information, he's the

 5        gentleman from Bayview that's the asset manager that

 6        sent her the HAMP letter back in March.  Okay?

 7   A.   So he's the name on the letter?  On the bottom of the

 8        letter?  Is that what you're --

 9   Q.   Correct.

10   A.   Okay.

11   Q.   Yep.  That's --

12   A.   That's -- that's different than who's sending.  It's

13        just a name on the bottom of the letter.  He's the

14        asset manager on the bottom of the letter.

15   Q.   Yep.

16   A.   Okay.

17   Q.   That's who -- that's who sent her that letter.  Right?

18   A.   That's not who sent it.  That's the name that is --

19        that is the asset manager on the bottom of the letter.

20   Q.   Okay.  Well, tell me what the asset manager's job is.

21   A.   I don't know what Bayview's asset manager's job is.

22   Q.   Okay.  All right.  So at the top of this page, on that

23        August 2nd, 2017, contact, it says she was questioning

24        info on her -- on her modification, and it says,

25        "Advised still in review.  Customer requested to make
```

1       a payment," and they did. Right? So there's the

2       August payment.

3    A.  Well, that's the payment that was made in August.

4    Q.  Right. That's the August --

5    A.  It does not mean -- it does not mean it's for the

6        August payment. It means it was made in August.

7    Q.  Well, doesn't -- she has to make payments every month.

8        Right?

9    A.  Right. They are -- right.

10   Q.  Okay. And so you and I have gone through these notes.

11       She made the March payment -- or the April payment,

12       the May payment, the June payment, the July payment,

13       and now here's August. Right?

14   A.  Right.

15   Q.  Okay. All right. Let's scroll up to page 13. Take a

16       look at the note on September 14th, 2017, right in the

17       middle of the page. Right? It says, "Spoke with

18       Kimya. Advised loan is in conversion waiting on lien

19       information. Processed a payment." Right? So now

20       this is September, and that's the September payment.

21       Right?

22   A.  That's the payment made in September. Yes, payment

23       made in September.

24   Q.  Okay. Now if we go up, we see a contact on the 10th

25       of October. "Borrower was calling in to make a

1     payment," and another payment was made.  So this is

2     the October payment.  Right?

3  A.   That's the payment made in October.

4  Q.   Right.  So, so far, she hasn't missed a payment yet.

5     Right?  We've looked at all the months.  From the

6     beginning of the trial period, she hasn't missed a

7     payment.  Right?

8  A.   We have gone through several ones.  I don't know which

9     ones they were applied to, but each month, payments

10    were made.

11  Q.   Okay.

12  A.   So making a payment and applying a payment could be

13    two different terms.

14  Q.   Okay.  Tell me what you mean by that.

15  A.   You could make a payment, and a payment could be less

16    than what is due, so it is not applied.

17  Q.   Well, would there be some reflection in the notes as

18    to whether or not the payment wasn't applied?

19  A.   That would reflect in the payment history.

20  Q.   Okay.  And have we --, we haven't seen that document

21    yet.  Correct?

22  A.   That is correct.

23  Q.   Okay.  Let's go to the next -- let's go up to the next

24    page.  Let's go up to 12.  Yeah.  Let's stay towards

25    the bottom, though.

1         There's a note on 11/6/17.  Yeah.  Before we get

2     there, let's look at the bottom of the page.  Right?

3     At the -- in the middle of October, it looks like

4     there's more title reports being received.  Does

5     that -- can you decipher that to see if I'm right

6     about that?

7  A.  Which date?  I see a title search received

8     October 31st.

9  Q.  So then on 10 -- a note on 10/25/17, it looks like the

10    title was received.  Right?  From ServiceLink?

11 A.  Right.  Right.

12 Q.  And then it says, "Unable to raise Step G51."  What's

13    that?

14 A.  It could be a -- you go -- it's a process of different

15    steps to move to the next stage.

16 Q.  Okay.  But do we -- how do -- do you know what the G51

17    step is or no?

18 A.  I don't know offhand what is G51.

19 Q.  Okay.  Who would I -- would I have to talk to somebody

20    in title from Cenlar or Bayview to find out what that

21    is?

22 A.  That is -- that is Bayview.

23              MR. LYONS:  Okay.  All right.  So let's stop

24    right there, and let's show the witness Exhibit 23.

25              (Exhibit 23 was introduced at this time.)

1    BY MR. LYONS, CONTINUING:

2    Q.   Okay.  So this is, it looks like, maybe a 73-page

3         document, and unfortunately, it's not Bates-numbered,

4         but I can tell the court reporter to go to probably

5         somewhere in the middle.  You're looking for a similar

6         sheet to the curative grade sheet that you see right

7         here.  When you see another document like that, then

8         stop.  We might be too far.  Stop.

9              Okay.  So, Mr. Crawford, this is the ServiceLink

10        document from October 23rd, 2017.  Do you see that

11        date appearing in the middle of the page?

12   A.   I see the October 23rd of 2017 date.  Yes.

13   Q.   Okay.  And it would be Bayview that would order this

14        title report.  Correct?

15   A.   Correct.  Bayview ordered the title reports.

16   Q.   Okay.  So -- and do you know how to read these title

17        reports?

18   A.   No, sir.  I don't work and I've never worked in the

19        title department.

20   Q.   Okay.  So you're not going to be able to tell me

21        anything about these title reports.  Right?

22   A.   I have just a basic understanding of what's on a title

23        report, but not the issues or what to resolve or what

24        needs to be done, what's a problem, what's not a

25        problem.  No.  That would be handled by title.

1   Q.   Okay.  Bear with me just for a minute.

2           According to the documents that we're looking at,

3        it says that there's judgment and lien information

4        related to Item Number 2.  Do you see that?

5   A.   I see what's in the middle of the page, sir.  Is that

6        what you're referring --

7   Q.   Yep.  I am.  That's what I'm referring to.  And see

8        where it says, "Curative items:  Subject mortgage is

9        not in a first lien position"?  Do you see that?

10  A.   I see that in the document.

11  Q.   Okay.  And then if you flip to the next page, there's

12       a property report?  Do you see that?  "Client:

13       Cenlar"?  At the top of the page?

14  A.   What are we referring to now?

15  Q.   Right there, on the top of the page, it says, "Cenlar

16       FSB."  Right?  "Cenlar Federal Savings Bank/loss

17       mitigation."  Right?

18  A.   Right.

19  Q.   And then the date to the right says 10/20/2017.

20       Right?

21  A.   Right.

22  Q.   Okay.  Do you know who Lisa Hildreth is?

23  A.   Yes.

24  Q.   Who is she?

25  A.   I don't know her current position.  I think back then

1          she was a VP of -- she was a VP back then.  I don't

2          remember a VP of which department.

3     Q.   Okay.  And is the Ewing, New Jersey, address, is that

4          Cenlar's address?

5     A.   Yes, sir.

6     Q.   Okay.  Oh.  If you turn to the -- what would be the

7          second page of that report, in the middle of the page,

8          there's an Item Number 2 under "Judgment and lien

9          information."  Do you see that?

10    A.   Yes, sir.

11    Q.   And it says, "UCC financing statement, DEM

12         Investments, Kimya D. Green, dated 9/19/2013."

13         There's no amount in there.  Right?

14    A.   Right.

15    Q.   Okay.  And so I feel like it's kind of unfair to ask

16         you this question, but do you know what is holding up

17         the -- what the issue is with this property report?

18    A.   I'm not sure what you mean, "issue with the property

19         report."

20    Q.   Well, you saw on that first page, right, that there

21         was the grade "B" on the -- on the ServiceLink title

22         report, but it says there was a problem and that the

23         mortgage, right, is not in the first lien position.

24         Do you know what that means?

25    A.   Yes, sir.

1   Q.   What does that mean, "not in the first lien position"?

2   A.   I mean -- not to use the same word, it is not -- the

3        mortgage is not first.  There is something -- based on

4        our information, it's saying there's something ahead

5        of the mortgage.

6   Q.   Okay.  Something ahead of the mortgage, and that would

7        be Cenlar.  Right?  Something ahead of Cenlar.

8   A.   No.  Something ahead of the mortgage.  Cenlar is the

9        subservicer.

10  Q.   Oh, yeah.  Yeah.  Something ahead of either Lakeview

11       or the -- or the mortgagee.  Right?

12  A.   Something ahead of the mortgage that she took out.

13  Q.   Okay.  And that's -- and that's bad.  Right?  That's

14       what would prevent the modification.  Correct?

15  A.   Again, not a title expert, but it's -- it's stating

16       the title is not clear.

17  Q.   Okay.  So when you look at this property report, it

18       seems like it's indicating that that UCC financing

19       statement is what is the problem.  Right?  Can you

20       tell that from reading this, or are you just not

21       qualified to do that?

22  A.   I'm not qualified to do that.  I can -- just based on

23       the letter that was sent out, it lists that same UCC

24       financial statement that needed to be taken care of.

25  Q.   Okay.  Because it was in the first position ahead of

1       the mortgage.  Right?

2   A.  Again, I'm not going -- I'm not an expert.  I don't

3       know what was in first position ahead of the mortgage.

4       The document just states that the mortgage is not in

5       the first position.

6   Q.  Okay.  And then it lists the judgment and lien

7       information in Item Number 2, right, that we looked

8       at, which was the UCC financing statement.

9   A.  Correct.

10  Q.  Okay.  I want to show you -- well, before we change,

11      you don't see anything on this title report referring

12      to the Kim Green judgment anymore.  Right?  It seemed

13      like that got cleared up.  Remember, we looked at that

14      before on Exhibit 15.

15  A.  I mean, you only showed me a couple of pages of this

16      title report, so -- but based on the letter, on the

17      second letter that was sent, it only had the UCC

18      information.  That's what I'm basing that on.

19  Q.  Okay.  Well, let's take a look at 15 first.  Let me

20      refresh your recollection.  Take a look at Exhibit 15.

21      That's the June letter from 2017.  Right?  So we've

22      got two problems.  We've got the judgment in the name

23      of Kimberly Green that she said wasn't her.  Remember,

24      we read that note.  And then we've got the UCC

25      financing statement.  Right?  So those are the two

1      things in June that are a problem.  Right?

2   A.  Those are the two things listed on the letter.

3   Q.  Right.  And now, like you said, we've got another

4      letter coming in November.  Right?  We've got another

5      letter in November, and we're going to show that to

6      you right now.  That's Exhibit 16.

7                  (Exhibit 16 was introduced at this time.)

8   BY MR. LYONS, CONTINUING:

9   Q.  There's Bayview's letter that we've marked as

10      Exhibit 16 dated November 9th, 2017.  Do you see that,

11      Mr. Crawford?

12  A.  Yes.

13  Q.  So now we're down to one thing.  Right?  Now we've

14      just got to get this UCC financing statement figured

15      out.  Right?

16  A.  Right.

17  Q.  Okay.  And, again, I feel like it's -- I feel like a

18      broken record, but you don't know if they provided a

19      copy of that, of the title report or of the -- any

20      other information related to the UCC financing

21      statement.  Right?

22  A.  No.  I do not know what was included with the letter.

23  Q.  Okay.  Okay.  So let's go back to Exhibit 4.  Let's go

24      back to page 13.  Let's go up one more page to

25      page 12.  All right.  So we saw that she was trying to

1    make a payment on 11/6.  See that note that says,

2    "Contact made with customer.  Borrower called to make

3    payment.  No Cenlar reps available"?  Do you see that?

4    A.   Yes.

5    Q.   Is that how this -- is that how it works?  When you

6         call Bayview to make a payment, then do you get

7         switched to Cenlar to actually make the payment?  Or

8         how does that work?

9    A.   Yes, sir.  Bayview is only handling the loss

10        mitigation portion.

11   Q.   The payments get handled by Cenlar directly.  Right?

12   A.   Yes, sir.

13   Q.   So there would be a -- there would be a transfer of

14        the call, right, from Bayview -- if the customer calls

15        in, they'd be transferred from Bayview to Cenlar.

16        Right?

17   A.   Right.

18   Q.   Okay.  So then if you keep going up, it looks like on

19        11/6, later on that same day, there's a contact made

20        with Ms. Green.  It says, "Calling borrower back at

21        the request of management to assist with payment.

22        Read mini-Miranda and notice.  Borrower is in

23        conversions and wanted to make a payment."  Right?

24             So she made a payment.  So that's -- we're

25        calling that the November payment, right, if we're

1      keeping track?

2  A.  I see a payment was made on November 6th.

3  Q.  Okay.  Now we're going to go up to 11/8/17, so just a

4      few notes up.  It says, "Received e-mail.  Title is

5      clouded."

6  A.  I'm sorry.  Which date are you reading from?

7  Q.  11/8/17, first note --

8  A.  Okay.

9  Q.  Yep.  "Received e-mail.  Title is clouded."  Do you

10     see that?

11 A.  Yes, sir.

12 Q.  Okay.  Now, tell me what that -- tell me what that

13     note means to you.  There's an e-mail.  Who is -- who

14     is e-mailing whom?

15 A.  I can't see all that.  It just said, "Received e-mail.

16     Title is clouded."

17             MR. LYONS:  Okay.  Madam Court Reporter, I'd

18     like you to mark that portion of the deposition.

19             And, Counsel, will you make a note to

20     yourself?  I don't think that e-mail has been

21     produced.  And maybe it's not a Cenlar e-mail.  Maybe

22     it's a Bayview e-mail, but let's at least get to the

23     bottom of it.

24             MS. CUMMINGS:  Sure.

25             MR. LYONS:  Thank you.

BY MR. LYONS, CONTINUING:

Q.   Okay.  So then it goes on to say, that same note,
     "There is a UCC lien to be paid off."  Do you see
     that?

A.   Yes.

Q.   Okay.  Now, what -- I haven't been able to figure out
     what amount needs to be paid off.  And when we looked
     back at those letters, remember, I showed you that
     there's never an amount listed.  Right?

A.   Right.

Q.   Okay.  So how would Ms. Green know what amount to pay?

A.   Ms. Green -- I'm assuming Ms. Green would need to
     contact UCC, the name that's on the letter, and
     discuss that.

Q.   Okay.  The DEM Investments, you're saying?

A.   Say that again?

Q.   You were saying that she should call the DEM
     Investments, LLC, that -- the plaintiff?

A.   I don't know who she should contact, sir.  I -- the
     information is just what was on the title report, and
     that's who -- I guess, you know, UCC are the --
     whatever name is below that, that name -- that lien
     needs to be taken care of.

Q.   Okay.  And so in the title report, so now let's go
     back to -- that's a good point.  Let's go back to the

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 72 of 187   Document 30-2

1  title report, Exhibit 23.  All right.  So let's go to

2  page, like, 60 and see where we're at there.  Keep

3  going a little further.  No, no.  Other way.  Let's go

4  deeper into the document.  Right there, that DFI

5  document.  Yep.  Right there.  Okay.

6          All right.  Mr. Crawford, this looks to be the

7  UCC financing statement.  Do you see that?

8  A.  Right.

9  Q.  Okay.  And this is -- the secured party's name, right,

10     is DEM Investments, LLC.  See that in the middle?

11 A.  Right.

12 Q.  And that's got a mailing address in Evanston,

13     Illinois.  Do you see that?

14 A.  Right.

15 Q.  And up above, it's got contact information for a Doug

16     Mandeville.  Do you see that?

17 A.  Right.

18 Q.  It's got an e-mail address.  We've got a telephone

19     number, and now we've got a physical address.  Right?

20     We've got three different points of contact.  Correct?

21 A.  Right.

22 Q.  Okay.  Still no dollar amount on this document,

23     though.  Right?

24 A.  I don't know, sir.  You only showed me a few pages,

25     but the pages I looked at, I did not see a dollar

1       amount.

2   Q.  Okay.  Yeah.  Let's take a look at the next page too.

3       Good point.  That's fair.  Okay.  So those are the two

4       statements of the financing payment.  Do you see -- so

5       nothing here on page 66.  Right?

6   A.  Right.

7   Q.  And see where it says, "No designation," at the top?

8   A.  Right.

9   Q.  Okay.  Now if you scroll back to 65 and split that

10      document so we can see -- yep.

11          So see where it says, "Collateral," for the lien?

12      There is no e-OSCAR designation for the collateral.

13      Right?

14  A.  I don't see anything listed.

15  Q.  Right.  So certainly there's no property listed.

16      Correct?  Ms. Green's property isn't listed as

17      collateral for this.  Correct?  You don't see it, at

18      least.

19  A.  I don't see anything listed on the document you're

20      showing me.

21  Q.  Okay.  Now, do you have any evidence that Cenlar or

22      Bayview ever sent my client a copy of this UCC

23      financing statement prior to the modification being

24      denied?

25  A.  As I've stated before, sir, I don't know if a copy of

Raymond Crawford                                        75

1        this document was sent with the letter.

2    Q.  Okay.  You don't have any knowledge of that.  Right?

3        It's not as if -- nobody told you that it was sent.

4        You haven't seen any records to show that it was sent.

5        You don't have any evidence, as you sit here today, to

6        indicate that this financing statement, this document

7        we're looking at as part of Exhibit 23, was ever sent

8        to Ms. Green.  Correct?

9    A.  As stated before, there was -- Ms. Green was advised

10       of the UCC.  What was included on the title report, I

11       don't know whether this document was provided to her.

12   Q.  Now, the title report, we looked back on so -- well,

13       here.  Let's just look at the first page of the title

14       report.  The first page of Exhibit 23, all the way up

15       to the top.  Yep.

16            Do you see the disclaimer on the first page at

17       the bottom, when it says, "The title grade report is

18       intended for informational purposes only.  It is not

19       intended to replace or supplement the title evidence

20       to which it refers, and no liability for reliance

21       thereon is inferred, implied, or expressed"?  Do you

22       see that, Mr. Crawford?

23   A.  I see what's on the document.

24   Q.  Do you know what that means?

25   A.  No, sir.  I'm not an -- I'm not an attorney.

1   Q.   Okay.  All right.  Let's go back to Exhibit 4.  Yep.

2        Right there.  Perfect.

3             On November 30th, there's a note at the top of

4        the page that said, "Requested update with title

5        department."  Do you see that?

6   A.   Yes, sir.

7   Q.   Okay.  So is that Bayview requesting something from

8        the title department at Bayview?

9   A.   I don't know from which title department, but it's a

10       Bayview note.

11  Q.   Okay.  Then there's a note on 12/6/17 from Bayview

12       that said, "Denial request."  What does that mean?

13  A.   It means the loss mitigation request was denied,

14       because title is still clouded.

15  Q.   Okay.  And then it goes on to say, "Customer was sent

16       a lien letter."  We talked about what a lien letter

17       is.  "Lien letter expired, and title is still clouded.

18       Please review for denial."  Do you see that?

19  A.   Yes.

20  Q.   Now I'd like to show you what's been marked as

21       Deposition Exhibit 17.

22                 (Exhibit 17 was introduced at this time.)

23  BY MR. LYONS, CONTINUING:

24  Q.   Okay.  Exhibit 17 is a December 5th, 2017, letter from

25       Bayview.  Right?

1   A.   Right.

2   Q.   Still identifying that UCC financing statement, but

3        nowhere in the letter, again, is there any reference

4        to an amount that's outstanding.  Correct?

5   A.   Correct.

6   Q.   Nor is there any of that contact information that we

7        saw for Mr. Mandeville.  Right?

8   A.   Right.

9   Q.   So despite the fact that Bayview has got the contact

10       information in the title report for DEM Investments

11       and the specific contact person, it doesn't appear, at

12       least in this letter, that that information was

13       communicated to Ms. Green.  Correct?

14  A.   Ms. Green was advised of the lien that is on the

15       property.

16  Q.   Okay.  Now, Mr. Crawford, we've got to be careful

17       about our language.  Right?  You don't know if there's

18       a lien against the property.  Right?

19  A.   I'm sorry.  Ms. Lien -- Ms. Green was advised of the

20       issue that came out on the property, the UCC financial

21       statement.

22  Q.   That was appearing in a title report.  Correct?

23  A.   That appears on the title report.  Correct.

24  Q.   Okay.  But you don't -- as you sit here, you don't

25       know whether or not there was ever any lien against

1    the property related to the DEM Investments document

2    that we're -- that we looked at.  Right?

3  A.  Right.  I misspoke.  Ms. Green was advised of the UCC

4    financial statement information.

5  Q.  Okay.  Have you seen the declaration of

6    Mr. Mandeville?

7  A.  I don't recall.  If you can show it to me, I can take

8    a look at it and see if I've seen it before.

9  Q.  Sure.  Let's show the witness Exhibit 25.

10            (Exhibit 25 was introduced at this time.)

11  BY MR. LYONS, CONTINUING:

12  Q.  Okay.  Do you need to take a break, Mr. Crawford, or

13    are you good?

14  A.  No.  I'm good.

15  Q.  Okay.  Showing you what's been marked as Exhibit

16    Number 25, it's a -- it's entitled, "Declaration of

17    Doug Mandeville."  Do you see that?

18  A.  Yes.

19  Q.  And it's dated the 3rd of April, 2020.  Do you see

20    that?  On the second page.

21  A.  Yes.

22  Q.  Have you seen this document before?

23  A.  I don't recall.

24  Q.  Okay.  Paragraph 6 says, "The UCC financing statement

25    was never filed with the Milwaukee County Register of

1    Deeds and had nothing to do with Ms. Green's

2    property."  Do you see that?

3  A.  I see that that's what they say in the document.

4  Q.  Okay.  And do you have any reason or information that

5    would dispute that?

6  A.  That's -- you just read what was listed in the

7    document, sir.

8  Q.  Okay.

9  A.  And that's -- no.

10  Q.  Have you talked to anybody at Cenlar or Bayview about

11    Exhibit 25?

12  A.  No, sir.  I never spoke to anyone at Cenlar or

13    Bayview.

14  Q.  Okay.  Let's go back to Exhibit Number 4.  Thank you.

15    Let's scroll up to half that page.  Yep.  Right there.

16        On 12/6/2017, the -- Kimya Green, my client,

17    called in, and there was a payment made for December

18    of 2017.  Correct?

19  A.  On 12/6 -- yes.  A payment for 12/6.  A payment made

20    on that date.

21  Q.  Okay.  And then there's more discussion.  It says,

22    "Reviewed account for a modification update."  What

23    screen would the Bayview operator review to find the

24    update on the modification?

25  A.  I'm not familiar with what system Bayview is using,

1      sir.

2   Q.   Okay.  The Bayview agent "advised her it was being

3        reviewed for denial for lack of lien satisfaction."

4        Do you see that?

5   A.   Yes, sir.

6   Q.   "Advised her of the UCC lien."  Right?  We've seen

7        that in the -- in the letters from Bayview.  Correct?

8   A.   Right.

9   Q.   It says, "She will go to her title company and try to

10       obtain the original title policy to send to Bayview,"

11       and then it says, "I sent her," and then it kind of

12       breaks off.  Do you -- can you interpret that for me?

13  A.   No, sir.  No.  I can't interpret that.  No.

14  Q.   Do we know what was sent to Ms. Green at that time?

15  A.   I believe on 12/6 a denial letter was sent out.

16  Q.   I thought that denial letter was sent out on 12/14,

17       the note right above it.

18  A.   Oh.  Have we reached up to 12/14?

19  Q.   No.  We're still on the 12/6 note.

20  A.   Say that again?

21  Q.   We're still on the 12/6 note.

22  A.   Right.

23  Q.   Okay.  So no denial letter was sent on 12/6.  Right?

24  A.   It says another lien letter sent, and "she can send me

25       any lien satisfaction documents she obtains," on 12/6.

1   Q.   Right.  Okay.  So a lien letter was sent on 12/6, but

2        not a denial letter.  Right?

3   A.   Right.

4   Q.   Okay.  So now let's scroll up and show the rest of

5        page 11.  Yep.

6            And then see, Mr. Crawford, on 12/14, there's --

7        it says, "Denial letter sent."  Do you see that?

8   A.   Right.

9   Q.   Okay.  And it says, "Delinquent status equals AO.

10       Reason for delinquency," then it's blank.  Do you know

11       what that was?  Do you know how to interpret that?

12   A.   They usually ask the homeowner what's the reason for

13       the delinquency.  So there's no answer given, so it's

14       blank.

15   Q.   Okay.  And was there a -- do you see a contact with

16       the client on that day?

17   A.   Yes.

18   Q.   On 12/14?

19   A.   12/14, I don't see a contact being made.  I see notes

20       made.

21   Q.   Right.  Okay.  I just wanted to make sure we were on

22       the -- because I didn't see -- there's -- there was no

23       contact on 12/14 between Bayview and Ms. Green.  At

24       least it doesn't look like it.  Right?

25   A.   I don't see any notes that reflect that.

1   Q.   Okay.  On 12/14/17, Bayview enters a note that says,

2         "Cenlar denial comment."  Now, is that -- is this

3         Cenlar now entering some note about the denial or not?

4   A.   It says, "Cenlar denial comment."

5   Q.   Okay.  Do you know what that means?

6   A.   I guess a denial comment from Cenlar.

7   Q.   Okay.  Even though it looks like it's entered by a

8         Bayview person.  Right?

9   A.   Right.

10   Q.   So to the best of your knowledge, is that the Cenlar

11         note or is that the Bayview note?

12   A.   It's Bayview entering the notes.

13   Q.   Okay.  And it says, "There are unresolved title

14         issues, claims, or -- and/or judgments preventing us

15         from approving your modification at this time."

16         Right?

17   A.   Right.

18   Q.   Okay.  Now, that looks like that's a decision being

19         made by Bayview.  Am I right about that, or is there

20         something else that would indicate whether Cenlar has

21         reviewed this as well?

22   A.   Again, it's -- a decision would be made by the FHA

23         underwriting.  If no document has been received to

24         clear the title, it's the same information.

25   Q.   Okay.  So let's talk about that.

1    A.    But --
2    Q.    So let's talk about that for a minute.  So if the lien
3          information that Bayview is trying to clear up doesn't
4          get cleared up, does it ever make it to FHA to review
5          or no?
6    A.    If the lien -- if the lien is not collateral, you
7          don't have the information to enter into the FHA
8          system to present it to FHA as title being clear.
9    Q.    Okay.
10   A.    You don't -- you don't -- you don't have clear title
11         to present a final loan modification to the FHA.
12   Q.    Okay.  So --
13   A.    You don't have the documents for that.
14   Q.    I'm sorry.  I interrupted you.
15               So, Mr. Crawford, what you're -- what you're
16         telling me is that it never made it to the review,
17         because it -- because of the title issue that we
18         talked about today.
19   A.    Yes.  Title was not cleared, so you don't have clear
20         title to present a final loan modification for
21         approval.
22   Q.    And is there -- are there any records, other than the
23         ones we've looked at in Exhibit Number 4, that would
24         show any effort or investigation by Cenlar or Bayview
25         into that lien information that we looked at in --

1      related to the UCC financing statement?

2    A.   From my understanding, sir, that would be the

3         homeowner responsibility to resolve the lien issue and

4         provide a supporting document.

5    Q.   So -- but to answer my question, you don't see where

6         Cenlar or Bayview did any investigation or made any

7         contact with DEM Investments or Doug Mandeville.

8    A.   No, sir.  I -- again, that is under the homeowner's

9         name.  They will be responsible for that.  They

10        were -- they were advised of the information of the

11        title report, and the responsibility is not on them to

12        resolve the issue.

13   Q.   Well, let's hold on a minute.  Ms. Green wasn't

14        provided with all the information that Cenlar and

15        Bayview had, though.  Right?  They got a copy of

16        the -- of the document we looked at in the title

17        report.  Right?  Or at least you can't say that she

18        did.

19   A.   As stated before, I do not know whether that copy was

20        provided to her.

21   Q.   Okay.  But you agree with me, do you not, that that

22        would be a pretty big help, right, to have all those

23        points of contact for DEM Investments?  Right?  The

24        telephone number, the e-mail, and the physical

25        address, that would be three key pieces of information

```
 1        that would help Ms. Green contact and communicate
 2        related to the UCC filing -- financial statement.
 3        Right?
 4   A.   Sir, again, I said I do not know whether that
 5        information was provided to her.  The title that --
 6        the issue that appears on the report, she was advised
 7        of it.  There's also Google, where a search could be
 8        done to retrieve that.  But to answer your question, I
 9        do not know whether that information from the title
10        report -- complete title report was provided to her.
11   Q.   But you do agree with me that the e-mail address, the
12        telephone number, and the physical address would all
13        be information that would be useful and helpful to
14        Ms. Green in communicating with DEM Investments.
15        Right?  You're not going to tell me that wouldn't be
16        helpful to her.  Correct?
17   A.   It could be helpful, sir, but, again, I'm not going on
18        the -- on assumption.  I'm going based off the
19        information that was provided in the letter.  I don't
20        know what could or could not have been helpful to her.
21        She would make the decision based on that, or she can
22        make a decision based on her research what is
23        important to her.
24   Q.   Okay.  So we need to mark or show the witness, I'm
25        sorry, Exhibit 18.
```

1            (Exhibit 18 was introduced at this time.)

2    BY MR. LYONS, CONTINUING:

3    Q.   Mr. Crawford, I'm showing you what's been marked as

4         Exhibit 18.  This is the December 14th, 2017, letter

5         from Bayview that I think we can refer to as the

6         denial letter.  Is that your understanding?

7    A.   Yes, sir.

8    Q.   Okay.  I'm trying to see, Mr. Crawford, if there is a

9         payment history.  Oh, I think there is.  Okay.  Here

10        we go.  Hold on.  Let's go to the back of Exhibit 4,

11        and am I right that if we start down at the bottom of

12        the page, above the word "delinquency," is that the --

13        is that the payment history or not?

14   A.   No, sir.  It's not.

15   Q.   What is that reference?

16   A.   Again, those are different servicing notes.

17   Q.   Okay.

18   A.   They -- what you're looking at is the credit reporting

19        information.

20   Q.   Okay.  So if we go up to the -- yep.  Right there.

21        Perfect.

22             So according to Cenlar, she was current up to

23        December of 2017.  Is that right?  Am I reading that

24        right?

25   A.   Where -- what date are you looking at?

| | |
|---|---|
| 1 | Q. So I'm looking at kind of the upper third of the page. |
| 2 | There's an entry on the left-hand side that says |
| 3 | 12/5/2017. It says -- |
| 4 | A. I'm not seeing that. |
| 5 | Q. Okay. On the left-hand side are the dates. |
| 6 | A. Oh, the dates. Okay. |
| 7 | Q. And there's a December 5th, 2017, entry that says, |
| 8 | "Current." Do you see that? |
| 9 | A. December 5th. |
| 10 | Q. Yep. |
| 11 | A. Okay. |
| 12 | Q. Right there. |
| 13 | A. All right. |
| 14 | Q. See where it says, "Current"? |
| 15 | A. Correct. |
| 16 | Q. Okay. So that means she's paying -- she's paying on |
| 17 | time through December of 2017. Right? |
| 18 | A. Right. |
| 19 | Q. Okay. So then, on the very next month, in January of |
| 20 | '18, they've got her 90 days past due, is the |
| 21 | reporting. How can that be? How can you go from |
| 22 | current in December to late 90 days in January? |
| 23 | A. That would be based on the account status. |
| 24 | Q. Okay. So tell me what that means. |
| 25 | A. It means based on the review of the account at that |

1   time, it shows for that month that they reported the

2   account as being late.

3   Q.   Okay.  So you're saying that -- am I reading the data

4        wrong that shows that, in December -- on December 5th

5        of 2017, she is being reported as current?

6   A.   She is being reported as "partial payment agree."

7   Q.   Okay.  And she's current on that.  Right?

8   A.   Right.  It says, "Current," and, "Partial payment

9        agree."  Right.

10  Q.   Okay.  So she was -- she was current all the way up to

11       December, but then in January, now she's 90 days late?

12       I don't -- I guess I'm not -- can you explain that to

13       me?  I don't understand that.

14  A.   There was -- there was no arrangement in place.  The

15       loan modification had been denied.  There was no

16       arrangement in place, and the status would be based --

17       the reporting would be based on the account status.

18  Q.   Well, was there some notice to her that she needed to

19       pay something other than the partial payment amount

20       for the months July, August, September, October,

21       November, and December?

22  A.   That was -- that was the amount -- that's why they

23       reported her as "partial payment."  That was the

24       agreement at that time.

25  Q.   Okay.  And so if she paid the amount agreed during

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 88 of 187   Document 30-2

1    that time, then how could she go from being current to

2    90 days late the very next month?  That's what I'm not

3    understanding.  Do you understand that?

4  A.   Because the amount that was being paid -- that's why

5       it said, "Partial."  The amount that is being paid is

6       not enough to cover her payment, so that's why it's

7       being reported as being partial.  So in December, once

8       all the pay- -- after the loan mod was broken, all the

9       payments was reported -- applied.  Then it then

10      reflected the actual due date.

11 Q.   Which was when?  When was the actual due date in

12      January?

13 A.   In January, it's showing due for 10/1/17.

14 Q.   Okay.  So she was actually late starting in October.

15 A.   Right.  So on January 5th, that reporting is showing

16      the due date of 10/1/17.

17 Q.   Are you aware that Ms. Green filed a Consumer

18      Financial Protection Bureau complaint in April of

19      2018?

20 A.   Yes.

21 Q.   Scrolling up in Exhibit 4, let's go to the page --

22      yep.  Keep going.  Keep going.  Right there.  Let's go

23      down to the bottom of that page.  Right.

24          So this is part of the payment history for

25      Ms. Green's loan.  Correct?

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 89 of 187   Document 30-2

1    A.   I mean, go to the top of it.  I need to see what it

2         is.

3    Q.   Sure.

4    A.   Okay.  It says, "Loan financial history."  Okay.

5    Q.   Okay.  So let's scroll back down to that December

6         2017 -- right here.  Yeah.

7              So this'll show payments, right, that were made

8         after the loan denial.  Right?

9    A.   Right.

10   Q.   So were there any payments in January that were made?

11        Right?  Isn't there a payment on January 16th, 2018?

12   A.   Yeah.  I show a payment January 16, 2018.

13   Q.   In the amount of 1,339.72.  Right?

14   A.   Right.

15   Q.   And that was her -- that was the monthly payment

16        amount before the modification.  Correct?

17   A.   I don't recall what was the monthly payment amount

18        before.  I don't recall offhand.

19   Q.   Would this document, somewhere in Exhibit 4, indicate

20        that?

21   A.   This is a document of it being -- being applied.  I

22        guess if you go to older months, then you can kind of

23        backtrack into that.

24   Q.   Let's see.

25   A.   So I don't know if an escrow analysis took place, if

```
 1        there were different changes.  I don't know if that
 2        was the old payment amount or when that payment amount
 3        started.
 4   Q.   Okay.  So back on that page, if you go up to
 5        February 12th, 2018, there's another payment in the
 6        amount of 1,034.72 [sic] that was made on
 7        February 12th, 2018.  Right?
 8   A.   Right.
 9   Q.   Okay.  And then if we go to March, there was a payment
10        made on March 30th, 2018, in the amount of 1,334.
11        Correct?
12   A.   Correct.
13   Q.   And then there was another payment on May 7th, 2018.
14        Correct?
15   A.   May --
16   Q.   May 7th.  1,334.72 on May 7th.
17   A.   Right.
18   Q.   All right.  And then if we go up to May 21st, there's
19        another payment for 1,634.25.  Correct?
20   A.   Right.
21   Q.   Okay.  Then let's go to the next page.  At the bottom
22        of that page, there's a payment on June 14th, 2018,
23        1,634.25.  Correct?
24   A.   Right.
25   Q.   And then I don't -- you tell me.  I don't see any more
```

1   payments being made.  Do you see any more?  We'll get

2   up to December in a minute, but between June and

3   November, do you see any payments being made?

4   A.  No.

5   Q.  Okay.  Then, up in December, on the 24th, there's an

6      entry, a minus and then a credit, for 3,348.16.  Can

7      you tell me what that is?

8   A.  What date are you looking at now?

9   Q.  12/24/18.

10  A.  12/24/18.  Oh.

11  Q.  Is that a payment?

12  A.  That's not a payment.

13  Q.  What is that?

14  A.  That's Code -- with Code 161, it could be a bill being

15     paid or taxes or insurance.  It's something being

16     paid.  It's not a payment.

17  Q.  Okay.  But it's a -- you don't think it's a payment.

18  A.  I know it's not a payment.  A payment is -- the

19     transaction code is 171, 172, and 173.

20  Q.  Okay.  Like we looked at at the very bottom of the

21     page.  Right?

22  A.  Right.

23  Q.  There's the 173 code.  Okay.

24         All right.  I asked you, Mr. Crawford, about a

25     CFPB complaint.  You said there was one.  I'd like to

1    mark -- or I'd like to show you what's been marked as

2    Deposition Number 19.

3                   (Exhibit 19 was introduced at this time.)

4    BY MR. LYONS, CONTINUING:

5    Q.   Exhibit 19 is a letter dated April 15th, 2018, from

6         Cenlar to Ms. Green saying that they received a copy

7         of the complaint.  Correct?

8    A.   Yes.

9    Q.   And that was sent from, "Executive resolution

10        analyst."  Do you see that?

11   A.   Yes.

12   Q.   Do those -- does that department or that person enter

13        notes into the system notes that -- or the

14        consolidated notes that we were looking at in

15        Exhibit 4?

16   A.   If they make a review and make a decision, then yes.

17        They would put notes in it -- into the notes screens.

18   Q.   Okay.  So now I want to show you what's been marked as

19        Exhibit Number 20.

20                   (Exhibit 20 was introduced at this time.)

21   BY MR. LYONS, CONTINUING:

22   Q.   Showing you what's been marked as Exhibit Number 20,

23        this is the April 23rd, 2018, letter from Cenlar to

24        the Consumer Financial Protection Bureau.  Do you see

25        that?

1   A.   Yes, sir.

2   Q.   Okay.  And if we scroll down to the end of the letter,

3        it was sent by Allison Johnson of the executive

4        resolution analysis team.  Right?

5   A.   Right.

6   Q.   Okay.  And do you know who Allison Johnson is?

7   A.   I do not personally know Allison Johnson.

8   Q.   Okay.  Does the executive resolution team enter notes

9        into any system?

10  A.   They will put notes onto the same system.

11  Q.   Okay.  So we -- if they -- there should be a note

12       probably from Allison or somebody else from that team

13       in Exhibit 4 that we were looking at before.  Correct?

14  A.   Right.  There should be notes of complaint being

15       received, letter being sent out.

16  Q.   Okay.  So let's take a look at Exhibit -- let's go

17       back to Exhibit 4 for that date in April of 2018.

18       Keep going all the way up pretty long -- nope.  Now

19       down.  April.  There you are.  Okay.

20            So there's April, but I'm not seeing any notes

21       related to either the complaint or the response in

22       Exhibit 4, and I'm wondering if you know why that

23       would be.

24  A.   Because what you're looking at is a collections

25       screen.  Those are calls being made.

1   Q.   Okay.  But --

2   A.   So --

3   Q.   -- this is the -- I hear what you're saying, but if

4        you go up to the top, in the consolidated notes on the

5        first page, it's pulling from certain systems or

6        certain notes.  Right?  And do you see up there --

7   A.   Right.

8   Q.   -- if the executive team is part of that consolidated

9        notes?

10  A.   I don't see anything from NOTS, anything from notes.

11  Q.   So NOTS would be the system or the screens that would

12       be where a response to the CFPB complaint would be?

13  A.   Since the NOTS is where people who are not in those

14       departments or your regular screen, they would just

15       make notes on the account.  Folks that don't use the

16       system regularly, they can input notes.

17            MR. LYONS:  So, Madam Court Reporter, I

18       would like you to mark that part of the deposition.

19            And, Opposing Counsel, I would like you to

20       see if there are notes from that system that have not

21       been produced.  Or if they have been produced, just

22       let me know, and I'll pull them, and we can talk about

23       them.

24  BY MR. LYONS, CONTINUING:

25  Q.   And then, Mr. Crawford, the other question I have for

1          you is, like you were show- -- like you were telling

2          me, if you look across that top line from all the

3          systems, the one that does have a no is FOR.  That's

4          foreclosure.  Right?

5     A.   Right.

6     Q.   Okay.  So there's no notes -- we don't have the

7          notes -- the foreclosure notes.  And then is the LMT,

8          is that loss mitigation?

9     A.   Yes.

10              MR. LYONS:  Okay.  Ms. Cummings, have those

11         notes been produced but in another production?

12              MS. CUMMINGS:  Can you hear me?

13              MR. LYONS:  I can just barely right now.

14              MS. CUMMINGS:  I believe the notes from loss

15         mitigation have been provided.

16              MR. LYONS:  Okay.  But not in these

17         consolidated notes?  Is that what you're telling me?

18              MS. CUMMINGS:  I think they're part of the

19         notes that were provided.

20              MR. LYONS:  Okay.  I don't see any LMT notes

21         as I go through it, but I'll take a look at it when we

22         take a lunch break, and we can deal with it, then,

23         after lunch.

24              MS. CUMMINGS:  Okay.  And maybe one of the

25         distinctions I could ask Raymond about is whether or

1    not LMT concerns Cenlar L- -- loss mitigation versus

2    Bayview.

3              MR. LYONS:  Okay.  Well, we can deal with

4    that when we take a break.

5              THE WITNESS:  I mean, the Bayview -- the

6    Bayview notes, that's the loss mitigation notes.  The

7    Bayview information pulls over into Cenlar.  So the

8    notes that were Bay- -- from Bayview, those are loss

9    mitigation.

10   BY MR. LYONS, CONTINUING:

11   Q.   So you're saying the Bayview loss mitigation notes are

12        in there.  Right, Mr. Crawford?

13   A.   Right.  Right.

14   Q.   But the Cenlar loss mitigation notes are not in there.

15   A.   They -- it said N next -- after loss mitigation, so if

16        there's -- I mean, Bayview was working the loss

17        mitigation prior to that time, but, again, with the N

18        being next to it, the report is not -- when this

19        report was done on that date, it's not pulling -- it's

20        not including the Cenlar loss mitigation notes if

21        there was notes from that time.

22   Q.   Right.  Okay.  I follow you.

23              MR. LYONS:  Okay.  It is 1:00.  Let's take a

24        break for a half an hour.  Let me get a little

25        something to eat, and then we will come back and start

1    talking about the credit reporting and the disputes.

2             (A recess was held at this time.)

3             MR. LYONS:  Let's show the witness

4    Exhibit 22.

5             (Exhibit 22 was introduced at this time.)

6    BY MR. LYONS, CONTINUING:

7    Q.  Mr. Crawford, I'm showing you what's been marked as

8        Exhibit 22.  It's a -- it's a multipage document that

9        contains disputes that plaintiff had sent to Cenlar at

10      various times.  So there's one that you're looking at

11      on the first page that's January 16th, 2018, that's

12      got some proof documents attached to it in the form of

13      her Educators Credit Union transaction history.

14          If you scroll down to the next page, yep, you'll

15      see the payment history there.  Keep going down to the

16      next page.  These are records of her payments that she

17      made in -- on the account, okay, to -- from '16 to

18      2017, and then up above was in 2018.  Yep.  Continue

19      up one more, and then there's the letter.

20          So she is sending in evidence of payments and a

21      dispute letter dated January 16, 2018, and my question

22      really is do you see a record or receipt of this

23      information in the notes that we looked at in

24      Exhibit 4?

25          So let's put those up, and I can kind of help

1     you.  Go down on those until you get to 2018.  It's

2     going to be, yep, a little further.  Yep.  Right in

3     there.

4           So, Mr. Crawford, do you see around the middle of

5     January a dispute being received from Cenlar

6     concerning the payment dispute?

7   A.   I do not see anything in these notes regarding that.

8   Q.   Okay.  So if you look at the dispute on January 15th,

9     2018, is this a call, but -- is this related to a call

10    that was received by Cenlar?  Where they're saying,

11    "She is not behind.  Borrower said she was going to do

12    a PDC for 2/2/18," what's that?

13  A.   Postdated check.

14  Q.   Okay.  And so do you see that there's a communication

15    going on between Cenlar and the plaintiff at this time

16    concerning payments?

17  A.   Right.

18  Q.   Okay.  And then in February, on the 10th, just kind of

19    up in the middle of the page, it says, "Borrower

20    account showing delinquent for four months.  Stated

21    account should be current.  Sent in proof of payment.

22    Set CI callback."  Do you see that?

23  A.   Yes.

24  Q.   Okay.  So there's a dispute going on.  She's sending

25    in information about a payment dispute.  Is that

1        correct?

2    A.   Yes.  She did not agree with the account status.

3    Q.   Right.  And then on February 19th, she said "she is

4         current and we are reporting to the credit bureau and

5         we need to stop," and then it says the borrower

6         disconnected.  Do you see that?

7    A.   Yes.

8    Q.   Okay.  I just want to make sure I'm reading these

9         notes right.  So then let's go up to the next page,

10        page 9, and at the bottom, on March 17th, 2018, it

11        looks like there was more calls and a payment dispute.

12        Do you see that down there?

13   A.   Which date are you referring to?

14   Q.   March 17th.

15   A.   Okay.

16   Q.   Right?  Do you see that there's a dispute going on

17        with her that she says she's current, she's not

18        delinquent?  "Stated sent in proof to research

19        department over a month ago," and there's been no

20        response yet.

21   A.   Okay.

22   Q.   Is that -- did I read the note correctly?

23   A.   Yes.

24   Q.   Okay.  Then the second-to-the-last March 17th, 2018,

25        note says, "Advised consumer payment methods due

1    dates.  Left message for OPTS.  Verified account

2    information.  Referred payment dispute."  Did I read

3    that right?

4  A.  No.  RFD, reason for default, payment disputes.

5  Q.  Okay.  So RFD is a payment -- is -- but who is that

6    note being sent to, or is that just what -- a recap of

7    what the plaintiff is saying?

8  A.  That's a recap.

9  Q.  Okay.  And there's a note up on 3/21/18 from CRM.

10    Is -- what is CRM?  What department is that?

11  A.  CRM is a processor ID.

12  Q.  Okay.  So that note says, "Already paid.  Advised four

13    payments due."  She "stated she sent in proof of

14    payment to research department.  Loss call in

15    progress."  Right?

16  A.  Right.

17  Q.  And at the very top of that page, there's a note on

18    June 12th.  It says, "Callback task, credit dispute

19    open."  What's, "PPW received"?

20  A.  I'm not sure what PPW is, sir.

21  Q.  Okay.  Is there a chart or a legend or a code or a key

22    that would help you decipher what the -- what some of

23    the shorthand is in here?

24  A.  No, sir.

25  Q.  Okay.  So to talk -- to figure out what PPW means, who

1    do we got to talk to?  Is there some -- is EZW the

2    agent that entered in that note?

3    A.   Yes.

4    Q.   Okay.  Does it show in the notes any resolution of

5         this payment dispute by her or any correspondence

6         being sent back to her prior to April of 2018?

7    A.   It showed the executive resolution analyst sent a

8         report back.

9    Q.   Okay.  What page is that?  Where did you see that?

10   A.   I'm referring to the letter that you showed me

11        earlier.

12   Q.   And does that show up now in these notes?  Are you

13        saying you found that?

14   A.   Again, that is not in the notes.  They usually put

15        their notes in NOTS.  NOTS is not included.

16   Q.   Oh, I thought you were saying that, in Exhibit 4, you

17        saw a reference to that, but you did not.

18   A.   No.  I did not see that.  I did not.

19   Q.   You just know that an executive report came back

20        because I showed you the exhibit.  Right?

21   A.   Because I've seen the letter before.  Yes.

22   Q.   Yes.  That's Exhibit 20, and we already -- we marked

23        that.  Now let's go back to Exhibit 20 for a minute.

24        On the second page of Exhibit 20, second-to-the-last

25        paragraph of that page, the Cenlar agent -- executive

Case 2:19-cv-01555-NJ  Filed 11/02/20  Page 102 of 187  Document 30-2

1    agent wrote, "We note that on January 15, 2018, the

2    borrower requested to speak with a supervisor, who was

3    unavailable at that time of her call.  It appears the

4    borrower wished to discuss the denial of her loan

5    modification.  Unfortunately, our supervisor failed to

6    return her call."  Do you see that?

7  A.   Yes.

8  Q.   And then it goes on to say on January 15th she made a

9    payment, and we already talked about that.  Right?

10 A.   Right.

11 Q.   Okay.  Let me show you Exhibit Number 21 that we've

12   marked.

13            (Exhibit 21 was introduced at this time.)

14 BY MR. LYONS, CONTINUING:

15 Q.   Exhibit Number 21 is a letter dated July 16th, 2018,

16   again to the CFPB, and if you go to the end of the

17   letter, you will see that this letter is also from

18   Allison Johnson.  Do you know why this letter was sent

19   twice to the CFPB, once in April and once in July?

20 A.   If there was multiple responses, there were multiple

21   requests.

22 Q.   Okay.  And in order to find out if there were multiple

23   requests, we'd need to look at the notes, right, to

24   see what the history was on the contacts?

25 A.   If there's notes of the letter being received in the

1    NOTS, then you can look at that.

2              MR. LYONS:  Okay.  And let me stop right

3    there and maybe ask Ms. Cummings.  Were you able on

4    the break to find out if those notes were, in fact,

5    produced?

6              MS. CUMMINGS:  No.  I didn't have a chance

7    to look into that.

8              MR. LYONS:  No problem.  We'll talk about

9    that after the deposition, and then also not only the

10   notes, but the loss mitigation notes for Cenlar.

11   BY MR. LYONS, CONTINUING:

12   Q.   Okay.  Turning back to Exhibit Number 22, let's put

13        that exhibit up for -- yeah.  Thank you.  Scroll down

14        to the CFPB complaint.  Yep.  Keep going.  Right

15        there.

16             So, Mr. Crawford, are you aware -- you're aware

17        of the CFPB complaint, and you reviewed that?

18   A.   Yes, sir.

19   Q.   Okay.  And that, again, had to do with the payments

20        and the payment history?

21   A.   Yes.  We just looked at the response to that

22        complaint.

23   Q.   Right.  And there were attachments to the CFPB

24        complaint.

25             MR. LYONS:  If you look -- keep scrolling

1    down, Madam Court Reporter.  Up now.  Up.  Right --

2    keep going.  Keep going.  That's the page I want.

3    Keep -- right there.

4  BY MR. LYONS, CONTINUING:

5  Q.   See the attachments that are listed in the complaint

6       detail, Mr. Crawford?

7  A.   Right.

8  Q.   Have you reviewed all those documents as well?

9  A.   I believe I've seen some of them.

10 Q.   Okay.  But you're aware that they were part of the

11      plaintiff's CFPB complaint.  Right?

12 A.   That's what's listed on the stuff as it being

13      attached.

14 Q.   All right.  And then we were talking for a minute

15      about -- back in the consolidated collection notes

16      that we were looking at that there was communications

17      in July of 2018 and into August of 2018.

18           MR. LYONS:  And if, Madam Court Reporter,

19      you keep scrolling down the document.

20 BY MR. LYONS, CONTINUING:

21 Q.   Mr. Crawford, you will see right there there's a

22      letter dated July 20th and another dated -- another

23      one dated July 20th and also with an appendage there

24      on the side from September of 2018.  Again, these are

25      issues with the -- with the payment history that

1      Ms. Green is trying to bring to Cenlar's attention.

2      Correct?

3   A.  I'm sorry.  Repeat the question?

4   Q.  Yeah.  These additional letters that are being sent

5      and faxed in to Cenlar are complaining about payment

6      history and credit reporting disputes.  Correct?

7   A.  She's disputing her payments, her account status.

8   Q.  Yes.  Right.  And you saw those were reflected in

9      Exhibit 4, right, that we also looked at at the

10     various time periods.  Correct?

11  A.  I don't recall which one is Exhibit 4.

12  Q.  Exhibit 4 are the -- is the consolidated notes.

13  A.  And what was your question about the consolidated

14     notes?

15  Q.  That there is reference, if we go back to Exhibit --

16     or Exhibit 4 -- we can do it right now.  In June and

17     July and August, there is record of -- yep.  Keep

18     going up to page 8.  There's -- yep.  Right there.

19         There's records of correspondence, letters being

20     received by fax, and information showing that the

21     plaintiff is disputing the payment history and the way

22     that it's credit-reporting.  Right?  We just looked at

23     those same letters in Exhibit Number 22.

24  A.  Right.

25  Q.  Okay.  All right.  Now, staying with Exhibit 4, if we

1    scroll up to the top -- yep.  We're going to get up to

2    December.  Yep.  Right in there.  The top of the page

3    should be December 6th, 2018, right -- one more.  Yep.

4            So in December, the plaintiff begins to dispute

5    with the credit reporting agencies.  Correct?

6    A.   I don't know what date she started to report that, to

7         dispute that.

8    Q.   You can see it right in the middle of the page.  There

9         is an e-OSCAR dispute received on December 6, '18.

10        Right?

11   A.   Yes.  I've seen when we -- when we received it.  Yes.

12   Q.   Okay.  So let's stop for a minute.  Let's pause for a

13        minute and talk about direct disputes versus indirect

14        disputes.  We kind of touched on that this morning,

15        but let's circle back to that now.

16            So there would have been many direct disputes

17        from the plaintiff to Cenlar about the payment

18        history.  Right?  And the credit reporting.  We talked

19        about those.  Right?

20   A.   There was dispute about payment.  Not dispute about

21        credit reporting, about payments.

22   Q.   And credit reporting.  Right?

23   A.   I remember -- I can go back to that, but I think

24        there's dispute about account status.

25   Q.   Okay.  But both account status and payment history

1     would be reflected in how Cenlar is reporting to the

2     credit reporting agencies.  Correct?

3  A.   Correct.

4  Q.   Okay.  So if she has a dispute about that directly

5       with Cenlar, there's a process by which Cenlar can

6       advise the credit reporting agencies that Ms. Green

7       has a dispute.  Correct?

8  A.   No.  We're not going to advise the credit agency that

9       she has a dispute.

10 Q.   Why are you not going to do that?

11 A.   Because everybody can -- every homeowner can call and

12      say, "We have a dispute," so you're not going to send

13      each in.  Every time someone calls and says, "I have a

14      dispute," you send that report to the credit bureau,

15      that's not -- I don't have any knowledge of that being

16      a process.

17 Q.   Okay.  That's -- so on a direct dispute like the ones

18      we were talking about, there is no process for

19      updating the credit reporting agencies to explain that

20      there's a dispute.  Correct?

21 A.   No.  If someone's sending a dispute and it's being

22      handled by the credit department, then they have their

23      processes.

24          If someone calls and you have a phone

25      conversation and you're disputing your account, that

1      is -- they advise you to send in the information to

2      the research department, but that's -- but because

3      it's still a dispute of what is owed, a report does

4      not automatic go towards the credit report because

5      there was a dispute.

6   Q.   Okay.  So in order to trigger the dispute to send to

7      the credit reporting agency, you have to send in

8      information.  Right?  You can't just do it on the

9      phone.

10  A.   That's -- there has to be ongoing research to look

11     into the matter.

12  Q.   Okay.  And based on what you've seen both in

13     Exhibit 22 and the other exhibits concerning the CFPB,

14     was there an ongoing dispute between the plaintiff and

15     Cenlar?

16  A.   Which one is Exhibit 22?

17  Q.   Exhibit 22 is the last one we looked at with her

18     letters from January 16, the CFPB complaint from

19     April, and then the July and August disputes from

20     2018.

21  A.   Okay.  Which one -- I mean, which -- you just

22     referenced three letters.  Which ones -- are we doing

23     one at a time there?  So I don't --

24  Q.   I think what I'm --

25  A.   -- I guess, follow your lines of question.

1   Q.   Sure.  What I'm saying to you, sir, is that over the

2        course of 2018, from January of 2018 to April of -- so

3        January of '18 is the first page of Exhibit 22.  Okay?

4        Okay?

5   A.   Okay.

6   Q.   Then there's an April.  Right?  Keep going down.  Yep.

7        There's an April CFPB complaint.  Right?  And we know

8        that you received both of those, the January dispute

9        and the April dispute.  And then if you keep going

10       down, there's a July dispute, and then there was an

11       August dispute, because -- right there.

12            As you can see from the top page, there's an

13       August 13th, 2018, fax that we just looked at in the

14       notes in Exhibit 4 showing all the -- that these

15       disputes were being received by Cenlar and Cenlar was

16       responding to them.  Correct?

17  A.   Cenlar responds to the April and the July.  That's

18       what we have discussed so far.

19  Q.   Okay.  You don't see anything in August.

20  A.   I mean, we have not discussed anything from August.  I

21       don't remember the dates off the letter.  I'm just

22       referencing what we have discussed and what you have

23       presented so far.

24  Q.   Oh, okay.  Well, then, so you've seen -- you've seen

25       April, and you've seen July, and now I'm going to show

1     you August.  So let's go back to Exhibit 4, and we're

2     going to go to August.  Right at the top.  Yeah.

3     Yeah.  Right there.

4          At the -- on the second page.  Right?

5     "Correspondence letter received by fax."  "Bank

6     statements received by fax."  Right?  These are all --

7     these are all things that are being received.  Right?

8  A.   Where are you looking, sir?

9  Q.   Okay.

10 A.   Where are you -- what date are you reading from?

11 Q.   8/13/18.

12 A.   Okay.

13 Q.   "Bank statements received by fax."  "Correspondence

14    letter received by fax."  "Envelope received by fax."

15    "Fax cover page received by fax."  Do you see -- do

16    you see where I'm reading?

17 A.   Right.

18 Q.   Okay.  So there is an ongoing set of correspondence

19    with the plaintiff related to the credit reporting and

20    the account status and the payment history.  Correct?

21 A.   No, sir.  Those -- those information that's faxed are

22    being received.  If you look at the notes, they are

23    being sent for hardship or loss mitigation.  You show

24    bank statement.  You show correspondence.  You show

25    fax cover letter.  You show hardship letter.

1   Q.   Yep.

2   A.   And you go up on 8/13, it says, "LM002 packet,

3        acknowledge package received."  So it was --

4        information was being sent for loss mitigation work.

5        Where -- that's where it was being sent to.

6   Q.   Well, that's -- it may be --

7   A.   That was --

8   Q.   It may be being sent there, sir, but I've shown you

9        the fax -- I mean, do you have any information to deny

10       that you were not -- that Cenlar was not receiving

11       these disputes concerning the reporting and the

12       payment history?

13  A.   Sir, I'm not denying what was received and whether it

14       was not received, what was received.  You referenced

15       the notes on 8/13/18, and in response to that, I'm

16       letting you know that it was information that's being

17       sent to loss mitigation, and loss mitigation is

18       tracking that as a loss mitigation package, not a

19       research package.  So that's a big difference between

20       there.  So that's -- that's what I'm trying to clarify

21       regarding those notes.

22  Q.   Okay.  So do you ever see Cenlar straightening it out

23       and sending it to research?

24  A.   Say that again?

25  Q.   Do you ever see Cenlar sending the package that it

1    received related to plaintiff's dispute to research?

2  A.   No.  It said that the package's received and the

3       package is incomplete, so an incomplete package letter

4       will be sent out.  Once you get a full package, then

5       our loss mitigation will review the full package to

6       determine what is included within that package.

7  Q.   So if loss mitigation didn't send the package to

8       research, research would never get it to investigate

9       the dispute related to the payment history problem and

10      the account status problem.  Correct?

11 A.   Right.  If we scan a package and a package is -- if it

12      goes to loss mitigation and a package is incomplete,

13      it has not been assigned to someone to review it to

14      determine what the information is being sent for.

15 Q.   So if we scan -- or if we scroll up, in September, do

16      you ever see it being forwarded to research for

17      investigation?

18 A.   No, sir.  Again, in September, another letter was sent

19      on September 6th stating that that package is

20      received.  That package is being recognized.  You have

21      a hardship letter being recognized as a loss

22      mitigation package, not a research package.

23           So, again, until the package is complete, then it

24      gets -- the entire package can be reviewed.  But the

25      package was incomplete, and another missing document

1   was sent out.  So whoever reviewed it may have been

2   understanding they had a loss mitigation package and

3   not a payment research package, because that was the

4   wrong place it was sent to.

5   Q.   I understand.

6        So let me ask you this.  Is -- are the -- are the

7   documents that are received from the borrower, are

8   those imaged and kept somewhere?

9   A.   Yes, sir.

10  Q.   Where are they -- where are those documents housed?

11  A.   They are kept in the Meta -- Meta system, M-E-T-A.

12  Q.   And do the -- does the credit dispute department have

13  access to that document warehouse?

14  A.   That is where loss mitigation stores their documents.

15  Q.   Yep.

16  A.   That's the -- that's the storage --

17  Q.   Right.

18  A.   -- for loss mitigation.

19  Q.   Okay.  So credit would never see those documents.

20  Correct?

21  A.   No.  You have to open up a credit task and provide a

22  document for credit to start their review and their

23  process.

24  Q.   Okay.  Is there a -- is there a platform within either

25  Black Knight or Cenlar to warehouse documents that all

```
 1          departments can view?

 2   A.     No, sir.  Based on your department, you have -- you

 3          don't have access to everywhere.  So based on where

 4          you work and what credentials you have, you may have

 5          the password to go into certain places.

 6   Q.     And as you sit here right now, do you know if credit,

 7          the credit department that handles the either direct

 8          or indirect disputes, has access to loss mitigation

 9          documents?

10   A.     They may have access to loss mitigation documents,

11          because they do our research for the entire company.

12          So credit may have access to loss mitigation

13          department -- documents.

14   Q.     May have, but you don't know for sure?

15   A.     I'm -- so many have, or they can -- they can request

16          the documents that they will need.  So if you need a

17          document from a certain department, you can contact

18          someone in that department and request those

19          documents.

20   Q.     Okay.  So that's what I'm trying to find out.  Right?

21          So the people in credit, if they want to research an

22          issue and review documents from loss mitigation, they

23          need to make a request to loss mitigation to get that

24          information.  Correct?

25   A.     You can contact someone in loss mitigation and request
```

1          the document that you need.

2     Q.   Okay.  But without making that request, those

3          documents aren't readily available to credit.

4          Correct?

5     A.   That's correct.  It's on a needs basis.  If you need

6          it, then you go ahead and retrieve it yourself if

7          you're doing the research.

8     Q.   What group is MWB?

9     A.   I'm not sure -- what's MWB?  I'm not -- I'm not

10         understanding your question.

11    Q.   Sure.  Let's look -- if you could scroll up on the

12         current document -- right there.  Yep.

13              So on -- remember how we were talking about

14         December 6th, 2018?  MWB, what department is that?

15    A.   That's a -- that's a processor ID.  The department is

16         the first one.  The SER, COL, those are the

17         departments.

18    Q.   Thank you.

19    A.   The MWB, QDG, those are processor IDs.

20    Q.   And SER is what?

21    A.   Is service -- service and customer service.

22    Q.   And what images did customer service have in its

23         warehouse of documents?

24    A.   I don't recall where they store their documents, but

25         they send the information to different places based on

Case 2:19-cv-01555-NJ  Filed 11/02/20  Page 116 of 187  Document 30-2

1    what document comes in.

2    Q.   Okay.  So, for example, credit disputes, where would

3         they save those?

4    A.   They would send it to the credit dispute box.  You

5         would open up a task and assign this for someone in

6         the credit department to look up for their work

7         assignment.

8    Q.   And would there be a reflection in these notes if

9         there was an instruction to save documents from an

10        indirect dispute?

11   A.   I'm not understanding the question as state -- I'm not

12        understanding the question.

13   Q.   Okay.  So, for example, on December 6th, 2018, we know

14        that the agent received the e-OSCAR dispute.  Right?

15   A.   Right.

16   Q.   And do they save copies of those e-OSCAR disputes or

17        the responses?

18   A.   Yes.  The credit department will save copies of the

19        dispute and the responses.

20   Q.   And do you have to open a task in order to instruct

21        them to do that or not?

22   A.   No.  That's -- any document that is received, it is

23        stored under the loan history, but it's a matter of

24        where it is stored by which department.

25   Q.   Okay.  Now, we talked about the direct disputes.

1    Right?  So if the research department, which is part

2    of customer service -- is that right?

3  A.   I'm not sure if research is part of customer service.

4    I'm not sure of that family tree.  It's a separate

5    department.

6  Q.   Okay.  But that's why -- that's why, I guess, I need

7    to know if you could answer that question.  So if a

8    direct dispute comes in related to credit reporting or

9    payment history or account status with relationship to

10   a credit report, who should that eventually filter to?

11 A.   Well, there's a lot in that question.  That's a very

12   broad question, because you said, "Payment," and you

13   said, "Credit reporting."  So those are two -- if it's

14   a payment, research will review the payment history

15   and send a copy of the payment history, giving that

16   "Here's the payment history that we have."  If we need

17   additional information, they would send you out that.

18       If you have credit reporting disputes, then that

19   dispute would go to the credit reporting department to

20   review and respond to that.

21 Q.   Even if it's -- even if it's direct?

22 A.   Right.  If -- it's credit reporting, so it will be

23   handled by the credit reporting department.

24 Q.   In the April CFPB dispute, did we -- do you know

25   whether or not credit -- the credit department was

1      engaged to perform any investigation or if it was all

2      handled by the executive team?

3  A.  Which -- please go back to the document and make sure

4      we're talking about the right dispute or so.  There's

5      so many different letters.  I don't know which

6      exhibit --

7  Q.  Okay.  Yep.  That's fair.  Let's go to Exhibit 20.  We

8      can go to the top of the page.  So this is the letter

9      from April, right, from Cenlar back to the CFPB?

10 A.  Right.

11 Q.  About credit reporting.  Right?

12 A.  Right.

13 Q.  Okay.  So my question for you, sir, is was this

14     dispute ever directed to credit, or was it handled

15     only by the executive team?

16 A.  It was handled by the executive team conducting their

17     research of the loss mitigation, the credit reporting,

18     and anything that was included within the dispute.

19 Q.  Okay.

20 A.  They would review the loan history.

21 Q.  And if credit reporting performed any research related

22     to this dispute, would that show up in the

23     consolidated notes?

24 A.  No, sir.  Credit reporting would put their notes on

25     their account.  "Fax received."  "Dispute received."

1   "Responded to the dispute," and put their notes on the

2   account.

3  Q.   Right.  So if we don't see anything from credit, that

4       means they weren't engaged in April to deal with the

5       CFPB -- the CFPB complaint.  Correct?

6  A.   Sir, because the information was sent to the executive

7       team to respond to that, so they are the ones sending

8       out the written correspondence.  They would conduct

9       the research, speak to the various departments that it

10      needs to speak to if they need additional information,

11      look at the payment history, look at the credit

12      reporting, look at the loan file.

13          If you have any additional questions, then you

14      can reach out to the various departments and ask those

15      questions before you respond to the letter.

16 Q.   Okay.  And so if there was no note from the credit

17      bureau department in the consolidated notes that we've

18      marked as Exhibit 4 related to the CFPB complaint,

19      then they weren't contacted.  Correct?

20 A.   That's not correct, sir.  If the dispute -- if there's

21      credit reporting questions, you can still speak to the

22      credit reporting department while conducting your

23      research.

24          Like, "The borrower is disputing this.  What was

25      reported?"  And you match what is being reported and

1    what is the payment history or the account status

2    being reviewed for.  So we keep a record of

3    everything.

4         So you have a payment, and you have a reporting

5    date as it went to their credit history, so you match

6    that out.  "Okay.  This one was reported.  What month

7    was it reported for?"  So you can look at a track of

8    the credit reporting to answer your -- to answer the

9    question from the dispute.

10   Q.  Right.  But what I'm asking you is, if there's no

11   record in Exhibit 4 of credit being contacted in April

12   of 2018, then that means the executive team didn't

13   reach out to credit and credit didn't make any

14   determinations or do anything on behalf of that.

15   Right?

16   A.  I cannot answer that question based on that note, sir.

17   Again, it's -- if that is the product of research, you

18   would reach out to different departments.  So you

19   can -- you can call and say, "Can you take a look at

20   this loan for me?"

21   Q.  Yeah.

22   A.  It's not -- it doesn't -- it doesn't involve putting

23   your notes on the account.  If a person provides you

24   with information, then you can go ahead and put that

25   in -- you make -- if you make your notes what you

```
 1        found, you will summarize your notes from your

 2        research that you have done with various departments

 3        and put that into the notes.

 4   Q.   Okay.  So maybe those notes are the -- in the

 5        executive notes that we haven't -- that haven't been

 6        produced, but we at least don't see anything from

 7        credit about the --

 8   A.   I'm not -- I did not speak of any executive notes.  I

 9        don't know of any other executive notes platform.

10        They will put their notes in the account in there.

11        "Fax received.  Complaint received."  They will put

12        that note in the file as far as what was received and

13        what was reviewed.

14             That's as far as -- as far as I have seen

15        regarding putting the status on the account.  So if

16        they receive a research, they conduct the research,

17        and they put in what was sent, and they summarize

18        that.

19   Q.   Okay.  Okay.  So now let's talk about indirect

20        disputes, and that gets us to December on Exhibit 4.

21        So we've got disputes coming in from the credit

22        reporting agencies.  Right?

23   A.   Right.

24   Q.   Okay.  And if the customer makes a dispute through the

25        credit reporting agencies, there's a procedure to
```

1        follow.  Is that correct?

2    A.   Yes.

3    Q.   Okay.  And that procedure, we've marked as Deposition

4         Exhibit Number 6, so let's show the witness that.

5                    (Exhibit 6 was introduced at this time.)

6    BY MR. LYONS, CONTINUING:

7    Q.   I'm showing you a copy of Exhibit 6, which is the

8         first eight pages of the third party operational

9         reporting departmental procedure.

10                   MR. LYONS:  So if you scroll, Madam Court

11        Reporter, down for the eight pages, Mr. Crawford will

12        see the first eight pages.

13   BY MR. LYONS, CONTINUING:

14   Q.   But this is a 48-page document.  Do you know what else

15        is included in this manual?

16   A.   No.  Not off the top of my head, sir.

17   Q.   Okay.  And if you can scroll down one more page, also

18        page 24 was produced, and there are some redactions at

19        the top of the page.  Do you know what those

20        redactions are about?

21   A.   Not from look -- from looking at what you're looking

22        at, sir.  I don't know off the top of my head.

23                   MR. LYONS:  And, Counsel, we don't know why

24        Section 7.2.3 was redacted, but you and I can take

25        that up after the deposition or on a break.

 1              But, Madam Court Reporter, will you please

 2       mark that section of the deposition?

 3  BY MR. LYONS, CONTINUING:

 4  Q.   Okay.  And then let's scroll down to the next page.

 5       Keep going one more page.  Yeah.

 6            There's an -- there's an appendix to this that

 7       shows a map.  It's kind of a -- this is the direct

 8       disputing map.  Do you see that?

 9  A.   I can barely see that, but --

10  Q.   Yeah.  That's how it was produced to me.  It's not

11       great, but it says, at the bottom of the page, "These

12       process maps are intended as a broad overview.  Refer

13       to the departmental procedure for an in-depth

14       description."  What is the departmental procedure for

15       in-depth description?  Where is that?

16  A.   I'm not sure what you're referring to, sir.

17  Q.   Yeah.  I don't -- I don't know how else to describe it

18       to you.  So at the bottom of that page, underneath all

19       the boxes, right, it says, "These process maps are

20       intended as a broad overview.  Refer to the

21       departmental procedure for an in-depth description."

22       What is the departmental procedure that that is

23       referring to?

24  A.   I cannot see what is in the box, so I can't answer

25       that without seeing what it's referring to.

1   Q.   Okay.  Now let's go back to page 6 of this exhibit, 6

2        of 48.  Okay.  So at kind of towards the bottom, it

3        says, "7.2, Credit bureau reporting procedures.

4        7.2.1, Credit bureau reporting disputes - direct."  Do

5        you see that?

6   A.   Right.

7   Q.   So the "credit bureau reporting disputes are received

8        by the call center."  Tell me what that is.  Is that

9        just customer service?

10  A.   It's a call center.  Customer service and collection

11       is the customer -- is the call center.  Customer

12       service and collection.

13  Q.   Okay.  So credit bureau reporting disputes can be

14       received by either collections or customer service.

15       Correct?

16  A.   Right.  That's who you're speaking to on the phone, so

17       whoever you speak to.  Yes.

18  Q.   And then they get just directed to credit bureau.

19       Right?  Or not?

20  A.   Yes.  They will advise you of where to send that

21       information.  Yes.

22  Q.   Okay.  Now, I don't see anywhere on this first page of

23       7.2.1 or, if you flip to the next page, I don't see

24       anywhere in this procedure that talks about updating

25       the compliance condition code.  Do you see anything

1       about updating the compliance condition code?

2   A.   You have shown me a couple of pages that connect with

3       what you're trying to ask, so I can't answer that

4       question based on the couple of pages you have shown

5       me.

6   Q.   Is this the procedure for -- is this the procedure for

7       direct dispute?

8   A.   It is one of the procedures.  I don't remember what

9       was -- what was on top of the procedure.  You just saw

10      that certain pages, so I don't quite recall exactly

11      what procedure this is for.

12  Q.   Okay.  Here.  Let's flip back up to the page above.

13      So there it is right there.

14         Credit reporting procedure for direct disputes,

15      take a minute and review that, 7.2.1.

16  A.   Okay.

17  Q.   Okay.  Now let's take him to the next page.  So 7.2.1

18      finishes up there.  So I'll -- let me repeat the

19      question.  I don't see any procedure in 7.2.1 related

20      to direct disputes that has anything to do with the

21      compliance condition code.  Do you see anything?

22  A.   I'm not knowing which -- that code that you're

23      referring to, sir.

24  Q.   You don't know what that code is?

25  A.   No, sir.  I do not know.

```
 1    Q.    Okay.  And then down in 7.2.2, take a minute to read
 2          that.  So those are the indirect disputes related to
 3          credit reporting.
 4    A.    Okay.
 5    Q.    Next page, do you see anything in that procedure
 6          related to indirect disputes through the credit
 7          reporting agency and the compliance condition code?
 8          Do you see anything referenced in there about it?
 9    A.    I'm not reviewing the entire document, so, I mean, I'm
10          just -- I can't -- I don't want to guess.  I'm not
11          reviewing the entire document to answer that question.
12    Q.    Yeah.  I don't even have the entire document.  You've
13          got what I've got right there.  So you don't see
14          anything in there about compliance condition code.  Do
15          you?  Do you see anything?
16    A.    Based on what is in front of me, I do not see that
17          language.  That is based on what is on the screen.
18    Q.    Thank you, sir.
19              And in your preparation for your deposition
20          today, Mr. Crawford, did you speak with -- or were you
21          advised or prepared to talk anything about the
22          compliance condition code?
23    A.    No, sir.  I did not speak to anyone regarding the
24          compliance condition code.
25    Q.    Okay.  Let's mark Deposition Exhibit Number 5.
```

1          (Exhibit 5 was introduced at this time.)

2    BY MR. LYONS, CONTINUING:

3    Q.   This is Deposition Exhibit Number 5.  It is entitled,

4         "Third party operational reporting, credit bureau

5         reporting oversight."  Do you see that?

6    A.   That's what you just read off the document.

7    Q.   Yep.  Are you familiar with this procedure?

8    A.   I've seen the document before.  Yes, sir.

9    Q.   Okay.  So who is the third party that it's referring

10        to?  Is that Black Knight?

11   A.   No.  It's the system that is -- that is used for the

12        reporting.  Yes, sir.

13   Q.   Okay.  But third party operational reporting, who is

14        the third party that that describes?

15   A.   As we go through the document, I can better answer

16        that question.

17   Q.   Okay.  Let's go to the next page.  Anything on that

18        page help you determine who the third party is?

19   A.   No, sir.

20   Q.   Okay.  Let's go to the next page.  Anything on this

21        page help you understand who the third party is that's

22        being identified there?

23   A.   I mean, it says the third party operational reporting

24        department is Cenlar's third party operational

25        reporting department.

1   Q.   So you think this is -- that Cenlar is the third

2        party.

3   A.   It's referring to a Cenlar FSB third party operational

4        reporting department.

5   Q.   Okay.  So Cenlar FSB is the third party that this

6        is -- that this is referring to.

7   A.   That's based on what is in front of me.  We have not

8        gone through the entire document, but that's the name

9        of that department.

10  Q.   Okay.  So let's keep going.  Let's look at the next

11       page.  A lot of talk about third party over there on

12       the -- on the left-hand margin, but I just don't know

13       who the -- if that third party is referring to Cenlar

14       or someone else.  That's what I'm trying to find out,

15       sir.  So take your time.  That's what I'm trying to --

16  A.   Referring to -- referring to Cenlar.

17  Q.   Okay.  So you think where it says, "Third party," that

18       means Cenlar.

19  A.   Yes.

20  Q.   Okay.  Thank you.

21            Let's go to the next page, page 5.  It looks like

22       the credit reporting analyst and senior credit

23       reporting analyst and third party, or Cenlar,

24       operational reporting team lead has the responsibility

25       to escalate issues to ensure compliance with the FCRA.

1        Am I reading that right over in the bullet points?

2   A.   That's what you read in the document.

3   Q.   Okay.  And are these credit reporting analysts and

4        senior credit reporting analysts, are those the agents

5        that process the ACDVs?

6   A.   Yes, sir.

7   Q.   Okay.  So that's -- you would call Barker and Cooper

8        credit reporting analysts.  Correct?

9   A.   I don't know their official title, but yes.  That's --

10       it could be one of them.

11  Q.   Okay.  And do you know if they're senior status yet?

12       Do you know anything about Cooper or Barker?

13  A.   No, sir.

14  Q.   Okay.  Who would know that?  Somebody from credit?

15  A.   I mean, know them as far as know what about them?

16  Q.   Know what their status is.  Are they -- are they

17       credit reporting analysts?  Are they senior credit

18       reporting analysts?  Are they operational reporting

19       team leads?  What are they?

20  A.   You can just look up the name in the e-mail and see

21       their title.

22  Q.   In the -- in the e-mail?

23  A.   Yes.  You just -- yes.  In the directory, just look up

24       someone's name, and you can find out their title.

25  Q.   Okay.  Well, hold on.  I don't know if I have that

1      document, but let me take a look.  So I've got to --

2   A.  It's not a document, sir.  It's a company directory,

3      not a document.

4               MR. LYONS:  Okay.  Company directory.  Okay.

5      Well, Counsel, I'd like that produced so I can find

6      out -- I guess what Mr. Crawford's saying is that's

7      how you find out who they -- what their title is, so

8      I'd like that.

9   A.  I mean, do you want to know their title?  It's not --

10     again, I can look up someone's e-mail and get you

11     their title.  Is that what you're trying to know?

12     You're not going to -- it's a -- it's a Microsoft

13     directory.  You're not going to receive a directory of

14     everyone in the entire --

15  BY MR. LYONS, CONTINUING:

16  Q.  No.  And so --

17  A.  So what is your -- what is your specific question?  Do

18     you want to know their current title now?

19  Q.  I want to know what their title is.  Yeah.  I want to

20     know if this applies to them.  Are they credit

21     reporting analysts?  Are they senior credit reporting

22     analysts?  Are they third party operational reporting

23     team leads?  What are they?

24  A.  Okay.  Whose title would you like to know?

25  Q.  Are you looking at another screen for this

1        information?

2    A.  I'm looking through e-mail.  Which title would you

3        like to know?

4    Q.  Marquita, M-A-R-Q-U-I-T-A, Barker, B-A-R-K-E-R.

5    A.  I'm sorry.  How do you spell the last name?

6    Q.  B as in boy, A-R-K-E-R.

7    A.  She's a credit reporting analyst.

8    Q.  Okay.  And to find that, you did what?

9    A.  By typing her name in e-mail.

10   Q.  Okay.  In your -- in your other computer that's next

11       to you that allows you to type e-mails to other

12       company employees?  Is that right?

13   A.  I type it in Microsoft.

14   Q.  Okay.  And then how about Monique, last name, Cooper,

15       C-O-O-P-E-R?

16   A.  Monique Cooper is a credit reporting analyst.

17   Q.  Thank you.

18           This document that we were looking at, Exhibit 5,

19       is the operational reporting, credit bureau reporting

20       oversight.  Does this govern the monthly tape

21       reporting that Cenlar sends to the credit reporting

22       agencies through Black Knight?

23   A.  I don't understand the question, sir.

24   Q.  Okay.  Well, we're just trying to figure out what this

25       reporting procedure governs.  Right?  So is this -- is

Case 2:19-cv-01555-NJ   Filed 11/02/20   Page 132 of 187   Document 30-2

1       this the monthly tape reporting that's done and sent

2       to the credit reporting agencies?

3   A.  It's the policy and procedure for credit reporting.

4   Q.  Okay.  Not ACDV responses, but monthly credit

5       reporting.  Correct?

6   A.  For all things regarding credit reporting.

7   Q.  Okay.  All right.  Well, let's -- so let's go back to

8       the beginning.  I'm trying to find out if this is the

9       procedure for how to process ACDVs.  So let's take a

10      look at it.  Let's go back to the second page.

11      Anything in there about ACDV processing?

12  A.  No, sir.

13  Q.  Okay.  Next page, anything there about ACDV

14      processing?

15  A.  No, sir.

16  Q.  Go to the next page.

17  A.  What about the next page?

18  Q.  Let's go on to the next page.

19  A.  I'm asking what -- you said the next page, but you did

20      not ask a question, so I didn't answer anything about

21      the next page.

22  Q.  Yeah.  I'm just -- I want to know, right -- so we're

23      going through the procedures, Cenlar's procedures for

24      responding to ACDVs.  So I haven't seen any procedures

25      that are going to tell Barker and Cooper how to do

```
 1         what their job is.  So I haven't seen that yet, but

 2         hopefully you're going to point it out to me in this

 3         procedure.

 4    A.   Okay.

 5    Q.   Anything on this page yet?

 6    A.   No, sir.

 7    Q.   Okay.  Let's go to the next page, page 5 -- or page 6.

 8    A.   No.

 9    Q.   Okay.  Let's go to the next page.

10    A.   Okay.

11    Q.   Anything on here about ACDVs?

12    A.   No.  Just the monthly reporting.

13    Q.   Right.  That's what we talked about -- that's what I

14         asked you about before.  This looks like to me -- and

15         this is a different question.  I'm just saying this

16         looks like the monthly tape reporting that Cenlar

17         does, and that's what this seems like it pertains to.

18         But you correct me if I'm wrong, because I want to get

19         to the point about ACDVs, and I'm not seeing it yet.

20    A.   On the pages I've seen so far, I haven't seen those

21         instructions.

22    Q.   Okay.  Great.  So let's go to the next page.  Now

23         we're on to page 7.  Yep.  Anything in there?

24    A.   No.

25    Q.   Okay.  Let's go to the next page.
```

1    A.    No.

2    Q.    Okay.   Page 9.

3    A.    No.

4    Q.    Let's go to page 10.

5    A.    Nope.   So far only monthly reporting.

6    Q.    That's what I thought too, but let's take a look at

7          page 11.   Anything on that page?

8    A.    Still monthly reporting.

9    Q.    Okay.   Page -- next page, page 12.

10   A.    Monthly reporting.

11   Q.    Okay.   I've just got a couple more to go.   13,

12         anything on that page?

13   A.    Monthly reporting.

14   Q.    Okay.   And the last page of the exhibit is that -- is

15         a flowchart again.   And I'm sorry -- oh, good.   She's

16         blowing it up a little bit for you.   Anything in there

17         about ACDVs?

18   A.    I see words, but I cannot read anything on that.

19   Q.    Okay.   I don't know what to do about that, because

20         that's how it was produced to me.   How -- does that

21         help at all?

22   A.    "Produce all oversight, access database," something,

23         "Monthly between the 1st and the 5th."   Okay.   That's

24         a credit reporting portion of it.

25   Q.    It kind of looks like more monthly reporting.   Right?

1  A.    Right.

2  Q.    Okay.  All right.  I'm going to represent to --

3  A.    It looks --

4  Q.    -- you, Mr. Crawford, that I didn't see anything in

5        there that had anything to do with ACDVs.  I couldn't

6        find it.  I didn't know if you knew if there was

7        anything in there, but I don't think so.

8              MR. LYONS:  Okay.  So, Ms. Cummings, am I

9        missing something?  Is there a better manual that the

10       witness should be looking at to understand what the

11       duties of the -- of Cooper and Barker are?  Has that

12       been produced?

13             MS. CUMMINGS:  Yes.  It's -- if you look at

14       the first manual that you were talking about, it's the

15       one called third party operational reporting

16       departmental procedure.

17             MR. LYONS:  Okay.  So that's Exhibit 6.

18             MS. CUMMINGS:  And if you look at starting

19       on page -- let me see here.  Starting on page 6, it

20       talks about the procedures when a direct credit bureau

21       reporting dispute is received, and the next page

22       discusses an indirect dispute.

23             MR. LYONS:  Okay.  And that was at 7.2.2,

24       and I think we already reviewed that with the witness.

25             MS. CUMMINGS:  Yes.  I think you talked to

1    him about it.  I'm not sure -- I can't remember

2    exactly what you went into.

3  BY MR. LYONS, CONTINUING:

4  Q.   So this is Exhibit -- we need to go to Exhibit 6, so

5       one back.  And right there, 7.2 -- no.

6            7.2.2, Mr. Crawford, we went over this before,

7       but you can take a look at it again.  I don't see

8       anything in there about ACDVs, and I don't see

9       anything in there about the compliance condition code

10      on an ACDV.  Do you?  In 7.2.2?

11 A.   The indirect, the -- the ACDV is a document.  So the

12      indirect, by coming from the credit bureaus --

13 Q.   Yep.

14 A.   -- that's -- that's the process that -- that will be

15      followed there.  So it may not mention the term that

16      you're looking at, but that is the procedure that is

17      followed regarding indirect disputes.

18 Q.   Okay.  So how does a -- how does an analyst know what

19      to do when they get an ACDV?  This is the man- -- this

20      is the procedure.  Right?  This is what they're

21      supposed to do.  Right?

22 A.   Right.  They do -- they do have training that advised

23      them how to handle the indirect dispute.

24 Q.   Okay.  But at least you don't know of any procedures

25      or training concerning the ACDVs that you can speak of

1        today.  Correct?

2   A.   We would refer -- refer you to the same instructions

3        that advised them about the e-OSCAR indirect.  So

4        you -- you get the reports, you conduct the research,

5        and you respond through that.

6   Q.   Okay.  And is there any response related to the

7        compliance condition code that we speak -- that we

8        spoke of?  Do you see any direction that Cenlar

9        provides the analysts for how to deal with that?

10  A.   Again, I've said that before.  I'm not familiar with

11       the compliance code that you're referring to.  I'm not

12       familiar with that.

13  Q.   Okay.  All right.  Let's take a look at Deposition

14       Exhibit Number 7.

15              (Exhibit 7 was introduced at this time.)

16  BY MR. LYONS, CONTINUING:

17  Q.   I'm showing you what is marked as Deposition Exhibit

18       Number 7.  This is a 32-page exhibit containing the

19       dispute letter, the information attached to the

20       dispute letter, and then eventually the ACDV that was

21       completed by Ms. Barker on December 6th, 2018.

22          So let's start with the dispute letter,

23       Mr. Crawford.  Have you seen this November 7th, 2018,

24       letter to Equifax before?

25  A.   I did see this letter.  Yes, sir.

1   Q.   Okay.  And you understand that she -- that Ms. Green

2        is disputing that she made late payments related to

3        January, February, and March of 2018.

4   A.   Yes.  I do see that in the letter.

5   Q.   All right.  And you and I already know -- we don't

6        have to go over it again unless you want to -- that we

7        know that she did make payments in January, February,

8        and March of 2018.  Correct?  She did make payments

9        those months.

10  A.   I don't recall specific dates or the time frame that

11       those payments were made without looking at a

12       document.

13  Q.   Okay.  Let's look at it again.  No problem.  You want

14       to go back to Exhibit 4.  At the end of the document,

15       four screens from the back.  Right?  So here comes

16       2018.  Right?  And we went over these before.  There

17       was a payment made on January 16, 2018.  Correct?

18  A.   January 16.  Yes.

19  Q.   Okay.  And that was 1,339.72.  Right?

20  A.   '18 -- yes.

21  Q.   All right.  And then on February 12th, there was

22       another payment made.  Right?

23  A.   Yes.

24  Q.   And then there was another payment made on March 30th.

25       Well, I think we need to be back down on page -- yep.

1    Right there.

2  A.   I still don't see March 30th.

3            MR. LYONS:  Madam Court Reporter, slide down

4    further towards the back of the document.  Yep.  Right

5    in there.

6  BY MR. LYONS, CONTINUING:

7  Q.   March 30th, 2018.

8  A.   Yes.

9            MR. LYONS:  Okay.  So now go back to Exhibit

10   Number 7, if you would, Madam Court Reporter.

11 BY MR. LYONS, CONTINUING:

12 Q.   So she sent this information to Equifax about her

13   making these payments in those three months.  Right?

14   Do you see that?

15 A.   Yes.

16 Q.   All right.  And then the next page of this document

17   are -- or next couple pages are documents that Cenlar

18   received from Equifax when processing the ACDV.

19   Correct?

20 A.   If that was what was attached to it.

21 Q.   Yes.  I'm representing to you that that's what was

22   attached to it.

23            And then all the way at the end of the document

24   is the ACDV, the last two pages.  Right there.  Yeah.

25   Let's take a look at that one first.  Mr. Crawford, do

1        you recognize this as an ACDV?

2   A.   Yes, sir.

3   Q.   Okay.  And the dispute code and the documents attached

4        have to do with the account status, the payment

5        rating, the account history; and it was requesting --

6        Equifax was requesting Cenlar to review all that

7        information and update it if necessary.  Correct?

8   A.   Yes, sir.

9   Q.   And you see, in the F- -- the "FCRA relevant

10       information" field, right by where the letter R, the

11       big letter R for "draft" is, do you see that?

12  A.   Say that one more time?

13  Q.   Do you see the "FCRA relevant information" field?

14  A.   Correct.

15  Q.   Do you know what that is?

16  A.   It's whatever information that they have attached to

17       the document.

18  Q.   And there were documents attached.  Correct?

19  A.   Yes.  There were documents attached.

20  Q.   And when Cenlar receives those documents, credit

21       copies those documents and saves them, right, in the

22       warehouse?

23  A.   Yes.  Those documents are saved.

24  Q.   In what platform, or where are they saved, again?

25  A.   It's saved on a shared drive.  Within the policy that

1          you went through, it gave instructions on where those

2          documents need to be saved.

3     Q.   Okay.  Now, if you turn -- or if we slide down to the

4          last page, you see, in the "account history response"

5          field, which is the shaded area -- do you see the

6          shaded area at the top?

7     A.   Right.

8     Q.   You understand that that's how Cenlar was telling

9          Equifax it wanted the account -- or the monthly

10         payment history to report.  Correct?

11    A.   Right.

12    Q.   Okay.  And from March of 2017 through December of '17,

13         Cenlar was reporting a zero, which I'm going to --

14         indicate to you means current.  Do you see that?

15    A.   Yeah.  Zero means current.

16    Q.   Yeah.  And then in the upper right-hand corner, we go

17         from current to 90 days late in January of 2018.

18         Right?

19    A.   Right.

20    Q.   And then in February, she's 90 days late.  Right?  In

21         March, she's 90 days late.  In April, she's 90 days

22         late.  Do you see that?

23    A.   Right.

24    Q.   Okay.  And you and I talked about this for a minute

25         before.  I asked you how you can go from current one

```
 1        month and then all the way to 90.  Right?  So no 30,

 2        no 60, but all the way to 90 days past due in January

 3        of 2018.  Do you see that?

 4   A.   Yes.

 5   Q.   But she did make a payment in January of 2018.  Right?

 6        We already looked at that.

 7   A.   She made a payment, but that was not for her January

 8        payment.

 9   Q.   Does this explain in any way, shape, or form to the

10        credit reporting agency that that's what you meant?

11        That "while she may have made a payment in January, we

12        did -- that's not when we credited it for"?

13   A.   This report does not reflect when a payment was made

14        or what month it was credited for.

15   Q.   Okay.

16   A.   This is the status of the account.

17   Q.   And if you look on the front page or the first page,

18        you will see, under the "compliance condition code" --

19        remember, we were talking about that.  It's kind of to

20        the left-hand side of the bottom of the page,

21        kitty-corner from the D in "draft."  Do you see that?

22   A.   Okay.

23   Q.   Do you see the "compliance condition code" field?

24   A.   Right.

25   Q.   Yes?  Do you see it?
```

1   A.   I see that in the document.

2   Q.   Yes.  And is there any -- did Cenlar populate anything

3        in that field?

4   A.   I don't see anything populated in the field.

5   Q.   Okay.  And do you know what Cenlar is supposed to

6        populate in that field or can populate in that field?

7   A.   I don't know off the top of my head, sir.  No, sir.

8   Q.   Okay.  Looking at that same exhibit and that same

9        document, was May 1st -- or, actually, I'm sorry.  Was

10       May 21st the date of the last payment that Cenlar

11       received and posted from Ms. Green?

12  A.   Where are you referring to?

13  Q.   In the middle of the payment information, right kind

14       of below the balance information, there's a "date of

15       last payment" field.  Do you see that?

16  A.   Right.  I believe that's 5/1/2018.

17  Q.   That's how -- that's how Cenlar was reporting it, and

18       now Cenlar changed the information to 5/21/18.  Is

19       that -- do you understand that that's how you read

20       that?

21  A.   Okay.  It said, "Date of last payment," so the first

22       day's the due date.  Again, 5/21 could be when the

23       payment was received.

24  Q.   Okay.  Do you know -- do you know how to read or

25       understand what information is being populated in that

1      field?

2  A.   Yes, sir.

3  Q.   Okay.  So tell me what the "date of last payment"

4       reflects.  What does that mean?

5  A.   It says, "Date of last payment, 5/1/2018."

6  Q.   And is that the date that the payment was received or

7       the date that it was due?

8  A.   That's the date it's due.

9  Q.   Okay.  So then you see that what Cenlar did in the

10      shaded area is updated that information and said, "Oh,

11      no, no, no, no.  It's not due on the 1st.  It was due

12      on the 21st of May."  Is that what it means?

13 A.   No.  That's not what it -- that's a due date.  The

14      white -- the white part is not done by Cenlar.

15      Everything that's in white is done by the credit

16      reporting.  The gray part is where Cenlar inputs their

17      information.

18 Q.   You got it.  That's right.

19 A.   So it says this -- it says, "Date of last payment,"

20      and the date of last payment, by this report, I

21      believe that's a date of 5/21/18.

22 Q.   Okay.  And so --

23 A.   This is what that says.

24 Q.   Okay.  And that is the last payment.  Right?  That's

25      what Cenlar is saying is that "the last time we got a

1      payment from the plaintiff was on May 21st, 2018."  Is

2      that right?

3  A.  That's the date that is in that document.

4  Q.  Do you know whether or not that's correct or not?

5  A.  You can easily go back to -- I don't know which

6      exhibit -- the payment history and see when a payment

7      was made in the month of June.

8  Q.  Okay.  So let's go back to Exhibit 4.  Yep.  You got

9      it.  Keep going.  Yeah.  A little bit further.  Yep.

10     Right there.

11         So the actual date of last payment was June 14th,

12     2018.  Right?

13 A.  Right.  You have a June 14.  Right.

14 Q.  Okay.  So that was actually the date of last payment.

15     Right?

16 A.  Well, it depends on when that report was submitted.

17 Q.  Which report?

18 A.  So -- the ACDV.  So at the time they're saying the

19     ACDV was submitted, they're saying the last payment --

20     we should go back.  It's the 5 -- it says processed

21     right there on 5/25/18 of 1,634.25.

22 Q.  Right.  And we looked at the ACDV, and that was dated

23     December 6th, 2018.  So that was after.  Right?

24 A.  Well, what was after?

25 Q.  The ACDV was after the June payment was made.  Right?

1  A.   Right.

2  Q.   Okay.  Now, the June payment that we looked -- that

3       we're looking at right on the screen, that June

4       payment really was, according to Cenlar, for March of

5       2018.  Right?

6  A.   That June payment -- what is that?  June 14th?

7  Q.   Now, what are you looking at?  What are you looking at

8       different than what I'm looking at?

9  A.   I'm looking at the same payment history, but I can

10      barely see it in that format, so --

11 Q.   So what --

12 A.   -- I'm looking at --

13 Q.   Yeah.  What are you looking at?

14 A.   The payment history.

15 Q.   On a different -- on a different computer screen.

16      Right?

17 A.   Right.

18            MR. LYONS:  Okay.  So, Counsel, that's a

19      problem, because I don't know what he's looking at.

20      He's looking at other information.  I'm going to

21      object to that.

22            THE WITNESS:  I can -- I can close -- I can

23      barely see what you put in front of me, so to better

24      answer --

25            MS. CUMMINGS:  Yeah.

1    THE WITNESS:  -- your questions, I'm viewing

2    the same payment history.

3    MS. CUMMINGS:  It's very small, what we have

4    that we can see.  It's probably, like, 2 inches big.

5    I was hoping what he could see was better than what I

6    could see, but it's -- I mean, it's, like, a

7    thumbnail.

8    MR. LYONS:  Yeah.  That's what I'm

9    looking -- there you go.

10    THE WITNESS:  Okay.  There we go.

11    MR. LYONS:  Thank you, Madam Court Reporter.

12    BY MR. LYONS, CONTINUING:

13    Q.   Okay.  So just so I'm clear, Mr. Crawford, the

14        June 14th, 2018, payment for 1,634.25 was really

15        credited and posted for March of 2018, right,

16        according to these records?

17    A.   No, sir.  If you go up, it shows that the due date did

18        not change.  It still showed a due date of March 18th.

19        So, I mean, if you can go down a little bit more, kind

20        of go from the bottom to the top, for me to look at

21        the history, so I guess on the page below --

22    MR. LYONS:  Yep.  You can scroll down, Madam

23    Court Reporter.  Sure.

24    A.   Mm-hmm.  So if you look, the payment on 5 -- on

25        5/25/18, that was applied towards -- let me see.  The

1    22 -- all right.  So the payment on 5 -- on 5/25, that

2    was applied towards January payment, and then you go

3    up one, the 6 payment, is 6 -- can you go up one?

4  BY MR. LYONS, CONTINUING:

5  Q.   Yep.

6  A.   So that -- so the 6/14 applied towards February,

7       leaving the account due for March.

8  Q.   Leaving -- say that again?  What for March?

9  A.   So the payment that was applied on 6/14/18, that went

10      towards February payment, and that's making the

11      account due for March '18.  So the payment is being

12      applied to the previous month.

13 Q.   Okay.  So in the "date of last payment" field, it says

14      May, but it really should probably be June.  Right?

15 A.   There was a payment received after the June one.

16      Right.

17 Q.   Okay.  Okay.  So now let's take a look at Cenlar's

18      response -- let's look at Deposition Exhibit Number 8.

19           (Exhibit 8 was introduced at this time.)

20 BY MR. LYONS, CONTINUING:

21 Q.   Okay.  So this is the letter from Experian that was

22      received by Cenlar.  Right?

23 A.   Right.

24 Q.   Okay.  And then there's attachments included, if we

25      keep scrolling down, and then all the way at the

1    bottom is the ACDV that Cenlar completed for Experian.

2    Right?  Do you see "Experian" up in the upper

3    left-hand corner, Mr. Crawford?  There you go.

4  A.  Right.

5  Q.  Okay.  And now scroll down.

6        Now, the "FCRA relevant information" field, we've

7    looked at it before.  Do you know what that

8    information is contained in that "FCRA relevant

9    information" field?

10 A.  Definitely did not understand that question, sir.

11 Q.  Okay.  So do you see the "FCRA relevant information"

12    field?  Right?

13 A.  Correct.

14 Q.  Okay.  Do you know what that -- what information is

15    populated in there?

16 A.  You mean the, "Current" -- where it says, "Current

17    account"?

18 Q.  Yeah.

19 A.  Okay.

20 Q.  Do you know who populated that is what I'm asking you.

21 A.  That's a white part, so it comes with the report.

22    Cenlar is populating the gray area.

23 Q.  Okay.

24 A.  So every white -- every white part is filled out with

25    the report that is filled out.

1    Q.   Okay.  And so that comes from the credit reporting

2         agencies is what you're telling me.  Right?

3    A.   Right.  It comes on the report.  Yes.

4    Q.   Okay.  And do you know what it means?  As you read

5         that, do you know what that information means?

6    A.   Not by just looking at that.  No, sir.  I don't know

7         the -- I don't know that code.  No.

8    Q.   Okay.  Okay.  And then down -- further down, we saw

9         the "compliance condition code" field is there.

10        Right?  And there's nothing in that.  Nothing's been

11        populated.  Right?

12   A.   Again, there's a white area, so that will be something

13        that will be done by -- by the report that it comes

14        with.

15   Q.   But Cenlar can fill in the shaded area.  Right?

16   A.   Yeah.  The shaded area will be what Cenlar has filled

17        in.  Yes.

18   Q.   Okay.  And you don't see that Cenlar filled in

19        anything in this.  Right?

20   A.   No.  There's nothing filled in in the shaded area.

21   Q.   Okay.  And then on this ACDV, the "special comment

22        code," the SCC right next to it, has been populated

23        with a BO code.  Do you see that?

24   A.   Yes.

25   Q.   Do you know what that code means?

1   A.   BO is the start of foreclosure.

2   Q.   Okay.  And so if we scroll down a little bit further,

3        this ACDV was also filled out by Barker, and she did

4        it on the exact same day, 12/6, but on the first ACDV

5        that we looked at, she didn't populate that code under

6        the SCC field.  She left it blank.  And on this one

7        for Experian, she didn't -- or she populated with a

8        BO.  Do you know why she would be inconsistent in her

9        reporting that way?

10  A.   No, sir.  I don't know why it wasn't completed on the

11       previous one.

12  Q.   Okay.  And Ms. Barker, on the exhibit that you're

13       looking at, which is Exhibit 8, also populated the

14       "response history" -- "account history" code showing,

15       again, that plaintiff was current from March until

16       December of 2017 and then was 90 days late in January,

17       February, March, and April.  Right?

18  A.   Right.

19  Q.   And then didn't report any information for May or

20       June.  Do you know why that is?

21  A.   In May and June of what year?

22  Q.   May and June of 2018.

23  A.   It has a D.  No reporting was done at that time.  No.

24       I'm not sure why it wasn't reported.

25  Q.   Okay.  Cenlar knew what the credit reporting status

1       was for the -- or the payment history was for June and

2       July of two thousand -- or I'm sorry -- for May and

3       June of 2018.  Right?

4    A. Cenlar did not report for those two months.  For May

5       and June, there's -- it appears that no reporting was

6       done.

7    Q. And why would they not report then?

8    A. You just asked the same question again.  I don't --

9       based on the report, I don't know why the reporting

10       was not done for those two months.

11    Q. Okay.  And is there a policy and procedure to cover

12       why they wouldn't report in certain months?

13    A. If there's a suppress of the credit reporting, it

14       would stop credit reporting.  We are -- I believe we

15       are not required to report every month, but if you do

16       report, you have to report accurate.  Again, just

17       looking at that document, I cannot answer why the

18       reporting was not done for those two months.

19    Q. Okay.  And then let's look at Deposition Exhibit

20       Number 9.

21              (Exhibit 9 was introduced at this time.)

22    BY MR. LYONS, CONTINUING:

23    Q. This is the third -- I'm going to show you what's been

24       marked as Exhibit 9.  This is the third dispute from

25       November of 2018, and this is the one that went to

1     TransUnion, and then TransUnion sent it on to Cenlar.

2     Correct?

3  A.  Yeah.  It's a TransUnion complaint.  It -- yes.

4     That's a TransUnion complaint.

5  Q.  Right.  And in the -- just as in the other disputes,

6     she sent copies of her payments, the proof that she

7     made the payments, and then if we get back far enough,

8     we'll get to the Cenlar ACDV, which is the last two

9     pages of the exhibit.  Yep.  Let's scroll down just a

10    little.

11        Here the "FCRA relevant information" field says,

12    "Never late in January, February, March, and April."

13    Do you see that, sir?

14 A.  Yes, sir.

15 Q.  Okay.  And then the two disputes are, "Disputes the

16    current balance, the amount past due," the current

17    balance, and then "the special comment code and/or the

18    other narrative remarks."  Do you know what narrative

19    remarks are?

20 A.  I'm not -- where are you referring to now, sir?

21 Q.  In the middle of the page, it says, "Dispute Code 2."

22    Do you see where it says, "Narrative remarks"?

23 A.  Yes.

24 Q.  Okay.  Do you know what a narrative remark is?

25 A.  Again, that's a -- it's a white part.  It's coming

1       with the credit report.  That's -- so that's coming --

2       that's TransUnion's box that they're checking and

3       completing for their part.  So that's from TransUnion.

4  Q.   So you're saying that Cenlar doesn't have to worry

5       about that part.

6  A.   I'm saying that that's what came with the report,

7       those information.

8  Q.   Right.  I'm just asking you if you know what it means.

9  A.   I -- and, again, it came from TransUnion, so no.  I

10       don't know what it means.

11  Q.   Okay.  All right.  Then no "compliance condition code"

12       field updated by Cenlar.  Correct?

13  A.   It has a -- it has a BO.

14  Q.   That's in the special comment code.  That's the SCC

15       field, but I'm talking about the one just to the left

16       of it, the "compliance condition code" field.

17  A.   That -- there's nothing filled in there by the credit

18       bureau.  There's nothing filled in by Cenlar.

19  Q.   Okay.  And, again, the analyst -- and we'll find out

20       who that is in a minute -- is reporting the date of

21       last payment as May 21st, 2018.  Right?

22  A.   Right.

23  Q.   Even though we know there was a June payment.  Right?

24       That's what we looked at before.  Right?

25  A.   It's the same date as on the other reports.

1   Q.   Right.  Same date.

2          And then this, if we scroll down, the -- it's --

3       Ms. Barker completed this on 12/6, same day as she did

4       the other ones.  Right?

5   A.   I believe so.

6   Q.   And does she answer that telephone number at the

7       883-3900 number that we see down there?  Is that her

8       direct dial?

9   A.   No, sir.

10   Q.   Where does that ring at Cenlar?

11   A.   It rings at Cenlar.  It's a general number.

12   Q.   It's the general number.

13   A.   Yeah.

14   Q.   Okay.  And it's got the late payment, the 90 days late

15       for January, February, March, and April.  Right?

16   A.   Right.

17   Q.   So if Green was 90 days late in June, how could she be

18       90 days late in February, March, and April?  Wouldn't

19       she then be 120 in February and then more late in

20       March and more late in April?  Or no?

21   A.   What are you referring to, sir?  The -- your reporting

22       is always done for the previous month.  So if it's

23       reporting in January, that's reporting your December

24       status.  The reporting is done in arrears, not the

25       current month.

1   Q.   So you're saying that what this is really showing is

2        that she was 90 days late in Decem- -- in December of

3        '17.  That's what you think this says?

4   A.   Not -- that's why I said in December, after the plan

5        was broken, it was due for October of 2017.

6   Q.   But they reported in -- on the 5th day of the month.

7        Right?

8   A.   Right.

9   Q.   So the reporting happened on December 5th, and the

10       denial letter didn't come out until the 14th.  Right?

11  A.   The report was done for the previous month.

12  Q.   So is that what you're telling me is that what this is

13       saying is that she was actually 90 days late in -- as

14       of December?

15  A.   Right.  After the -- in the month of December, the

16       plan was broken.  So when the report was done in

17       January, she was due for October, November, and

18       December.  It's -- your report is reporting the

19       previous month.  January would be for December.

20       February would be for January.

21  Q.   So -- but then shouldn't she be over 90 days late come

22       March and April?

23  A.   She kept making -- she made payments those months, so

24       that -- if no payments were made, then it would have

25       changed, but one payment was made, so it went back to

1     the 90 days.

2                    MR. LYONS:  Mr. Crawford, how are you doing?

3     You want to take a break, or are you doing okay?

4                    THE WITNESS:  I'm doing okay, sir.

5                    MR. LYONS:  Madam Court Reporter, how are

6     you doing?

7                    COURT REPORTER:  I'm doing fine.  Thank you.

8                    MR. LYONS:  Ms. Cummings?

9                    MS. CUMMINGS:  I'm doing fine.

10                    MR. LYONS:  Okay.  All right.  Let's move on

11    to Deposition Exhibit Number 10.

12                    (Exhibit 10 was introduced at this time.)

13    BY MR. LYONS, CONTINUING:

14    Q.    Okay.  In January of 2019, Ms. Green started to

15          dispute again with three letters to the credit

16          reporting agencies: Equifax, TransUnion, and Experian.

17          Is that your understanding, Mr. Crawford?

18    A.    That's one document -- the exhibit you just presented.

19    Q.    This is the first one, and this is the dispute to

20          Equifax.  Right?

21    A.    Right.

22    Q.    And then attached to her dispute was the image from

23          her credit report, if you keep scanning -- or

24          scrolling down, and then -- you can keep going -- and

25          then the proof that she made payments in January,

1          February, March, and April.  Correct?

2    A.    Of which year?

3    Q.    Pardon me?

4    A.    Of which year?  You said January, February, et cetera.

5    Q.    Oh, I'm sorry.  2018.

6    A.    Right.  We went through the history.  Yes.

7    Q.    Right.  And then eventually, at the back of the

8          exhibit, is the ACDV from Equifax to Cenlar.  And if

9          we look at the last page first, let's -- yeah.  Let's

10         stop right there on that page.  Yep.

11              So these -- this one was responded to by

12         Ms. Cooper.  We see her name at the bottom.  She

13         responded to this on February 19th, 2019.  Right?

14   A.    Right.

15   Q.    She left the 90-day-lates for January, February,

16         March, and April.  She put that there was no payment

17         or no payment information related to the March and --

18         or the May and June of 2018.  Right?

19   A.    There was no reporting done by Cenlar for those

20         months.

21   Q.    And then if we scroll up, in the "compliance condition

22         code" field on the left that we've looked at before,

23         Cenlar did not populate any information.  Correct?

24   A.    The report did not come with a code for us to verify,

25         and we did not complete that part of it.

1   Q.   And you understand that just because nothing is

2        populated in the white part doesn't mean you can't

3        change it in the gray part.  Right?

4   A.   I'm not sure what you would be changing it to if you

5        have nothing to change it from, so I'm a little

6        confused about that statement.

7   Q.   Say that again?

8   A.   There is nothing to change it from.  It did not come

9        with a code.  So if it came with a code, Code X, and

10       they're asking us to change it, then we can either

11       verify that code or change it to something else.  If

12       it comes blank, there's nothing to change.

13  Q.   And then let's take a look at Deposition Exhibit

14       Number 11.

15                 (Exhibit 11 was introduced at this time.)

16  BY MR. LYONS, CONTINUING:

17  Q.   Look at -- now, this is the January 21st, 2019,

18       dispute that was sent to Experian.  Similar to the one

19       we looked at to Equifax, this is the Experian one.

20       Right, Mr. Crawford?

21  A.   That's what's on the document, sir.

22  Q.   Okay.  And then -- and you're aware that these

23       disputes were received by Cenlar.  Right?  Because you

24       saw those in the notes.  Correct?

25  A.   That's a different time frame, but I'm sure if we

```
 1        scrolled down, if there was an ACDV to this

 2        attachment, then they received it.

 3   Q.   Okay.  Let's scroll down to the bottom.  Yep.  Right

 4        there.

 5             So that was responded to on February 19th, 2019,

 6        by Monique Cooper.  Right?  She's the Cenlar agent.

 7        Correct?

 8   A.   Correct.

 9   Q.   And see right above her name where it says,

10        "Associated images," and there's a -- there's a yes

11        there.  That means that -- that means that there were

12        documents that came with the ACDV.  Right?

13   A.   It means -- yes.  It means some things were attached.

14   Q.   Okay.  And then, again, no reporting for May and June

15        of 2018 right above that.  Right?

16   A.   Right.

17   Q.   Okay.  And then still consistent reporting, saying 90

18        days late January, February, March, and April, 3's in

19        all of those fields.  Correct?

20   A.   In 2018, correct.

21   Q.   All right.  And then scrolling up to the page before,

22        nothing in the "compliance condition code" field

23        populated by Cenlar.  Correct?

24   A.   Nothing -- no code came with the report, and no code

25        was changed or updated.
```

1    Q.    Let's take a look at Deposition Exhibit Number 24.

2                  (Exhibit 24 was introduced at this time.)

3    BY MR. LYONS, CONTINUING:

4    Q.    24 is, it looks like, a six-page document.

5          Mr. Crawford, it looks like the history of the credit

6          reporting for the Green loan.  Is that your

7          understanding?

8    A.    The first page, yeah.  The first page is a CBR.  Yes.

9          The first page is credit bureau reporting.

10   Q.    Okay.  And if we scroll down -- stop right there.

11               So in December of -- on December 5th, 2018, this

12         shows what was being reported for that month and year.

13         Right?

14   A.    Right.  Showing -- they reported as "foreclosure

15         started."

16   Q.    And the status code of 84.  Right?  Which is 180 days

17         past due.  Right?  Well, that's just what it -- that's

18         what it says there.  Correct?

19   A.    It falls -- it falls within that.  That -- yeah.

20   Q.    Okay.  And do you see where the "compliance condition

21         code" field is right there?  Right below the "special

22         comment" field.

23   A.    Okay.

24   Q.    Do you see that field?

25   A.    I see the "compliance condition."

1   Q.   Okay.  And you see that there's nothing in there.

2        Right?

3   A.   Right.

4   Q.   So at least for that month and that year, Cenlar was

5        reporting nothing.  Correct?

6   A.   There's nothing in that -- next to the "compliance

7        condition."

8   Q.   Okay.  And that's what this -- that's what this

9        document shows.  Right?  The monthly -- this is, like,

10       a snapshot of every month that Cenlar reported.

11       Right?

12  A.   This is -- it's to keep a record of what is sent to

13       the bureaus.  Yes.

14  Q.   Exactly.  Okay.

15            So if we go to the bottom of that page -- yep --

16       the report date was October 5th, 2018.  Right?

17  A.   October 5th.  Okay.

18  Q.   Right?  That's what's -- that's -- so the information

19       below that line is what was reported in October -- on

20       October 5th, 2018, related to the plaintiff's loan.

21       Right?

22  A.   In October, it says, "84, slash, 180 days past due."

23  Q.   Right.  And still no special comments, and no

24       compliance condition code.  Right?

25  A.   Right.

1    Q.   Okay.  What's the override with a yes or with a Y in

2         it next to -- next to that?  Do you know what that Y

3         override is?

4    A.   It's some -- it's on any kind of special kind of

5         arrangement, and you put it in any kind of special

6         instruction on how operators do reporting and changing

7         stuff, so putting in an override.

8    Q.   But you don't know specifically what is being

9         overridden or what is supposed to be overridden?

10   A.   Not from looking at that.  Just a Y, I can't tell

11        exactly what it was -- what it was put in for.

12   Q.   Okay.  Let's keep -- let's put -- keep scrolling down.

13        Yep.

14             So then there's the next reporting date.  It

15        looks like October 6th, 2018.  Do you see that?

16   A.   Right.

17   Q.   So that one in August of '18, there's an 83, which is

18        150 days past due?  Is that your understanding?

19   A.   It's between that.  I guess that it became 83 at 150

20        days, so it's -- it's about -- pretty much the number

21        it states goes with anything over that time frame.

22   Q.   And then no special comment code.  Right?

23   A.   Right.

24   Q.   And then no compliance condition code.  Right?

25   A.   Right.

1   Q.   Then we go down to July.  Now it's an 82 with 120 days

2        past due.  We've got the special comment code and

3        no -- or no special comment code and no compliance

4        condition code.  Correct?

5   A.   Correct.

6   Q.   All right.  So the -- I just want to make sure we're

7        reading this right.  When we show it to the court, I

8        want to be able to represent that that's how to read

9        that document.  Right?  Is that correct, Mr. Crawford?

10  A.   I'm sorry.  Was there a question pending?

11  Q.   Yep.  I'm just saying that's -- I want to make sure I

12       understand what those fields mean in this document.

13       Right?  So that's -- with the, "Special comment code:

14       No special comment code," that means nothing was

15       reported.  And then with the compliance condition

16       code, when it's blank, that means Cenlar was not

17       reporting anything.  Correct?

18  A.   I'm not -- I don't agree with what you -- what you

19       mean by Cenlar was not reporting anything.

20  Q.   Oh, okay.  Here.  Let's look at it again.  So right in

21       the middle of the page, on July 5th, 2018, the status

22       code is 82, and it says, "120 days past due."  Right?

23       That's what Cenlar was reporting to the bureaus.

24       Correct?

25  A.   Right.

| | | |
|---|---|---|
| 1 | Q. | Okay.  Below that, it says, "Special comment:  No |
| 2 | | special comment code."  Right?  That's what they were |
| 3 | | reporting to the bureaus? |
| 4 | A. | Correct. |
| 5 | Q. | And below that, in the "compliance condition code" |
| 6 | | field, there's nothing reported, so nothing was being |
| 7 | | reported to the -- to the bureaus at that time. |
| 8 | A. | Nothing -- there was no additional information for |
| 9 | | special comments and compliance -- and compliance |
| 10 | | code, if that's what you're referring to.  You say, |
| 11 | | "Nothing."  There was a report being done, but a |
| 12 | | portion of that is not included, so I just want to |
| 13 | | clarify that. |
| 14 | Q. | That's a fair clarification.  All I'm saying is |
| 15 | | they're -- Cenlar was telling the credit reporting |
| 16 | | agencies to not populate anything in the "compliance |
| 17 | | condition" field.  Right?  Because we're looking right |
| 18 | | at it. |
| 19 | A. | Cenlar was reporting the status of the account. |
| 20 | | Cenlar was not telling the credit reports [sic] what |
| 21 | | to populate or what not to populate.  They were not |
| 22 | | filling in those fields.  So that's -- looking at the |
| 23 | | report, that's what I can take from it. |
| 24 | Q. | Well, okay.  So let's keep scrolling, and you tell me |
| 25 | | if at any time Cenlar ever populated the "compliance |

1    condition" field.  You take a -- as we -- as we scroll

2    up, you tell me whether you see where Cenlar ever told

3    the bureaus to report anything in that field.  Okay?

4         So yeah.  Leave it right there for a second.  Did

5    you see anything where the "compliance condition"

6    field was populated?

7    A.   No, sir.

8    Q.   Okay.  Keep going down.  Let's stop right there.

9         Any compliance condition code being populated in

10   those fields?

11   A.   No, sir.

12   Q.   Okay.  But this time now, under "Special comments,"

13   Cenlar was reporting that there was a partial payment

14   agreement.  Right?

15   A.   Right.

16   Q.   Okay.  All right.  Let's keep scrolling down.  Okay.

17   Stop right there.

18        Any compliance condition codes being populated by

19   Cenlar to the bureaus?

20   A.   No.

21   Q.   Thank you.

22        Let's go down a little further.  Let's see if

23   there's any other ones in here.  I don't see any.  Do

24   you?  Stop.  Mr. Crawford, do you see any?

25   A.   No.

1    Q.    All right.  That's enough for this exhibit.  Let's

2          mark Exhibit 12 or show the witness Exhibit 12.

3                    (Exhibit 12 was introduced at this time.)

4    BY MR. LYONS, CONTINUING:

5    Q.    Okay.  This is the third and final dispute letter that

6          Cenlar received from the credit reporting agencies in

7          January of 2019.  Correct?

8    A.    I show a TransUnion dispute letter.

9    Q.    Right.  And then we know that there was an ACDV that

10         was filled out, because you all produced it in

11         discovery.  We can scroll down to the last two pages

12         of the document.  Yeah.  So here's the ACDV.  Scroll

13         up just a little further so he can see it's from

14         TransUnion.  Yep.

15               TransUnion, you see it?  You guys got it on

16         February 2nd, 2019.  Right?

17   A.    Yes, sir.

18   Q.    Okay.  And scroll down.  No -- okay.

19               This dispute code is different.  This one is a

20         110.  It says, "Claims company will change.  Verify

21         all account information."  Do you see that?

22   A.    I see the dispute code.

23   Q.    Okay.  And that's populated by the credit reporting

24         agency.  Correct?

25   A.    Right.

1  Q.  Okay.  And that's a specific instruction, right, to

2      the credit report analysts.  Right?  They know what to

3      do when they get those codes.  Right?

4  A.  Right.

5  Q.  Okay.  Now, we didn't look at any manual that tells

6      specifically what to do depending on the code, but I

7      think that Cenlar will be able to produce that

8      information.  I haven't seen it yet, but hopefully

9      that information will be coming.

10         But then down below, the "foreclosure initiated"

11     is the special comment code.  Right?  We see that in

12     the SCC field.  Correct?

13 A.  Correct.

14 Q.  And in the "compliance condition" field, Cenlar made

15     no change.  They just left it blank.  Right?

16 A.  It came blank.

17 Q.  It came blank.

18 A.  It was left blank.

19 Q.  Yep.  Cenlar left it blank after it came blank.

20     Right?

21 A.  It came blank and was left blank.

22 Q.  And then scrolling down, we see that this was

23     completed by Monique Cooper on 2/19/19, and there were

24     images attached.  Is that correct?

25 A.  Yes.

```
 1   Q.   And she made no changes to the May or June "account
 2        history" fields, and -- nor did she make any changes
 3        to the January, February, and May [sic], and April of
 4        2018 fields.
 5   A.   She re- -- she verified the status.  No changes were
 6        needed at that time.
 7   Q.   But she did make some changes to the payment -- to the
 8        account history.  Right?  She changed August of '18 to
 9        a 5.  She changed September -- Mr. Crawford, do you
10        see where I'm looking?  I'm sorry.  I didn't mean to
11        be obtuse.  So in August of 2018, Cenlar is then
12        reporting a 4, and Monique Cooper now changed it to a
13        5.  Right?
14   A.   Correct.
15   Q.   And then in September, it used to be a 4.  Then she
16        changed it to -- September of '18, she made it a 6.
17        Right?
18   A.   Right.
19   Q.   And in November of 2018, it had been a 4 just like in
20        December, and in both of those she changed them to a
21        6.  Right?
22   A.   Right.
23   Q.   And then in January, she had previously -- or Cenlar
24        had previously not been reporting, but now they wanted
25        a 6 in January of 2019.  Right?
```

```
 1   A.      In January of 2019, it's a 6.

 2                 MR. LYONS:  Yeah.  Okay.  Give me one sec.

 3           Okay.  Why don't we take a five-minute break?  Let me

 4           review my notes, and then we can see what's left.

 5           Okay?

 6                 MS. CUMMINGS:  Okay.  Sounds good.

 7                 (A recess was held at this time.)

 8                 MR. LYONS:  Let's go back on the record.

 9   BY MR. LYONS, CONTINUING:

10   Q.      So if we could pull back out Exhibit Number 1 and show

11           that to the witness.  Let's -- yeah.  Scroll down just

12           a little.

13              So, Mr. Crawford, you were put up today as the

14           corporate representative to discuss various topics.

15           Okay?  They're listed here.  I just want to go over a

16           couple of them with you and -- just real quickly.

17              So Topic Number 3 is, "Defendant's investigation

18           into the plaintiff's credit reporting disputes."  We

19           looked at the ACDVs, but you -- I think you've told me

20           that you didn't interview Barker or Cooper.  So you

21           don't really know what they did, other than just

22           looking at the ACDVs.  Correct?

23   A.      No, sir.  I'm familiar with the process that they go

24           through to review to make -- to review and update the

25           ACDV.
```

1  Q.   Okay.

2  A.   So it's the same thing that is done on each and every

3       loan, so it's more of a process rather than the

4       individual that is doing it.  You can ask the

5       individual for something that happened in 2017.  All

6       they can do is rely on the same notes and the same

7       record that was created.  That's how I'm able to

8       review and testify on behalf of that.

9  Q.   Right.  But if you can't answer about the compliance

10      condition code, you don't think they're going to be

11      able to answer about it either?

12 A.   Again, I'm not familiar with the compliance condition

13      code.  I did not see it on the report.  I did not take

14      a look into that, so...

15 Q.   Okay.  So there's certain things about the

16      investigation that you can't answer because you're --

17      you weren't them and you didn't do the investigation.

18      Right?

19 A.   I mean, like what?  For five, six days -- five, six

20      hours, I've answered your questions, so --

21 Q.   I wasn't --

22 A.   -- if there's a specific code, I'm not familiar with

23      the code, but if you have any additional questions, I

24      will, again, continue to answer the questions, best of

25      my knowledge.

1  Q.  Well, did -- can you answer this?  Do you know if

2      Barker or Cooper ever made a request for any documents

3      from any other source like loss mitigation or

4      executive -- the executive team or anybody like that?

5      Do you know if they did that?

6  A.  Based on the ACDVs, those documents, it was verifying

7      the account status and verifying payment.  So what

8      you're looking at is the payment history.  You're

9      looking at the notes.  You have copies of the trial

10     plan that shows that we're on a trial plan.  You have

11     the payment history that reflects the payments being

12     made.

13             Those are basic information that is needed that I

14     could have done the review based on the information

15     without seeking some other opinion or seeking

16     additional information.  You just have to verify when

17     a payment was received, what month it was for, when it

18     was applied, what is the due date.

19             You look at loss mitigation; was there any kind

20     of loss mitigation in place?  So those are the steps

21     you can go -- you look at foreclosure; is a

22     foreclosure workstation set up?  These are the

23     different steps within a certain platform and the

24     different screens that you go through to answer your

25     question.

1   Q.   Right.  But you -- but you didn't interview Cooper or

2        Barker, so you don't know what they did, what steps

3        they did.  Right?  You're assuming that they did these

4        things, but you don't know for sure, because you

5        haven't interviewed them.   Correct?

6   A.   I did not interview them, but that is the process.

7        You will review the loan history to match the

8        reporting that is done.

9   Q.   And so -- and to review the loan history, you've got

10       to go through Exhibit 4.  Right?  The consolidated

11       notes.

12  A.   That is just one of them.  You have different things

13       that you -- that you go through.  You have customer

14       service.  If there's a tax issue, you have different

15       things.  A loan history is the entire loan file that

16       you will review by entering the borrower name or the

17       loan number into the system and reviewing the system.

18            So if I was to get an ACDV and that's my work,

19       that is the -- my job, that is the process I will go

20       through for each and every loan that you get.  You

21       determine the dispute, and you --- and you review the

22       information to either verify or change it if there's a

23       dispute that is in place.

24  Q.   Okay.  So are you telling me that, in addition to the

25       notes that we looked at in Exhibit 4, right, because

1    you explained to me all the different notes that were

2    pulled from, you're telling me that loss mitigation

3    would not have been an important system note to look

4    at or not?

5  A.  No.  It's -- loss mitigation notes was in there.  The

6    loss mitigation was being handled by Bayview.  Bayview

7    handled the loss mitigation, and loss mitigation were

8    included in the consolidated notes.

9  Q.  Bayview's were, but not Cenlar's.  Right?

10  A.  Yeah.  Bayview was handling the loss mitigation.

11  Q.  So do you know whether there's any Cenlar loss

12    mitigation notes?

13  A.  It depends on the time frame.  In later years, there

14    are Cenlar loss mitigation notes, because the loan

15    came back from Bayview.  So depending on the time

16    frame would determine if there's a Cenlar loss

17    mitigation or if there's a Bayview loss mitigation.

18  Q.  Okay.  And then the notes, the NOTS, those are the

19    notes, the executive notes, and those weren't included

20    in Exhibit 4.  Right?

21  A.  It gets -- some of that could be included.  NOTS is

22    just somewhere where, if someone that is out -- it'd

23    be outside servicing, collection, you're outside a

24    different department, it's where you would just input

25    your notes that, if anyone else decided to look at the

 1      account, instead of looking around, you just go to

 2      NOTS, and it kind of accumulates all the notes.

 3   Q.  Okay.

 4   A.  But, again, some of those notes could be included in

 5      what was -- what was already in the consolidated

 6      notes.

 7   Q.  Right.

 8   A.  But it's a place that you can enter additional notes.

 9   Q.  Could have been, but we don't know, because we don't

10      have those.   Right?

11   A.  Again, you have it.  A report can be ran, but just

12      NOTS, to see what is included in there.

13   Q.  Okay.  Now, did you tell me -- I think we talked about

14      the FCRA -- so Number 7 on Exhibit 1, "The 'FCRA

15      relevant information' field and how, when, and why

16      defendant, if ever, has instructed its ACDV processors

17      on how and when to use it," I didn't see anything in

18      the manual, right, Exhibit 6, that we -- that your

19      counsel pointed out that talked anything about the

20      "FCRA relevant information" field.  Did you?

21   A.  The "FCRA relevant" field on an ACDV, that came with

22      something from the credit reports.  That is their

23      field of what they populated that different code that

24      they use.  So that's not part of this -- it's the

25      credit reporting agency part.

1   Q.   But you --

2   A.   So that's --

3   Q.   -- understand that that's -- or do you understand that

4        that is critical information that the credit reporting

5        agency is communicating to Cenlar related to the

6        dispute?  Or do you not understand that?

7   A.   I understand that is their coding.  You know, most

8        things you do, you have a drop-down box to enter the

9        code.  You select the appropriate drop-down box for

10       the appropriate dispute that is in front of you, and

11       that is the information that Cenlar would use to look

12       at to determine what is the issue.  Sometimes those

13       drop-down boxes are just broad, but you try to be as

14       specific as possible to identify the issues.

15  Q.   Do you think that the "FCRA relevant information"

16       field is a drop-down field that gets populated by the

17       credit reporting agencies?

18  A.   I -- that's -- I don't know what -- how they populate

19       that code, but looking at the ACDV, that is a report

20       where it has a dispute code, and it -- and you -- with

21       a dispute code, you have some -- just a short

22       diagnosis of the issue.

23  Q.   And we've talked about the compliance condition code.

24       You weren't sure about that.  I'll ask -- I'll take

25       that up with Barker and Cooper.  Okay.  Right?

1   A.   I'm not -- again, I'm not familiar with the compliance
2        condition code.
3   Q.   Okay.  And then the account notes, we talked about the
4        missing notes, the executive notes and loss mitigation
5        notes from Cenlar.  I think your counsel's going to
6        look for those and produce it.  That was Topic
7        Number 9.
8             Topic 10 is the policy and procedure manual.  The
9        only one I got was -- that pertains to ACDVs and the
10       operators and direct disputes and indirect disputes
11       was the Exhibit 6 that looked like it was incomplete
12       and it had been redacted.  Remember, we looked at
13       that.  Right?
14  A.   Yeah.  We've looked at some redacted copies.
15  Q.   Yeah.  And there's pages missing.  We only got up to
16       page 8 of 48.  Then we got a redacted page 24, and we
17       got some -- something on page 25, but we didn't get
18       the whole manual.
19            And then you and I talked about those maps at the
20       end of Exhibit 6 that had to do with direct and
21       indirect disputes, and then I pointed out to you that,
22       in the small print at the bottom, it told me that "the
23       maps are a broad overview.  Refer to the departmental
24       procedure for a more in-depth description," and I
25       don't think you knew whether or not that had been

1       produced.  Right?

2   A.  I don't know whether that was produced, sir.

3   Q.  Thank you.

4           Okay.  And then Number 11 on the screen, the

5       subscriber agreements with the credit reporting

6       agencies, that's -- you don't know anything about

7       those.  Right?  I don't think those were produced.

8   A.  I did not -- in my review, I did not see a subscriber

9       agreement.

10  Q.  And you're not prepared to testify about subscriber

11      agreements today.  Are you?

12  A.  Do you have any document?  I'm not sure what you're

13      referring to as a subscriber agreement.

14  Q.  So if I say "subscriber agreement with the credit

15      reporting agencies," you don't understand what that

16      means?

17  A.  No.  I don't -- I mean, I don't know what you mean

18      with the subscriber agreement.

19  Q.  Okay.  And you -- and like you said, you haven't seen

20      any subscriber agreements in your preparation for

21      today's deposition.  Correct?

22  A.  No.  I did not see a subscriber agreement.

23          MR. LYONS:  Okay.  And do you know -- so

24      Topic Number 12 on the next page, Madam Court

25      Reporter, if you can slide down, that's great.

 1   BY MR. LYONS, CONTINUING:

 2   Q.   "Audits or quality assurance reviews concerning

 3        defendant's responses to ACDVs with the credit

 4        reporting agencies," do you know if Cenlar has ever

 5        been audited by any credit reporting agency?  Did you

 6        do -- are you prepared to testify about that today?

 7   A.   I did not come across a copy of anybody's -- we are

 8        audited by the OCC and different agencies.  We have

 9        internal and external audits.

10   Q.   Okay.  And did you look specifically and inquire with

11        the credit department to find out if there are -- have

12        been audits by the credit reporting agencies?

13   A.   I am not familiar with any credit reporting -- any --

14        I reviewed for this specific -- no.  I'm not familiar

15        with any audit being done by the credit agencies.

16   Q.   Okay.  And so you're telling me that, specifically in

17        Number 12, you did some research and tried to find out

18        if there were audits done, and there aren't?

19   A.   No.  No, sir.  I did not say that.

20   Q.   Okay.  You haven't -- you didn't do any research to

21        find out if there were audits or quality assurance of

22        Cenlar by the credit reporting agencies.  Correct?

23   A.   I did not see any information regarding that.

24   Q.   Okay.  You're evading my question.  Let me ask it a

25        different way.  Did you or did you not conduct any

1    investigation into whether or not the credit reporting

2    agencies conducted audits or quality assurance reviews

3    concerning Cenlar's responses to ACDVs?

4  A.  I did see any report regarding that, sir.

5  Q.  And when you say you didn't see any report, did you --

6    where did you look to see the report?

7  A.  Our -- I looked within the loan history, within the

8    documents that were produced for production.

9  Q.  Okay.  You didn't go and ask credit.  You just looked

10    at what has already been produced in this case.

11 A.  That is correct.

12 Q.  Thank you.

13    Topic Number 13, "Defendant ACDV operators Barker

14    and Cooper, any employment history reviews, audits,

15    disciplines, warnings, or other critiques relating to

16    processing of ACDVs," did you do any of that research?

17 A.  I did not see any reports regarding them, sir.

18 Q.  Did you ask credit to pull any reports related to

19    those topics or related to any of those audits,

20    disciplines, warnings, critiques, history reviews of

21    Barker or Cooper?

22 A.  No, sir.  I did not -- the discipline report, that is

23    not something that I do know if there's one, and --

24    that they have one in their file, and that is not

25    something that I did come across.

1   Q.   Did you look at their employment files?

2   A.   I do not have access to the employment files.  That is

3        with HR.

4   Q.   So you did not make an inquiry to credit, to anybody

5        at credit, to find out if there are even these history

6        reviews, audits, disciplines, warnings, or other

7        critiques concerning processing of ACDVs for Barker or

8        Cooper.  You did not do that.  Correct?

9   A.   I cannot look into any individual history --

10       employment history files, sir.  So I don't have that.

11  Q.   Okay.  And you haven't requested that information from

12       credit, even to find out if that exists.

13  A.   That's information with HR, and that's not information

14       HR will release to me.

15  Q.   Okay.  And you didn't ask HR for it.  You just know

16       they won't give it to you.  Right?

17  A.   That -- sir, yeah.  That -- someone's personnel file

18       would not be provided to me.

19  Q.   And other than the e-mail addresses, you wouldn't know

20       any of the last known contact information for Barker

21       and Cooper.  Right?

22  A.   I don't understand the question.

23  Q.   Take a look at Number 15.  Do you know the last known

24       contact information for Barker and Cooper?

25  A.   What do you mean their last known information?

1   Q.   Do you know how to reach them?  Do you have their

2        telephone numbers?  Do you know where they live?  What

3        their addresses are?  Do you know any of that

4        information?

5   A.   Sir, that is someone's personal information.  I would

6        not have access to that.

7   Q.   Okay.  But you didn't ask anybody for it in

8        preparation for this deposition.  Correct?

9   A.   I would not ask anyone for someone's personal

10       information regarding a loan, sir.  That's their

11       personal information.

12  Q.   And you weren't prepared to answer that topic today.

13       Correct?

14  A.   I am -- I am prepared, but in preparation, as far as

15       someone's personal cell number, their home number, or

16       their address, that's not relevant to this loan, sir.

17       And that's someone's personal -- that's someone's

18       personal information that I would not request.

19  Q.   Okay.  So you didn't make the request for that, and

20       you're not prepared to discuss it today.  Correct?

21  A.   That is a request that is not needed, sir.  That is

22       someone's personal information.  It has nothing to do

23       with their job.  Their home address and their cell

24       phone has nothing to do with the job, and I did not

25       and I would not request that information.

```
1          MR. LYONS:  Okay.  Subject to the defendant

2     producing the documents that we have discussed today

3     on the record that have not yet been produced, and

4     subject to the topic areas that we just went over that

5     this witness -- that this witness cannot testify to,

6     the plaintiff reserves the right to recall this

7     witness or another witness to testify on those topics.

8          And so we will continue the deposition, but

9     for right now, sir, I appreciate your time today.  I

10    know it's been long, and it's difficult with this

11    platform to look at the documents, but I do appreciate

12    your patience, and I appreciate your time today.

13    Thank you.

14         THE WITNESS:  Thank you.

15         MR. LYONS:  Ms. Cummings, do you want to

16    provide notice to your witness?

17         MS. CUMMINGS:  I'm sorry.  I couldn't hear

18    you.  What did you say?

19         MR. LYONS:  Sure.  Do you want to advise the

20    witness of his rights?

21         MS. CUMMINGS:  I don't know what you're

22    talking about.

23         MR. LYONS:  Well, the witness has the right

24    to review the deposition.  I didn't know if you wanted

25    to advise him about those rights or not.
```

1          MS. CUMMINGS:  I'm sorry.  Usually the court

2     reporter does that at other depositions I've attended.

3          COURT REPORTER:  Would you like me to do

4     that?

5          MS. CUMMINGS:  That would be great.

6          COURT REPORTER:  Mr. Crawford, you have the

7     right, after the transcript has been finalized and

8     produced, to review it for accuracy.  There would be a

9     sheet attached at the end where you could correct

10    spellings or anything that you felt was taken down

11    incorrectly.  It's your choice whether you want to

12    read and then sign the deposition transcript or

13    whether you want to waive that and not take advantage

14    of that opportunity.  What would you like to do?

15         THE WITNESS:  Read and sign.

16         COURT REPORTER:  Thank you.

17                    - - - - -

18         (The videoconference 30(b)(6) deposition of

19    Raymond Crawford was adjourned at 4:25 p.m.)

20                    - - - - -

21         (The original deposition transcript of

22    Raymond Crawford was forwarded in a sealed envelope to

23    Attorney Thomas J. Lyons, Jr., who is to retain the

24    same until such time it can be filed.)

25                    - - - - -

1        I, the undersigned, Raymond Crawford, do hereby certify

2    that I have read the foregoing deposition transcript and

3    that, to the best of my knowledge, said deposition

4    transcript is true and accurate with the exception of the

5    following corrections listed below:

6

7    PAGE    LINE         CORRECTION                    REASON

8    ____    ____      _____        _____

9    ____    ____      _____        _____

10   ____    ____      _____        _____

11   ____    ____      _____        _____

12   ____    ____      _____        _____

13   ____    ____      _____        _____

14   ____    ____      _____        _____

15   ____    ____      _____        _____

16   ____    ____      _____        _____

17   ____    ____      _____        _____

18   ____    ____      _____        _____

19

20                               _____
                                 Raymond Crawford

21                               _____
                                 DATED

22
     Subscribed and sworn to
23   before me on this _____ day
     of _____, 2020.

24
     _____
25   Notary Public

STATE OF MINNESOTA

COUNTY OF DAKOTA                              CERTIFICATE

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

    I hereby certify that I reported the videoconference
30(b)(6) deposition of Raymond Crawford and that the
witness was by me first duly sworn to tell the whole truth;

    That I was then and there a Notary Public in and for
the County of Dakota, State of Minnesota, authorized to
perform remote notarial acts;

    That the testimony was transcribed by me and is a true
record of the testimony of the witness to the best of my
ability;

    That the cost of the original has been charged to the
party who noticed the deposition, and that all parties who
ordered copies have been charged at the same rate for such
copies;

    That I am not a relative or employee or counsel of any
of the parties or a relative or employee of such attorney
or counsel;

    That I am not financially interested in the action and
have no contract with the parties, attorneys, or persons
with an interest in the action that would affect my
impartiality;

    That the right to read and sign the deposition by the
witness was not waived.

    WITNESS MY HAND AND SEAL this 27th day of July, 2020.




                    /s/ Ryan Ziegler
                    Ryan Ziegler, RPR
                    My commission expires January 31, 2022.