# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KIMYA D. GREEN,**

    Plaintiff,

v.                                           Case No. 19-CV-1555

**CENLAR FSB,**

    Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Kimya D. Green sues Cenlar FSB for alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* arising from a mortgage loan Green originally obtained in 2013. Green alleges that Cenlar failed to conduct a reasonable investigation into disputed information reported to the three major credit bureaus (TransUnion, Experian, and Equifax), negatively impacting her credit score and emotional well-being. The parties have filed cross-motions for summary judgment. Green moves for partial summary judgment, asking the Court to find Cenlar liable for violations of the FCRA (Docket # 33.) Cenlar moves for summary judgment dismissing Green's complaint and entering judgment in its favor. (Docket # 29.) For the reasons explained below, Green's motion for partial summary judgment is denied and Cenlar's motion for summary judgment is granted.[1]

---

[1] Cenlar also moves to strike the affidavits of Denisse De Los Reyes (Docket # 40), Tanya Wiedenhoeft (Docket # 50), Sannia Green, Aubrey Gomez, Veronica Neumann (Docket # 52), and Jon Stanek (Docket # 58). I do not find these affidavits relevant to disposition of the issues on summary judgment. Thus, these motions are denied as moot.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## UNDISPUTED FACTS

Kimya Green executed a note and mortgage ("the loan") to Mortgage Electronic Registration Systems, Inc. as Nominee for A & N Mortgage Services, Inc. on October 17, 2013 and promised to pay the principal balance of $131,081.00 plus interest payable in accordance with the terms and provisions of the note and mortgage. (Def.'s Proposed Findings of Fact ("DPFOF") in Supp. of Summ. Judg. ¶ 1, Docket # 31 and Pl.'s Resp. to DPFOF ¶ 1, Docket # 44.) The loan is secured by a multi-unit property located in Milwaukee. (*Id.* ¶ 2.) Green defaulted on the loan in 2015. (Pl.'s Proposed Findings of Fact ("PPFOF") in Supp. of Partial Summ. Judg. ¶ 2, Docket # 36 and Def.'s Resp. to PPFOF ¶ 2, Docket # 46.) Lakeview Loan Servicing, LLC acquired the servicing rights while the loan was in default (*id.*) and Cenlar began sub-servicing the loan (*id.* ¶ 4).

On September 19, 2013, DEM Investments, LLC filed a UCC Financing Statement against Green's accounts receivables related to a loan that was repaid. (Declaration of Thomas J. Lyons ("Lyons Decl.") ¶ 15, Ex. 14, Docket # 35-14.) The UCC Financing Statement was filed with the Wisconsin Department of Financial Institutions but was not filed with the Milwaukee County Register of Deeds and had nothing to do with the mortgaged property. (*Id.*)

In February 2017, Green paid Cenlar $28,700.29 to reinstate the loan. (*Id.* ¶ 6.) Bayview Loan Servicing provided loss mitigation services for Cenlar. (Deposition of Raymond Crawford ("Crawford Dep.") at 35, Ex. 1 to Lyons Decl., Docket # 35-1.) Green received a letter dated March 15, 2017 from Bayview Loan Servicing offering her a trial period plan ("TPP") under the FHA Home Affordable Modification Program ("HAMP"). (PPFOF ¶ 7 and Def.'s Resp. ¶ 7.) The letter stated as follows, in relevant part:

3

> To accept this offer, you must execute and return a signed agreement with before the first payment due date, and make a new monthly payment of $1,157.31 for the next 3 months of the trial period. The original or a copy of the signed agreement should be mailed to: Bayview Loan Servicing, LLC, Loan Workout Department, 1415 West Cypress Creek Road, Suite 200 Ft. Lauderdale, FL 33309 or sent via fax to Loan Workout Department, (305) 280-1477. This payment is due on the first day of each month. Your first payment is due 04/01/2017, your second payment is due 05/01/2017 and your third payment is due 06/01/2017. Send these payments instead of your normal monthly mortgage payment.
>
> ***
>
> **How Do I Get Permanent Modification?**
> You must make all of your trial period payments by their due dates; if you do not make each of your trial period payments in the month which it is due, your loan will not be modified under the FHA HAMP Modification Program.

(Lyons Decl. ¶ 11, Ex. 10, Docket # 35-10.) The letter stated the following regarding credit reporting:

> **Credit Reporting:** Please note that if you are delinquent, we will continue to report the delinquency status of your loan to credit reporting agencies as well as your entry into a Trial Modification in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association requirements. **CREDIT SCORING COMPANIES GENERALLY CONSIDER THE ENTRY INTO A PLAN WITH REDUCED PAYMENTS AS AN INCREASED CREDIT RISK. AS A RESULT, ENTERING INTO A PLAN WITH REDUCED PAYMENTS MAY ADVERSELY AFFECT YOUR CREDIT SCORE, PARTICULARLY IF YOU ARE CURRENT ON YOUR MORTGAGE OR OTHERWISE HAVE A GOOD CREDIT SCORE.** For more information about your credit score please go to: http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.
>
> You acknowledge that this offer of a trial period plan is not a guarantee, promise, or contract by the Lender that your loan will be modified. Your timely trial payments are but one factor of many for consideration by the Lender.

(*Id.*) Green signed the TPP document on March 20, 2017. (*Id.*) Green made the three TPP payments due on April 1, 2017, May 1, 2017, and June 1, 2017. (Affidavit of Diane McCormick ("McCormick Aff.") ¶ 15, Docket # 30-1.) Bayview sent Green a letter dated June 23, 2017, stating that upon receiving a title report for the secured property in connection with her TPP application, two "clouds" appeared on the title: (1) a judgment in Milwaukee County against Kimberly Green in the amount of $550.00 recorded on August 2, 2005 and (2) the September 19, 2013 UCC Financing Statement. (McCormick Aff. ¶ 15, Ex. D, Docket # 30-1.) Green was informed that these clouds needed to be cleared before

4

her loan could be modified. (*Id.*) Green contacted Bayview on July 5, 2017 and confirmed that her name was not "Kimberly Green." (PPFOF ¶ 12 and Pl.'s Resp. ¶ 12.) Bayview noted that Green stated that she spoke to the City and there was no such lien. (Crawford Dep. at 37.) Green was told that Bayview would request a new title report. (*Id.* at 37–38.)

In November 2017, Bayview sent Green another letter after receiving the updated title report. (McCormick Aff. ¶ 16, Ex. E, Docket # 30-1.) This letter indicated that the "Kimberly Green" judgment was resolved; however, the UCC Financing Statement was still listed as a cloud on the property's title that needed to be cleared prior to loan modification. (*Id.*) Green received an additional letter from Bayview, dated December 5, 2017, again informing her about the UCC Financing Statement cloud. (McCormick Aff. ¶ 17, Ex. F, Docket # 30-1.) Green received a letter from Bayview, dated December 14, 2017, stating that she was ineligible for a loan modification because of the unresolved cloud on her title. (McCormick Aff. ¶ 18, Ex. G, Docket # 30-1.)

Cenlar sent Green a letter dated December 15, 2017, stating that she was in default under the terms of her mortgage. (McCormick Aff. ¶ 19, Ex. H, Docket # 30-1.) Green was sent an additional letter dated December 29, 2017, stating again that she was in default and that she could cure the default by sending $4,004.16 by February 2, 2018. (McCormick Aff. ¶ 20, Ex. I, Docket # 30-1.)

On January 16, 2018, Green sent Cenlar a letter as follows:

5

> To whom it may concern:
>
> For some reason, your records are different than those of Bayview Loan Servicing so I have included copy of my bank records to illustrate that I have not missed one payment with Bayview Loan Servicing. As procedure, I have to contact them every month to trigger the ACH occurrence of $1,157.31. For some reason, your company (Cenlar Central Loan Administration & Reporting) has me as being in arrears when I am in fact current. This has ADVERSELY affected my credit score and I would greatly appreciate a prompt update of your records, as well as what is reported to the 3 credit reporting agencies.
>
> Please contact me by either telephone at [redacted] or by mail 3781 North 60th Street, Milwaukee, WI 53216 should you need any further information or if I may answer any questions. Thank you in advance for your prompt attention to this matter.

(Lyons Decl ¶ 14, Ex. 13, Docket # 35-13.) Green included bank statements indicating loan payments made monthly from April 2017 to December 2017 in the amount of approximately $1,157.31. (*Id.*) Cenlar sent Green a letter dated January 26, 2018 stating that it had not received the mortgage payments for November 2017, December 2017, and January 2018. (McCormick Aff. ¶ 21, Ex. J, Docket # 30-1.) Green was sent an additional letter dated February 13, 2018 stating that she was in default and informing her that she could cure the default by paying $4,004.16 by March 20, 2018. (McCormick Aff. ¶ 22, Ex. K, Docket # 30-1.) Cenlar sent Green additional letters informing her that her loan was delinquent on February 15, 2018, April 4, 2018, April 6, 2018, May 16, 2018, May 22, 2018, June 13, 2018, and June 19, 2018. (McCormick Aff. ¶ 23, Ex. L, Docket # 30-1.)

Cenlar sent Green letters dated July 3, 2018 and July 30, 2018, returning checks dated June 27, 2018 and July 30, 2018, each in the amount of $1,634.25 because the funds were insufficient to bring the loan current. (McCormick Aff. ¶ 24, Ex. M, Docket # 30-1.) Green was sent a letter dated September 28, 2018, returning funds in the amount of $4,002.00 as insufficient to bring the loan current and informing her that the account had been referred to an attorney to bring a foreclosure action. (*Id.*)

Green contacted TransUnion, Experian, and Equifax (the "credit bureaus") on November 7, 2018 to dispute late notations from Cenlar on her credit report for January through April 2018. (McCormick Aff. ¶ 25, Ex. N, Docket # 30-1.) Green provided documentation showing the following payments:

- $1,339.72 on January 18, 2018;
- $1,339.72 on February 14, 2018;
- $1,334.72 on March 24, 2018; and
- $1,634.25 on April 27, 2018.

(*Id.*) Cenlar was alerted to Green's disputes by the credit bureaus between November 16, 2018 and November 21, 2018. (McCormick Aff. ¶ 26.) Cenlar responded to Green's disputes on December 6, 2018. (McCormick Aff. ¶ 26, Ex. O, Docket # 30-1.) Green initiated a second dispute with the credit bureaus on January 21, 2019. (McCormick Aff. ¶ 27, Ex. P, Docket # 30-1.) Green stated that her credit report now incorrectly showed late payments for January through April 2018, no data for May and June 2018, and late payments for July through September 2018. (*Id.*) Green provided receipts for payments made in January through June 2018. (*Id.*) Cenlar received notice of Green's second dispute with the credit bureaus between January 30, 2019 and February 3, 2019 and responded on February 19, 2019. (McCormick Aff. ¶ 28, Ex. Q, Docket # 30-1.) Green has not been denied a loan or credit since December 2017. (DPFOF ¶ 23 and Pl.'s Resp. ¶ 23.)

## ANALYSIS

Green alleges in her complaint that Cenlar both willfully and negligently violated its duties under 15 U.S.C. § 1681s-2(b) by "failing to conduct a reasonable investigation with respect to the disputed information and failing to update and/or remove the inaccurate account history or, in the alternative, to report the account as 'disputed' by changing the

Metro II CCC to 'XB.'" (Compl. ¶ 49.) Section 1681s-2(b) addresses the duties of furnishers of credit information upon receiving notice from a consumer reporting agency that a consumer disputes the completeness or accuracy of any of the information the furnisher provided to the consumer reporting agency. Section 1681n provides consumers with a claim for willful violations of the FCRA, while Section 1681o does the same as to negligent violations. 15 U.S.C. § 1681n, 15 U.S.C. § 1681o. Green alleges that Cenlar violated the FCRA in two ways: (1) by failing to conduct a reasonable investigation into her November 2018 and January 2019 payment history disputes pursuant to § 1681s-2(b)(1)(A) (Pl.'s Br. in Opp. Summ. Judg. at 11–12, Docket # 41) and (2) by failing to either remove the inaccurate account history or mark the account disputed pursuant to § 1681s-2(b)(1)(C) and (D) (Pl.'s Br. in Supp. of Partial Summ. Judg. at 13–14, Docket # 34). I will address each argument in turn.

    1. *Failure to Conduct a Reasonable Investigation - 15 U.S.C. § 1681s-2(b)(1)(A)*

Green alleges that Cenlar violated the FCRA when it allegedly failed to conduct a reasonable investigation of her November 2018 and January 2019 payment history disputes. (Docket # 41 at 11–12.) Under the FCRA, "when a credit-reporting agency notifies a debt collector of a disputed debt, the debt collector (called a 'furnisher' under the statute) must 'conduct an investigation with respect to the disputed information.'" *Walton v. EOS CCA*, 885 F.3d 1024, 1028 (7th Cir. 2018) (quoting 15 U.S.C. § 1681s-2(b)(1)(A)). Although the language of the statute does not expressly require it, courts have concluded that the statute should be read as requiring a reasonable investigation. *Scheel-Baggs v. Bank of Am.*, 575 F. Supp. 2d 1031, 1039 (W.D. Wis. 2008). Generally, the question of an investigation's reasonableness is one reserved for the jury. *Jensen v. Peoples Gas Light & Coke Co.*, No. 04 C

8

2945, 2005 WL 2007123, at *3 (N.D. Ill. Aug. 16, 2005). However, "'summary judgment is proper if the reasonableness of the defendant's procedures is beyond question.'" *Walton*, 885 F.3d at 1028 (quoting *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)).

In *Westra*, a credit furnisher received an Automated Credit Dispute Verification ("ACDV") form from TransUnion with a dispute code indicating that the consumer was disputing the charge on the basis that the account did not belong to him. 409 F.3d at 827. It did not include any information about possible fraud or identity theft. *Id.* The court held that the credit furnisher's investigation (consisting of verifying the consumer's name, address, and date of birth) was reasonable as a matter of law "given the scant information it received regarding the nature of Westra's dispute." *Id.* While the plaintiff argued that the credit furnisher should have contacted him directly about the disputed account, the *Westra* court stated:

> While that would have undoubtedly helped matters in the instant case, requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA. As such, the fact that Credit Control did not contact Westra does not make their investigation unreasonable.

*Id.* As such, "*Westra* makes clear that the information a credit furnisher receives about a dispute determines how extensive an investigation must be to be considered reasonable." *Jensen*, 2005 WL 2007123, at *3.

At issue in this case is Cenlar's investigation of two disputes Green initiated with the credit bureaus in November 2018 and January 2019. On November 7, 2018, Green sent letters to the credit bureaus disputing late notations from Cenlar for January through April 2018, reporting the payments as 90 days late. (McCormick Aff. ¶ 25, Ex. N, Docket # 30-1

9

at 65.) Green states that the "late notations are in error because [she] made these payments on time" and enclosed bank statements and receipts showing the following payments made:

- $1,339.72 made on January 18, 2018;
- $1,339.72 made on February 14, 2018;
- $1,334.72 made on March 24, 2018; and
- $1,634.25 made on April 27, 2018.

(Docket # 30-1 at 65–86.) Marquita Barker, a credit reporting analyst for Cenlar, testified that she received and responded to the ACDV associated with Green's November 2018 dispute. (Deposition of Marquita Barker ("Barker Dep.") at 7, 36–63, Docket # 30-4.) Although Barker testified that she could not specifically remember processing Green's ACDV forms (*id.* at 50), she testified that her standard procedure when a consumer disputes late payments is to pull the customer's payment history information and reconcile the effective date of the payment to make sure it was applied in a timely manner (*id.*).

In January 2019, Green again submitted disputes with the credit bureaus, disputing the late payment notifications for January through April 2018, no data for May and June 2018, and late payments for July through September 2018. (McCormick Aff. ¶ 27, Ex. P, Docket # 30-1.) Green again included bank statements and checks showing payments made from January through June. (*Id.*) This dispute was addressed by Monique Cooper, a third-party operational credit analyst for Cenlar. (Deposition of Monique Cooper ("Cooper Dep.") at 7, 21, Docket # 30-5.) Cooper similarly could not specifically remember processing Green's ACDV, but testified that she would typically look at the documents the consumer provided and compare that to the information shown in Cenlar's computer system. (*Id.* at 29–40.)

Green does not dispute that Cenlar maintains detailed written procedures that set forth the manner in which Cenlar responds to consumer disputes received from the credit bureaus (Pl.'s Resp. to DPFOF ¶ 19) and that Cenlar trains its employees on handling customer disputes (*id.* ¶¶ 20–22). Green argues, however, that Cenlar's procedures are inadequate.

Green argues the Cenlar's responses to the ACDVs are "nonsensical," further supporting the unreasonableness of its investigation. (Docket # 34 at 12.) For example, Green argues that Cenlar could not "explain why or how [Green] could go from zero to 120+ days delinquent in one month and why they verified it even after being confronted with the documents provided . . . showing regular monthly payments." (*Id.* at 13.) Green also argues that Barker provided inconsistent responses to the credit bureaus, for example, she added the code "BO" to TransUnion's response, indicating that the loan was in foreclosure, but did not add the code to her responses to Equifax and Experian. (*Id.*)

Again, whether a defendant's investigation is reasonable depends on the information it receives regarding the dispute. In both the November 2018 and January 2019 dispute letters, Green disputes the reporting of the timeliness of her payments. Thus, Cenlar's obligation was to investigate whether Green's payments from January through September 2018 (the dates identified by Green) were timely made. In her November 2018 dispute letter, Green challenged the late notations for payments made in January through April 2018. After receiving Green's ACDVs, Barker did not change the account history notations (of 90 days late) for any of those months with any of the credit bureaus. (McCormick Aff. ¶ 26, Ex. O.) In her January 2019 dispute letter, Green challenged the late notations for payments made in January through September 2018. After receiving Green's second ACDVs, Cooper

11

only made one correction for the months at issue. The TransUnion report was only showing Green's July, August, and September 2018 payments as 120 days late, while Equifax and Experian were showing those three months as 120, 150, and 180 days late, respectively. (McCormick Aff. ¶ 28, Ex. Q.) Cooper modified the TransUnion report to make it consistent with the other two credit bureau reports—changing July, August, and September 2018 to show payments 120, 150, and 180 days late, respectively. (*Id.*)

While Green argues that Cenlar's reporting of the days late was "nonsensical" and argues that Cenlar's agents could not explain why or how one could go from nondelinquent one month to 90 days delinquent the next month (Docket # 34 at 13), both Barker and Cooper (though unable to specifically recall Green's case), offered explanations as to how that could happen. For example, Barker testified as follows:

> Q: So when I look at this, it goes from December of '17 being a zero, meaning current, and then in January of 2018, we got to 90 days past due. . . Does that make sense to you?
>
> A: Yes. I have seen this in many cases where the payments have gotten returned. And once we get ready to report again, if it's multiple payments that were returned on the account, it can possibly have a zero, yes, for December. And once January reporting occurs, the account was delinquent for that time or how many payments were returned.

(Barker Dep. at 48–49.) Cooper similarly testified that she has seen accounts go from current in one month to 90 days delinquent the next month, and offered possible explanations as to why. (Cooper Dep. at 28–29.) But Green's critique of Cenlar's reporting of exactly how many days delinquent her account was during those months is irrelevant to her claim. Green does not assert that she suffered damages because Cenlar reported her account 90 days delinquent as opposed to 30 or 60 days delinquent. Green argues that her account was *not* delinquent because she continued to make monthly payments. As such, Green reasons

12

that any report to the credit bureaus that she was delinquent on her payments was inaccurate as a matter of law. (Docket # 34 at 13–14.)

But the record evidence indisputably shows that Green's account *was* delinquent from January 2018 onward. Green asserts that she was diligently pursuing a loan modification and "was in fact entitled to a permanent modification" in 2017. (Pl.'s Reply Br. in Supp. of Partial Summ. Judg. at 4, Docket # 56.) In reality, Green was offered a TPP under HAMP on March 15, 2017 (PPFOF ¶ 7), which she signed on March 20, 2017 (Lyons Decl. ¶ 11, Ex. 10). The TPP agreement stated that Green must make three timely payments of $1,157.31 in April, May, and June 2017 and that she could make these reduced payments instead of her normal mortgage payment. (PPFOF ¶ 8.) It is undisputed that Green timely made these three payments (Lyons Decl ¶ 14, Ex. 13, Docket # 35-13); however, this did not "complete the TPP," as Green claims (PPFOF ¶ 9), entitling her to a permanent loan modification.

While the TPP stated that making these three payments was a condition to receiving a loan modification (Lyons Decl. ¶ 11, Ex. 10) ("[I]f you do not make each of your trial period payments in the month which it is due, your loan will not be modified under the FHA HAMP Modification Program."), even with successful payment, receiving a loan modification was "not a guarantee" (*id.*). Instead, the TPP stated that "timely trial payments are but *one factor of many* for consideration by the Lender," in determining whether to modify the loan. (*Id.*) (emphasis added).

Another factor the lender considered was whether there were any clouds on the property's title. As Cenlar's employee Raymond Crawford testified, a property cannot be sold without clear title. (Crawford Dep. at 57–58.) After successfully making the initial three

13

TPP payments, Green received a letter dated June 23, 2017 alerting her to two clouds appearing on her property's title report (the "Kimberly Green" judgment and the UCC Financing Statement) that needed to be cleared before the loan could be modified. (McCormick Aff. ¶ 15, Ex. D.) Green contacted Cenlar and cleared up the "Kimberly Green" judgment cloud. (PPFOF ¶ 12 and Pl.'s Resp. ¶ 12.) A new title report was requested and the "Kimberly Green" judgment no longer appeared on the title report. (McCormick Aff. ¶ 16, Ex. E.) However, the UCC Financing Statement still clouded the property's title and Green was alerted to this in November 2017 (*id.*) and again on December 5, 2017 (McCormick Aff. ¶ 17, Ex. F). Green argues that this cloud was incorrect because the UCC Financing Statement did not impact the property at issue and had been satisfied years earlier (Pl.'s Resp. to DPFOF ¶ 4) and that the "details about the title report and UCC Financing Statement were withheld from [Green] during the loan modification process" (PPFOF ¶ 34). Green argues that had she received the title report in 2017, "the matter could have been quickly resolved." (PPFOF ¶ 35.)

But the evidence does not support Green's assertion that information regarding the UCC statement was withheld from her during the course of the loan modification process. Green received multiple notices between June and December 2017 regarding the UCC Financing Statement clouding her property's title and Green herself testified that she was informed that there was a UCC Financing Statement showing up on the title. (Deposition of Kimya Green ("Green Dep.") at 27, Docket # 30-3.) Thus, Green had ample opportunity to clear this title cloud, as she did with the "Kimberly Green" judgment.

Green's current assertion that the UCC Financing Statement cloud was incorrect is irrelevant to Cenlar's December 2017 loan modification decision. Green does not assert that

14

Cenlar somehow manufactured this cloud on her title; it merely acted on the information found in the title report. And without a clear title, Green's loan modification was denied on December 14, 2017. (McCormick Aff. ¶ 18, Ex. G.) The TPP agreement Green signed clearly stated that her current loan documents remained in effect, even while Green made the reduced TPP payments. (Lyons Decl. ¶ 11, Ex. 10.) Thus, without the permanent modification in place, Green was in default, as was communicated to her on December 15, 2017. (McCormick Aff. ¶ 19, Ex. H.) Green was told in February 2018 that she could cure the default by paying $4,004.16 by March 20, 2018 (McCormick Aff. ¶ 22, Ex. K); however, Green only paid $2,679.44 by that date ($1,339.72 on January 18, 2018 and $1,339.72 on February 14, 2018) (McCormick Aff. ¶ 25, Ex. N). Green does not dispute that she failed to pay the difference between her required mortgage payments and the TPP payments (Response to Interrogatory No. 21, Ex. 6, Docket # 30-6.) Thus, even though Green continued to make payments towards her loan in 2018, the amounts were insufficient to bring her mortgage current. Green was informed of this in eleven letters between February and September 2018. (McCormick Aff. ¶¶ 22–24, Exs. K, L, and M.) In other words, Green presents no evidence that her mortgage loan has been current since her permanent modification was denied in December 2017. And in fact, the evidence indicates that Green's loan was delinquent since January 2018.

Given this record evidence, it is unclear how Cenlar erred in its investigation of Green's November 2018 and January 2019 disputes. Green alleged that her continued monthly payments made it inaccurate to report her loan as not current. But even with these continued payments, it was insufficient to bring her loan current. This was communicated to Green in multiple letters. Thus, even assuming Cenlar's general investigation processes

15

are somehow inadequate, as Green asserts, in Green's specific situation, it is unclear how a different process would have affected how the loan was reported. For these reasons, Green fails to put forth evidence showing that Cenlar violated § 1681s-2(b)(1)(A). Thus, Green's motion for partial summary judgment is denied and Cenlar's motion for summary judgment is granted.

  2. *Failure to Mark Account Disputed - 15 U.S.C. § 1681s-2(b)(1)(C), (D)*

Green also argues that Cenlar violated the FCRA by failing to mark the account as disputed. Section 1681s-2(b)(1)(C) requires the furnisher to report the results of its investigation to the consumer reporting agency and § 1681s-2(b)(1)(D) requires the furnisher to report any "incomplete or inaccurate" information uncovered from the investigation to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis. Because I already found that Cenlar did not report inaccurate information to the credit bureaus, the issue is whether Cenlar's failure to mark the account as disputed violates its obligation under § 1681s-2(b)(1)(D) to report complete information. Reporting a debt without reporting its disputed nature can be deemed "incomplete or inaccurate" as a matter of law in certain circumstances. *Scheel-Baggs*, 575 F. Supp. 2d at 1039 (citing *Saunders v. Branch Banking and Trust Co. of VA*, 526 F.3d 142, 148–49 (4th Cir. 2008)). The "ultimate question" is "whether failing to report the dispute is 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect.'" *Id.* (quoting *Saunders*, 526 F.3d at 150). In *Scheel-Baggs*, the court reasoned that to determine whether an omission is misleading, "a court must take into account § 1681s–2(b)(1)(E), which is the only part of the statute that addresses the issue of disputes." *Id.* Section 1681s–2(b)(1)(E) states that when: "an item of

16

information is disputed by a consumer," the furnisher of information must modify, delete, or block the disputed information if it "is found to be inaccurate or incomplete or cannot be verified after any reinvestigation." § 1681s–2(b)(1)(E). "In other words, once a disputed piece of information has been verified by an investigation, § 1681s–2(b) imposes no further obligation." *Scheel-Baggs*, 575 F. Supp. 2d at 1039. The court concluded that the question of whether the furnisher of information was required to report the dispute "is subsumed within the question whether it conducted a reasonable investigation." *Id.*

The situation the Fourth Circuit faced in *Saunders* clearly illustrates when failure to mark an account disputed could be misleading to the extent it could have an adverse effect on the consumer. In *Saunders*, the plaintiff purchased a vehicle and the loan was assigned to BB&T. After experiencing problems with the car, plaintiff traded it in for a new vehicle. The dealership paid the remaining debt on the original loan, leaving plaintiff with *no* obligation under that loan. The dealership then assigned the loan for the second car to BB&T. When plaintiff did not receive a payment book for the new car, he called BB&T. BB&T told him that he owed no money on any loan. Plaintiff received documents from BB&T showing he owed nothing on the loan. Plaintiff went to the DMV and found no lien on the car's title. Plaintiff contacted BB&T several more times and each time he was told he owed no money.

Several months later, plaintiff received a letter from BB&T telling him that his payments were "seriously delinquent," that he was in default, and that he owed over $20,000 in principle, interest, and late fees. As it turned out, BB&T failed to record the second loan on its books for several months and only learned of the loan because plaintiff kept calling to pay down the loan. After the car was repossessed, the plaintiff tried to secure

17

a different loan in order to pay off BB&T, but he was turned down for the loan because his credit score had dropped 155 points and his loan was reported as in repossession status.

When plaintiff initiated a dispute with TransUnion, who then issued a ACDV to BB&T, BB&T failed to indicate that plaintiff was disputing the legitimacy of the debt. The *Saunders* court found that a consumer report that contains technically accurate information may be deemed "inaccurate" if the statement is presented in such a way that it creates a misleading impression. 526 F.3d at 148. In *Saunders*, the failure of BB&T to note the plaintiff's dispute was clearly misleading and caused plaintiff harm—BB&T was holding plaintiff responsible for failing to pay a debt after acknowledging that it was BB&T's error that caused plaintiff to not make his payments. Plaintiff was then unable to secure a loan to pay off BB&T because of the incomplete information BB&T provided to the credit bureaus.

Green's situation is a far cry from *Saunders*. As stated above, given that Cenlar was not reporting inaccurate information to the credit bureaus, it is entirely unclear how its failure to report Green's accounts as disputed creates a materially misleading impression that could be expected to have an adverse effect on her. For these reasons, Green's motion for partial summary judgment is denied and Cenlar's motion for summary judgment is granted.

## CONCLUSION

Green alleges that Cenlar violated § 1681s-2(b) of the FCRA by failing to conduct a reasonable information as to information she disputed on her credit report and failing to report her account as disputed. Although Green argues that her loan was never in default, the record evidence shows that she was denied a loan modification and upon denial, her loan was in default. Despite continuing to make monthly payments, Green never brought

18

her loan current. All of Green's allegations of harm rely on an assumption that Cenlar furnished inaccurate information about her loan. As the information was not, in fact, inaccurate, Green cannot show that Cenlar violated the FCRA. For these reasons, Green's motion for partial summary judgment is denied and Cenlar's motion for summary judgment is granted. This case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment (Docket # 29) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for partial summary judgment (Docket # 33) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendant's motions to strike (Docket # 40, Docket # 50, Docket # 52, and Docket # 58) are **MOOT**.

**FINALLY**, the clerk of court is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of April, 2021.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge